THE O'MARA LAW FIRM, P.C.
WILLIAM O. O'MARA  (Nevada Bar No. 0837)
DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV  89501
Telephone:  775/323-1321
775/323-4082 (fax)

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
JOSEPH F. RUSSELLO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) | No. |
| | CLASS ACTION |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| INTERNATIONAL GAME TECHNOLOGY, THOMAS J. MATTHEWS, PATRICK W. CAVANAUGH and DANIEL R. SICILIANO, ) ) ) ) | |
| Defendants. ) ) | |
| ) | DEMAND FOR JURY TRIAL |

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by International Game Technology ("IGT" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of purchasers of the common stock of IGT between November 1, 2007 and October 30, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

4.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6.    Plaintiff International Brotherhood of Electrical Workers Local 697 Pension Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of IGT during the Class Period and has been damaged thereby.

7.    Defendant IGT is a Nevada corporation whose principal executive officers are located at 9295 Prototype Drive, Reno, Nevada 89521.  IGT is a global gaming company that specializes in the design, manufacture, and marketing of electronic gaming equipment and network systems, as well as licensing and services, in North America and internationally.  IGT reports the results of its operations in two business segments:  North America, which consists of operations in the U.S. and Canada, comprising 76% of consolidated revenues in fiscal 2008, 77% in 2007, and 79% in 2006; and International, which encompasses the remainder of operations worldwide, comprising 24% of consolidated revenues in fiscal 2008, 23% in 2007, and 21% in 2006.  In addition, the Company has two revenue streams within each business segment:  gaming operations, which generate recurring revenues by providing customers with proprietary gaming equipment and network systems, as well as licensing, services and component parts; and product sales.  IGT's common stock is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "IGT."

8.    (a)    Defendant Thomas J. Matthews ("Matthews") served as IGT's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors during the Class Period. He later resigned as President and CEO but remained as Chairman.

(b)    Defendant Patrick W. Cavanaugh ("Cavanaugh") served as IGT's Vice President of Corporate Finance and Investor Relations during the Class Period.  In addition, during the Class Period, Cavanaugh oversaw certain forecasting and transactional activities.  He was later named as the Company's Chief Financial Officer.

(c)    Daniel R. Siciliano ("Siciliano") served as IGT's Interim Principal Financial Officer, Chief Accounting Officer and Treasurer during the Class Period.

(d)    Defendants Matthews, Cavanaugh and Siciliano are collectively referred to herein as the "Individual Defendants," and, together with IGT, as the "Defendants."

9.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of IGT, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business,

operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with IGT, each of the Individual Defendants had access to the adverse undisclosed information about IGT's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded)

that these adverse facts rendered the positive representations made by or about IGT and its business issued or adopted by the Company materially false and misleading.

13.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IGT common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding IGT's business, operations, management and the intrinsic value of its common stock; (ii) enabled certain of the Individual Defendants and other IGT insiders to sell nearly $29 million of their personally held common stock to the unsuspecting public; and (iii) caused plaintiff and other shareholders to purchase IGT common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the common stock of IGT during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IGT common shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IGT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IGT; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS[1]

21.    The Class Period commences on November 1, 2007.  On that date, IGT issued a press release announcing its financial results for its fourth fiscal quarter and year ended September 30, 2007.  The Company's "record" financial results included, in pertinent part, the following:

> Net income for the fiscal year increased to $508.2 million or $1.51 per diluted share compared to $473.6 million or $1.34 per diluted share in the prior year.  Fourth quarter net income totaled $122.6 million or $0.38 per diluted share versus $114.9 million or $0.33 per diluted share in the same quarter last year.

Fiscal year financial highlights:

- Record total revenues of $2.6 billion, up 4%, and related gross profit up 8% from the prior year

- Record gaming operations installed base of 59,200 machines at the end of the fourth quarter, up 19% over prior year end

- Record gaming operations revenues of $1.4 billion, up 9%, and related gross profit up 13% from the prior year

- Record non-machine sales of $384.2 million, up 6% from the prior year

_____

[1]    All emphasis is added unless otherwise noted.

- ▪ Record Adjusted EBITDA totaling $1.1 billion, up 10% from the prior year

- ▪ Record diluted earnings per share of $1.51, up 13% from the prior year

22.    Commenting on these results, defendant Matthews stated, in pertinent part, as follows:

"IGT achieved another record year in 2007, led by record revenue and placements of our gaming operations machines.  Non-machine sales also reached record levels as our business model continues to evolve towards a greater focus on software and systems . . . .   Adjusted EBITDA reached $1.1 billion, and we generated a record level of cash flow from operations.  All of these accomplishments, coupled with the strength of our balance sheet, allowed IGT to return $1.3 billion to shareholders in the form of stock repurchases and dividends in fiscal 2007."

23.    Following the issuance of the press release, defendants Matthews, Cavanaugh and Siciliano conducted an earnings conference call with analysts and investors during which they repeated the Company's financial results and expounded on its prospects, emphasizing the Company's efforts to capitalize on its software business and eventually migrate to a server-based ("SB") gaming platform.

24.    Defendant Cavanaugh opened the call, stating, in pertinent part, as follows:

Today, we reported results for the fourth quarter and fiscal 2007.  We not only realized another record quarter for our game and operations business, but we also posted record results for nonmachine sales and cash flows from operations.  For the year, IGT delivered record results on nearly every financial measure and returned a significant amount of capital to our shareholders. ***We generated over 70% of our revenues, operating income, and cash throw [sic] without shipping a single unit***.

25.    Defendant Matthews also discussed the Company's financial results and prospects, stating, in pertinent part, as follows:

***Our game operations and our nonmachine product sales contributed nearly 70% of the total revenues in 2007 and we expect that we'll have continued growth from these higher-margin sources in 2008 and beyond.  These reflect our efforts to emphasize our software and service businesses***, which deliver value to IGT's

customers through higher revenue realization and IGT shareholders through increased financial performance, thus continuing to reduce IGT's reliance on the sale of gaming machines.

*Looking forward, the install base of game machines is expected to enter a new growth phase with numerous casino openings and expansions*. One prominent Wall Street investment bank has projected 114,000 new machines in the United States being added over the next three years. In addition, they estimate 177,500 additional gaming machines across a large number of international markets. Our diversity and the depth of our innovative products, combined with the worldwide sales and distribution capacity, will allow to us compete for significant market share in this coming expansion of nearly 300,000 games.

26.    Defendant Matthews also represented that IGT's server-based gaming initiative was

"on target" for commercialization in 2009 and that its advanced video gaming platform ("AVP") was

taking off, stating, in pertinent part, as follows:

We are committed to delivering industry-leading products and service to our global customers. *We will continue to plan on spending over a billion dollars during the next five years to develop new technology. And while we consider our R&D efforts worthwhile long-term investments, we are especially excited about the returns we anticipate in the next few years as our server-based technology is rolled out*. At the upcoming G2E, we will be showing our newest machines and game themes that reflect the full diversity of our product lines worldwide. Many of the machines displayed will feature the AVP platform, which allows for the higher quality video and game play experience. *Most of IGT's game developments are now shifted to the AVP platform, which will allow to us serve as the delivery portal the connection to server-based gaming environments*. In addition, new AVP versions of video poker and spinning real slots will also be on display at G2E to help customers round out their gaming floors in preparation for the coming of SB. *During 2007, IGT made meaningful progress with our SB efforts and remain on target to begin commercializing this product in 2009*.

\*      \*      \*

Despite the fact that all of the products that we're selling now clearly – are clearly compatible with an SB environment, and I think there is a wait-and-see mindset exists that will be clarified for most when you start seeing announcements of customer commitments. *We anticipate that certainly in this fiscal year that we will have more than one customer commitment to SB gaming*. That it is tech – it is through technology that we can stimulate future replacement activity that at G2E you

have an opportunity to see the interface for 3.0 and I think that people will be very impressed.

Because *historically, people have measured us by the quality of our games*. And people have walked through that show or gone into other environments and try to predict what games they think would be best and try to determine as a result which vendor might be best situated – situated for the coming period. *I am very comfortable with the fact that when you come to this show this year, you're going to see that we are the clear technology leader. You're going to leave that environment thinking that we are best in class in terms of being able to develop new technologies*. The interface – the user interface is going to come across as a very intuitive interface and be much like the interfaces that you're familiar with and a whole host of other favorite products that exist in other industries, and I think that – *that doubt that maybe lingers as to will floors be networked and what kind of applications will be delivered is going to be a debate for only a little bit while longer here*.

27.     In addition, he confirmed that Defendants were maintaining earnings-per-share guidance for the next two quarters in the range of $0.35 to $0.40, adding that "we believe *there is a good likelihood* that our EPS will break out of this range in the second half of '08."

28.     In response to an analyst's question, defendant Matthews was also highly optimistic about the Company's ability to leverage its current platform to fuel growth in the coming quarters, stating, in pertinent part, as follows:

[T]*here's going to be a couple things that are – we're – game operations are going to continue to grow within our overall business*. (Inaudible) with the year-over-year comparisons up plus 9,600 units over the last year. Also the idea that we believe that we're going to grow those unit counts for the Q2 through 4 of this year as well. So I think that that's one area of growth. I think that you're going to continue to see growth and strength in our non-machine sales. There's still an opportunity for us to sell a lot of convergence in that existing install base. Intellectual property licenses to others is still a big source of relatively high margin dollars. *The systems business continues to grow. And so we're going to grow there*.

*You are going to see growth internationally as we continue to expand our footprint in a number of new markets, especially some of the emerging areas that are exciting in Asia and Latin America and us paying attention to other new markets might exist. You're going to see, I think, an uptick of the new unit demand in that back half of the year. And not just in the back half of '08 but*

- 10 -

*carrying through '09 and into '10* because of what has been that identified expansion in North America, which quite frankly might be modest.

29.     As the market digested this highly positive information, the Company's stock price rose over the next several days.  Indeed, on November 2, 5 and 6, 2007, IGT's stock price rose 2.13% to $43.66 per share, 1.6% to $44.36 per share, and 1.56% to $45.05 per share, respectively.

30.     The November 1, 2007 statements set forth above were false and misleading because: (i) Defendants had diverted substantial funds to the development of the Company's SB and AVP gaming platforms, which materially compromised the Company's growth prospects and undermined Defendants' optimistic statements; (ii) IGT was unable to develop and market its SB and AVP gaming platforms within the time frame that Defendants had represented to investors due to increasingly challenging market conditions and mounting costs; (iii) Defendants' positive representations concerning the Company's shift to non-machine based operations were undermined by a slowdown in the gaming industry, the impact of which Defendants minimized; and (iv) Defendants concealed that, as a result of the foregoing, it was not likely that IGT would achieve or exceed its earnings guidance.

31.     On November 28, 2007, the Company filed its 2007 Annual Report on Form 10-K for the fiscal year ended September 30, 2007.  In Item 7 of the 2007 Annual Report, dedicated to Management's Discussion and Analysis of Financial Condition and Results of Operations, IGT represented that it was poised for continued growth and record financial results during fiscal year 2008 as a result of its robust product development and "ability to generate substantial operating cash flows."  The 2007 Annual Report provided, in pertinent part, as follows:

> *In fiscal 2007 we achieved the highest annual revenues in company history at $2.6 billion, largely attributable to growth in our gaming operations installed base reaching a record 59,200 machines in service at September 30, 2007.*  We

operate in two segments, North America and International, with certain unallocated company-wide income and expenses managed at the corporate level. International operations continue to be a growing contributor with operating income up 44% in fiscal 2007. See the BUSINESS SEGMENT RESULTS below and Note 18 of our Consolidated Financial Statements for additional segment information and financial results.

We are dedicated to generating financial growth by continuing to focus on the three cornerstones of our success: product development, market development and capital deployment. *We invest more in product development than any of our principal competitors and believe this helps us deliver the broadest gaming product lines across the most markets. Our current development efforts reflect our forward thinking and will support the near term evolution of the gaming floor. This includes the expansion of our business model beyond machine sales toward a more systems-centric, networked gaming environment.* Our new World Game Platform initiative, started in fiscal 2007, will unify and standardize our development efforts worldwide. *We believe our sb™ applications will be commercially available beginning in 2009* and will further differentiate IGT gaming products by offering operators new ways to engage and interact with players, as well as the ability to market cross-functional products and player conveniences.

We are dependent, in part, on new market opportunities to generate growth. Some of these opportunities may come from political action as governments look to gaming to provide tax revenues in support of public programs and view gaming as a key driver for tourism. We continue to expand our footprint globally, especially in emerging markets in Asia and Latin America. Our ongoing initiatives to enhance growth in new areas of gaming include financing customer construction or expansion. In April 2007 we agreed to provide $80.0 million in development financing and $40.0 million in equipment financing over the next five years to gaming operators in Argentina.

*We are able to return value to our shareholders and reinvest in our business because of our ability to generate substantial operating cash flows, the highest ever in fiscal 2007 at $821.5 million.* During fiscal 2007 we returned $1.3 billion to our shareholders through dividends and share repurchases. We consider strategic business combinations, investments, and alliances to expand our geographic reach, product lines and customer base. During fiscal 2007, we invested $105.6 million in China LotSynergy Holdings, Ltd. (CLS) for developing opportunities in the China lottery, $31.2 million in electronic table games with Digideal and $21.9 million in VCAT for the Mariposa CRM software. See Notes 2 and 5 of our Consolidated Financial Statements for additional information about these investments.

While domestic replacement sales are expected to remain at historically low levels in the upcoming year, ***we anticipate benefiting from growth in new or expanding domestic markets beginning in the second half of fiscal 2008. We also anticipate revenues will be driven by our growing gaming operations installed base, network systems sales, and machine sales as casino operators begin to upgrade platforms to capitalize on networked functionality and new features. We also expect to benefit from further gaming expansion outside of North America and new content distribution channels enabled by network systems and table gaming initiatives***. We will continue server-based gaming development, working with our competitors and customers to ensure the future is powered by an open network that enables products from multiple suppliers to work together without the need for additional programming or interfaces.

32.    In response to these statements, the price of IGT's common stock once again increased, rising 3.2% to $42.89 per share on November 28, 2007 and an additional 1.77% to $43.65 per share on November 29, 2007.

33.    The November 28, 2007 statements set forth above were false and misleading for the same reasons as those set forth in ¶30.

34.    On January 17, 2008, IGT issued a press release announcing its financial results for its first fiscal quarter of 2008, *i.e.*, the three-month period ended December 31, 2007. These financial results included the following:

Consolidated revenues and gross profit for the quarter were $645.8 million and $366.5 million, respectively, compared to $642.3 million and $352.0 million in the prior year quarter. Consolidated gross margins for the first quarter came in at 57%, up from 55% in the prior year quarter. Net income in the first quarter totaled $113.7 million or $0.36 per diluted share, compared to $121.0 million and $0.35 per diluted share in the prior year quarter.

*          *          *

***IGT generated $120.2 million in operating cash flow on net income of $113.7 million in the first quarter, down from $223.5 million and $121.0 million, respectively, in the prior year quarter***. Operating cash flow decreased primarily due to additional prepayments to secure long-term licensing rights and timing of payments in working capital. First quarter capital expenditures totaled $62.7 million compared to $103.8 million in the prior year quarter.

35.    Commenting on the results, defendant Matthews once again spoke positively of the Company's financial results and prospects, stating, in pertinent part, as follows:

> "During the first quarter, IGT made progress towards achieving our long-term objectives, including demonstrating at the Global Gaming Expo this past November our vision for the right slot floor today and in the future. ***Operationally we continued to generate margin improvements and moderate revenue growth despite reduced marketplace demand*** . . . ."

36.    Following the issuance of the press release, defendants Matthews, Cavanaugh and Siciliano once again conducted an earnings conference call with analysts and investors during which they repeated the Company's financial results and expounded on its prospects.

37.    Defendant Cavanaugh opened the call with a rundown of the financial results, indicating that "[a]s demand recovers due to new and expanded markets opening up, as well as new products and technology being released, IGT should continue to achieve more efficiency in generating earnings and cash flow." He also assured investors that "IGT will continue to be prudent in its capital deployment as we continue to find ways to grow our game operations business and acquire important technologies and intellectual properties. You have may [sic] rest assured that we will also continue to be astute purchasers of our shares."

38.    Notwithstanding the softening market for IGT's gaming products, defendant Matthews represented that the Company's business was trending as Defendants had expected:

> Obviously, we have been operating in a difficult environment. It has been the weakest replacement demand that we have seen since 1998. This is going to continue into Q2, ***but we expect we will start seeing improvements to replacement demand in Q3 and Q4, coinciding with some of our product efforts***. This last quarter units were shipped -- units shipped were down 25%, but nonetheless product sales revenue were down 1% ***reflects both the expansion of pricing and margins on our existing products, largely driven by AVP, and better geographic mix as we continue to expand our efforts outside the United States***. We continue at these peak earnings and these margins despite these minimal demand levels which ***really***

*reflects well on what we anticipate in terms of being able to expand that even further when we see an uptick in revenue.*

39.    Defendant Matthews also described IGT's three growth "drivers," once again

emphasizing the Company's development and market acceptance of its SB products:

> *There is [sic] going to be three drivers for expanding revenues through our fiscal year 2010. It's going to be the new and expansion capacity that we'll see during that period.* We're going to have continued momentum in our international operations, and *we'll see the sb commercialization and the subsequent replacement cycle opportunity that is associated with that.*
>
> So let me describe each of those in a little bit more detail. *The new and expanded market growth will start in Q3. We're going to see shipments pick up* because we're going to have units shipped to the racetracks in Indiana. We will have some openings here in Las Vegas for the locals market. We're going to see expansions in Native American casinos in California and Connecticut. And beyond that period of time, we're going to have major resort openings in Las Vegas, Atlantic City, outside of the country in Singapore. We're going to see the impact from the expanded compacts in California and Washington. There will be the continued build-out of the market in Pennsylvania. There's going to be a new market opened in Kansas. As a result of all of this, our estimate is there will be over 100,000 units of new or expansion units by the end of 2010 created in North America. And the international market has a potential to either match or surpass North America for growth.
>
> \*       \*       \*
>
> *On sb, we continue to make progress, we – that includes discussions with almost all of our operator customers*, especially those that are opening a casino within the next few years, while we expect that sb is going to represent a significant upgrade to casino floors on a systems side, obviously we're focused on the machine opportunity for replacement cycle. *And that really begins in Q3 for us, as we introduce the new cabinets and platforms that are situated for the introduction of – the future introduction of sb by casino operators.*
>
> *We're going to see the sb cycle in our minds play out in three phases.* That first effort from us is going to be a commercial rollout in new operations where we have existing operators continuing to stand on the sidelines looking for proof of upside in ROI that make sense. That second phase will be those existing floors starting to install improved results for themselves, and we anticipate that really is the driver of the replacement cycle. *We think that will start taking place in early 2009 for us.* And then the third phase is the wider adoption that leads to a changed

business model for all of the operators and really results in that accelerated replacement cycle of which we have all spoken.

> *As a result of all of this, IGT will be moving to a more service-software revenue orientation that has an expanded margin associated with that, and really less reliance on product sales at some point in the future*. So our guidance is the result of these drivers is because of the new product introductions, but also some uncertainty surrounding the future market conditions, especially replacement demand, in the second quarter.

40. Before opening the call to questions, defendant Matthews confirmed that IGT was keeping its guidance in place and actually expected to beat its uppermost guidance in the third and fourth fiscal quarters as a result of "good visibility":

> We think that we'd keep the range in place of $0.35 to $0.40, but we'd probably operate outside of that range over the course of each of the next three quarters, perhaps a little bit to the weak side of that in Q2, because of lack of visibility to new and expanded units, but *likely to exceed $0.40 of earnings in both of Q3 and Q4, because of reasonably good visibility to the same*.

41. In response to this news, the Company's stock price declined an aggregate of more than 4% on January 17 and 18, 2008.

42. The January 17, 2008 statements set forth above were false and misleading for the same reasons as those set forth in ¶30.

43. On April 17, 2008, IGT issued a press release announcing that it had signed a memorandum of understanding with the CityCenter in Las Vegas, Nevada, "pertaining to installing a server-based network and related IGT sb™ and gaming management system products at the development's resort casino scheduled to open in late 2009."

44. The same day, IGT issued a press release announcing poor financial results for its second fiscal quarter of 2008, *i.e.*, the three-month period ended March 31, 2008. The Company's financial results included the following:

Net income for the quarter was $68.4 million or $0.22 per diluted share versus $128.2 million or $0.38 per diluted share in the same quarter last year. For the six-month period ended March 31, 2008, net income was $182.1 million or $0.57 per diluted share compared to $249.2 million or $0.73 per diluted share in the same period last year.

45.    In the press release, defendant Matthews was forced to acknowledge that the challenging market environment continued to have an adverse effect on IGT, but delivered an upbeat message about the Company's development efforts and prospects, commenting, in pertinent part, as follows:

"IGT's second quarter results were challenged by the current market environment . . . . We remain focused on strategic initiatives which will maintain our standing as the leading worldwide provider of innovative gaming products and services. We continue to prepare for the introduction of the next generation of technological innovations and look forward to the market-driven expansion in domestic and international jurisdictions we believe will develop in the near future. Recent strategic accomplishments that will enhance IGT's long-term opportunities include our sb™-related agreements with Harrah's and CityCenter, our cross-licensing agreement with WMS, our strategic alliances with Progressive Gaming, Games Media and The Global Draw, and our potential acquisition of Cyberview Technology, Inc."

46.    Following these announcements, defendants Matthews, Cavanaugh and Siciliano held a conference call with analysts and investors to discuss the Company's second quarter financial results. In his opening remarks, defendant Cavanaugh emphasized "replacement demand" associated with the AVP platform and other new products, which he represented was on track for the second half of the year:

*For the second half of the year, we anticipate replacement demand to begin to pick up as we release our latest products, including six new cabinet designs utilizing the AVP platform.* New unit demand should also reaccelerate in the second half of 2008 due to scheduled openings of new and expansion products.

47.    He also emphasized the Company's "prudent" approach to capital deployment, but did not disclose that IGT's tremendous development costs, incurred in the context of the most challenging market the Company had ever faced, were anything but prudent:

> We have 27.4 million shares remaining under the stock repurchase authorization and we continue to expect this authorization to be exhausted by the end of March 2010.  Through the first six months of the year IGT has deployed back to shareholders at total of $333 million through share buybacks and dividends.  *IGT will continue to be prudent in its capital deployment as we continue to find ways to grow our game operations business and acquire important technologies and intellectual property*.

48.    In turn, defendant Matthews acknowledged that the Company was experiencing difficulties replacing machines with a view toward rolling out its SB and AVP platforms, but nonetheless reaffirmed the timeline associated the rollout:

> *We had new products that began shipping in the third quarter and our anticipated new cabinets have delayed some of our customer orders with them expecting to take part in our latest offering*.  Of course we continue to concentrate on introducing new game themes particularly for the AVP, that is a real core strength here at IGT.  *We made several deals during the quarter which move us further along the path of successful deployment of server-based gaming*.

> This morning we announced the deal for CityCenter.  We also previously announced the orders that we have for NexGen with Harrah's, the strategic partnership established with WMS and that with BGIC as well.  We also announced this morning through our Barcrest subsidiary a partnership with the global draw and games media in the U.K. and then we have the pending potential transaction of Cyberview. *All of these should help us with our SB efforts as we continue to make progress on the timelines that we previously announced*.

> To remind people of those timelines '07 was really the introduction of the concept to the marketplace, regulatory agencies and customers.  '08 really has been the effort to prove the concept to ourselves technologically, to the marketplace in terms of impact on the customer.  We expect to have a field trial of SB 3.0 later this quarter and *continue to feel comfortable that our timelines for having meaningful impact on '09 in terms of being able to prove the concept and starting to get floor share for it will impact 2010 and beyond as previously articulated*.

Our efforts continue to focus on driving this technological innovation forward and we want to provide the best content and applications available for gaming floor and for casino operations. On our capital deployment and strategy aspects of our business, we continue to invest in our business, first, with capital expenditures. That's still where we'd rather deploy our money is in continuing to expand our game operations and devising new technology.

49.     Defendant Matthews also represented that "[m]arket expansion continues really in a very robust way even though there has [sic] been a couple of setbacks," and once again confirmed the Company's financial guidance, which he claimed IGT may actually *exceed*:

In the way of guidance, we continue to expect an uptick in our business levels during the second half of the year as new and expansion opportunities open and we release our new cabinets and game titles. However, ***given current operating conditions we maintain our guidance at $0.35 to $0.40 for the next four quarters with the possibility of coming in at the high end, if not slightly exceeding this range in the second half of this year***.

50.     Defendant Matthews reiterated IGT's optimistic outlook during the question-and-answer session following his opening comments, indicating that he felt "very comfortable" with the Company's position in the marketplace as well as with its prospects, adding that "our backlog is up a great deal quarter-over-quarter." He also noted that "there is still an opportunity for us to exceed the range in one or both of the quarters in the back half of '08. Just because we do have such good visibility to machine demand."

51.     Further, defendant Matthews denied that the decline in the Company's stock price reflected the poor quality of its prospects, claiming that "the day-to-day changes in the overall valuation of the Company don't always make sense in terms of really reflecting what is, I think, people that are close to our efforts, the underlying strategies." According to Matthews, Defendants had a superior grasp of the Company's condition and prospects: "we can be on a call and remark on

visibility to a much improved environment for the back half of '08 and reasons to share optimism about '09 and really know that SB will delivered [sic] and impacting our 2010."

52.    Although the Company's announcement pertaining to possible SB business for the CityCenter appears to have been timed to coincide with, and lessen the impact of, the Company's disclosure of its poor second quarter financial results, the CityCenter announcement did not have its intended effect.  Instead, the market's response was overwhelmingly negative, with IGT's stock price declining more than 6% on April 17, 2008 to $35.70 per share on extremely heavy volume of nearly 15 million shares trading, from a closing price of $38.01 per share the day before.

53.    The April 17, 2008 statements set forth above were false and misleading for the same reasons as those set forth in ¶30.

54.    On July 17, 2008, IGT issued a press release announcing its financial results for the third fiscal quarter of 2008, *i.e.*, the three-month period ended June 30, 2008.  The Company's financial results reflected a huge departure, in certain respects, from the same quarter the previous year, including the following:

> Net income for the quarter was $108.3 million or $0.35 per diluted share versus $136.4 million or $0.41 per diluted share in the same quarter last year.  For the nine-month period ended June 30, 2008, net income was $290.5 million or $0.92 per diluted share compared to $385.6 million or $1.14 per diluted share in the same period last year.

*    *    *

> **For the nine-month period ended June 30, 2008, IGT generated $360.7 million in cash from operations on net income of $290.5 million compared to $564.9 million on net income of $385.6 million in the prior year period**.  Lower year-over-year cash from operations was primarily the result of lower net income, changes in working capital and additional prepayments to secure long-term licensing rights.

Working capital increased to $779.0 million at June 30, 2008 compared to $595.5 million at September 30, 2007. Cash equivalents and short-term investments (inclusive of restricted amounts) totaled $382.1 million at June 30, 2008 versus $400.7 million at September 30, 2007. **Debt totaled $2.0 billion at June 30, 2008 compared to $1.5 billion at September 30, 2007.** The available capacity on our $2.5 billion line of credit totaled $1.4 billion as of June 30, 2008.

55.     Commenting on these results, defendant Matthews continued to claim that IGT's server-based initiatives would allow the Company to weather the market environment:

"Although the market environment continues to be impacted by unfavorable economic conditions, IGT delivered strong revenues and gross profits during the third quarter . . . . **We furthered our server-based gaming initiatives with the release of several new models on our Advanced Video Platform (AVP®)** and the completion of the strategic acquisition of Million-2-1 in the third quarter, as well as closing the acquisition of substantially all of the assets of Cyberview Technology, Inc. in July. In addition, we have repurchased 14.6 million shares of IGT stock since April 18, 2008."

56.     Following the issuance of the press release, Defendants held a conference call with analysts and investors to discuss the Company's financial results. During the call, defendant Cavanaugh attributed lower replacement demand to "an internal decision based on manufacturing capacity, and a prioritization of new or expansion units being put in the queue ahead of replacements," adding that "we hope that in Q4 we would see an uptick in replacement demand."

57.     In turn, defendant Matthews once again emphasized the importance of the Company's SB gaming initiative, but was forced to acknowledge that rising development and other costs required the Company to reduce spending in other areas. In addition, he indicated that the Company had finally reduced its earnings guidance:

So that brings us to the topic of guidance, and the fact is that the conditions that we see in the marketplace are looking like they will continue for the foreseeable future. They are unprecedented. **We have never really seen gaming play levels fall across all markets as we have in the first half of this year. If that continues, that will probably weigh a little bit on our game ops business, and is probably also going to affect some amount of casino spend activity**, whether it relates to CapEx or

OpEx.  So we at least need to be making sure that we are paying attention to whether or not there is any change of behavior in that regard.  And so while we were able to return to our prior trend levels after that difficult second quarter that we reported, *we really don't expect we will immediately build upon these results until the market conditions improve*.

       *So the result, I think our guidance for the next three quarters needs to be in a range of $0.30 to $0.35*.  This range is not going to contemplate any efficiency measures we are able to implement over the period, and it is likely that we will revisit our guidance on future earnings calls if visibility of the future marketplace conditions improves.  And as I said, in the back half of 2009, we know that new expansion unit demand should make those results the kind of results that we can have maybe a slight improvement in the guidance that we are giving here.

58.     Moreover, defendant Matthews acknowledged that the sheer length of time in developing and rolling out IGT's SB products weighed on the Company, observing that "[T]he problem with the SB story, and I think probably some of the frustration with investors is that we have just been talking about it too long.  We've been talking about it now since April of 2005, and it is still November 2009 before you see this big meaningful first deployment . . . ."

59.     In response to these announcements, the price of IGT's common stock declined by nearly 8% on July 17, 2008 to $22.77 per share on extremely heavy volume of nearly 18 million shares traded, from a closing price of $24.66 per share the day before.  The stock price further declined more than 2% in the aggregate on July 18 and 21, 2008.

60.     The July 17, 2008 statements set forth above were false and misleading for the same reasons as those set forth in ¶30.

61.     By September 2008, the cracks in IGT's façade were becoming more prominent as the media began reporting that the Company was undergoing a management shakeup and rumors surfaced that it had to reduce its workforce to staunch rising costs as a result of development efforts.

62.    For example, on September 7, 2008, the *Las Vegas Review-Journal* published an article entitled "INSIDE GAMING: Signs of trouble from slot giant," reporting on IGT's problems and impending layoffs at the Company, which IGT "vigorously denied":

> Twelve months ago, Wall Street analysts never imagined having concerns about International Game Technology. The Reno-based company, which has a large corporate presence in Las Vegas, controls the lion's share of the worldwide slot machine market.
>
> IGT has been an analysts' darling among manufacturers. Its stock price was stable and reviewers heaped praise over its products. Despite a casino industry slowdown in the slot machine replacement market, IGT still reported profits. Analysts remained bullish.
>
> What a difference a year makes.
>
> ***Last week's resignation by IGT Chief Operating Officer Steve Morro may have signaled the start of a companywide shake-up. Gaming sources told of layoff rumors, which IGT spokesman Ed Rogich vigorously denied.***
>
> IGT CEO TJ Matthews has said the company is in a restructuring mode. Rogich said all areas will be looked at to reduce expenses.
>
> Matthews, considered one of the industry's brightest executives, is feeling some heat. He will add Morro's COO duties when the resignation is complete. But Matthews is also chairman and president as well as CEO, leaving some analysts worried that management is spread too thin.
>
> ***Wall Street expressed concern last week that Morro's exit was symptomatic of IGT's fortunes. The stock price is down almost 60 percent from a 52-week high of $49.41 on Feb. 26.***
>
> ***"IGT's fundamentals, market share position, new device platform, game theme and system development progress are not likely to improve in the near term, and may have worsened since the company last communicated with investors," Merrill Lynch gaming analyst Rachael Rothman wrote.***
>
> UBS Securities analyst Robin Farley didn't think IGT's strategic examination would help increase earnings until the second half of 2009.
>
> "This review will ultimately include a cost-cutting component," Farley said, adding that the current focus is on management structure.

63.    Then, on September 17, 2008, *Las Vegas Review-Journal* published an article entitled "IGT to impose layoffs," confirming that IGT was implementing layoffs and that defendant Matthews had informed the workforce via an internal e-mail:

> Slot machine giant International Game Technology said Tuesday it will lay off a yet-to-be determined number of employees by Jan. 5 due to the troubled economy.
>
> In an e-mail to employees, IGT Chairman and Chief Executive Officer TJ Matthews said the number of layoffs will be based on how many workers accept a voluntary separation program that was introduced last week.  IGT spokesman Ed Rogich said roughly 500 employees, age 55 and over, were offered buyouts.
>
> *        *        *
>
> Macquarie Capital gaming analyst Joel Simkins said he was not surprised by news of the impending layoffs.  He said the slot machine maker has about 1,200 workers in engineering, an area he said could be reduced.
>
> IGT has also spent millions on server-based gaming, which may not be introduced to casinos as quickly as hoped.  IGT spent $76 million in June to acquire a European slot machine rival as part of its server-based gaming efforts.
>
> "The company needs to get leaner," Simkins said.  "There are a lot of incremental expenses that can be cut."
>
> Matthews told IGT workers the company was not closing its Reno headquarters nor are the layoffs focused in one department.  A decision regarding the layoffs is expected to be made by November with the jobs being eliminated in January.
>
> "My hope is that through these efforts, we can stabilize our spending to be aligned with our revenue forecasts and be in a position to weather the near-term uncertainty that is prevalent in our industry and our economy in general," Matthews said.

64.    The same day, Macquarie Research ("Macquarie"), an analyst that follows IGT, issued a report entitled "Changes on IGT Island, lowering TP and estimates," in which it lowered its target price for the Company's common stock and highlighted concerns raised by the Company's delayed cost saving measures, including the impending downsizing efforts reported by the *Las Vegas*

*Review-Journal*.  Specifically, Macquarie expressed concern that the Company's efforts to revise its cost structure came far too late, reporting, in pertinent part, as follows:

> While we are pleased that ***IGT is starting to take the right steps to right size its cost structure*** in light of the current environment, it may not be enough to offset a top line slow down.  We have reduced estimates as detailed further in our note, largely trimming expectations for participation game placements and revenue, as well as domestic/international game sales.

*    *    *

> • While IGT has been pounded YTD, down 57% versus 17/16% declines in the S&P 500 and Russell 3000, we recommend that investors continue to hold off buying the shares.  ***Although IGT appears to be focusing on developing more innovative content to offset market share losses, rather than an all-out effort to force migration to server-based, we are concerned that it could be on the verge of permanent displacement of share to its key rivals***.

65.    Macquarie also characterized the planned layoffs as one of several "***drastic measures to align the cost structure*** (500 employees to be involuntarily reduced with potential restructurings to follow)."

66.    On this news, the price of IGT's stock price declined nearly 6% to $17.70 per share.

67.    On October 30, 2008, IGT issued a press release reporting disappointing financial results for the fourth fiscal quarter that came in well below earnings guidance, and announcing its financial results for the fiscal year ended September 30, 2008.  The press release provided, in pertinent part, as follows:

> ***Net income for the quarter was $52.1 million or $0.18 per diluted share***, inclusive of a non-cash charge of $28.6 million or $0.10 per diluted share from write-downs of certain investments, ***versus $122.6 million or $0.38 per diluted share in the same quarter last year***.  For the fiscal year, net income was $342.5 million or $1.10 per diluted share compared to $508.2 million or $1.51 per diluted share in the same period last year.

*    *    *

For the fiscal year ended September 30, 2008, IGT generated $516.3 million in cash from operations on net income of $342.5 million compared to $821.5 million on net income of $508.2 million in the prior year period. Reductions in year-over-year cash from operations were primarily the result of lower earnings, increased inventory, additional prepayments to secure long-term licensing rights and increases in accounts receivable.

68.    Commenting on these results, defendant Matthews downplayed the Company's business problems and instead emphasized its prospects in developing new product technologies:

"Our fiscal 2008 results reflect challenging economic operating conditions affecting our customers and in turn our business . . . . Despite these challenges, we remained focused on key business initiatives. During 2008, IGT released several new models on our Advanced Video Platform (AVP®) and released close to 700 game titles worldwide across all platforms. We made significant progress in the development of our server-based gaming initiatives and will begin commercially deploying initial versions of this technology in 2009."

69.    Following the issuance of the press release, defendants Matthews and Cavanaugh held a conference call with analyst and investors, in which Matthews represented that the Company was "going to make strategic changes to increase productivity and responsiveness to the customer and this marketplace needs [sic]." As part of these strategic changes, he indicated that the Company sought to "adjust headcount," targeting "initial cost savings of about $20 million to $25 million per quarter" with "the impact to begin in the second quarter of 2009." He also indicated that Defendants expected that earnings per share "will probably come in at the lower end or maybe even slightly below our previous guidance of $0.30 to $0.35."

70.    During the question-and-answer session, Matthews was finally forced to admit that the Company was simply not positioned for revenue growth with its increasing operating and developmental expenses:

[J]ust on expense reduction, that we wanted to make sure that we did it right, that *we've spent about $700 million in operating expenses in the course of 2007, got ourselves to a run rate of $800 million or so by the end of this fiscal year 2008, and*

*it was too much. Obviously it was done in anticipation of revenue growth that has been deferred, and so we need to reinvestigate costs*. Much of that cost reduction is a reduction in staffing, and we wanted to make sure that we did it really with the idea that it was gentle as possible with our employees, that much of this situation is management created, and not necessarily the result of not every individual at IGT working very hard, and so offering first an early retirement program, and then following that with kind of the involuntary separations, was our plan. All of that is going to be accomplished by the middle of November, and that will manifest itself in much of the cost reduction. But the cost review doesn't stop there.

*I mean, really, we are looking at every expense and refocusing IGT on the idea that expenses matter. So it's cost of goods, it's SG&A, it's R&D, it's other expenses, it's taxes*. Five big categories for us to have focus on, making sure that whether it's access to capital, or it's better planning from a tax perspective. *It's making sure that our R&D priorities are correct, that the SG&A staffing supports the current level of business, that our cost of goods demonstrates efficiencies wherever possible. All of that is being focused*. And so I really expect that we will exceed that run rate as the course of the year progresses, and that $175 million a quarter or less still is the goal in total operating expenses. And so it may seem like it's taking a little while, but maybe it just took us a little while to say that we were committed to it, which we did last call, and I think got on it pretty quickly here with kind of this final action in November.

71.    Moreover, as reflected in the following exchange with an analyst, Matthews confirmed that the development and rollout of the Company's server-based platform would take a backseat to gaming content, in light of demand in the marketplace:

[STEVE WIECZYNSKI:] Yes, one more question for you guys. T.J., will you just give your strategy heading into G2E this year? I mean, *last year you were clearly focused on your SB platform. Will that change materially going into this year? Are you going to be focused more on the content?*

[MATTHEWS:] Well, I think it's – it's too bad that content ever seems to take a back seat, because this company is built around games. It's focus is games, and every show I think has that at its core, *but because of the idea of how games are going to be delivered and how the customer experience is going to be expanded due to network implementation, that that seems to kind of be in the background now*. This show where we've launched AVP, and we launched MLD, *you will see a much greater impact from our game development* than maybe you noticed in recent shows. *SB being deployed on a smaller footprint in the casino environment* is all about how to help the performance of 25 to 100 games through expanded offering on the game side of the equation. *And so even the SB offering, the strategy, will have a*

*much greater games focus than it has in times past.  So I think content will be the star of the show this year*.

72.     In response to these statements, the price of IGT's common stock declined nearly 5% to $12.01 per share.

73.     In November 2008, IGT implemented its workforce reduction, which the press reported on November 14, 2008.  The layoffs eliminated roughly 10% of the Company's workforce and had an equally profound effect on its stock price, sparking a decline that drove the stock down to $7.58 per share on November 20, 2008.

74.     The market for IGT common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, IGT common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired IGT common stock relying upon the integrity of the market price of IGT common stock and market information relating to IGT, and have been damaged thereby.

75.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of IGT common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

76.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false or misleading statements about IGT's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of IGT and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

77.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding IGT, their control over, and/or receipt and/or modification of IGT's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IGT, participated in the fraudulent scheme alleged herein.

78.    In addition, during the Class Period, certain of the Defendants and other Company insiders sold shares of their personally held common stock for proceeds of nearly $29 million. Among these insiders were: (i) defendant Matthews, the Company's President, CEO and Chairman;

(ii) Robert Bittman, who served as a member of the Board since May 2000; (iii) Richard Burt, who

served as a member of the Board since December 2001; (iv) Anthony Ciorciari, who served as the

Executive Vice President, Operations; (v) David Johnson, who served as the Executive Vice

President, General Counsel and Secretary; (vi) Stephen Morro, who served as the Chief Operating

Officer; and (vii) Richard Pennington, who served as the Executive Vice President, Corporate

Strategy.  Their Class Period sales are depicted in the following chart:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **BITTMAN** | **ROBERT** | 2/27/2008 | 15,900 | $48.12 | $765,108 |
| | | 2/27/2008 | 14,100 | $48.25 | $680,325 |
| | | 2/27/2008 | 14,000 | $48.00 | $672,000 |
| | | 2/27/2008 | 4,000 | $48.21 | $192,840 |
| | | 2/27/2008 | 2,900 | $48.23 | $139,867 |
| | | 2/27/2008 | 2,700 | $48.26 | $130,302 |
| | | 2/27/2008 | 2,300 | $48.24 | $110,952 |
| | | 2/27/2008 | 1,200 | $48.27 | $57,924 |
| | | 2/27/2008 | 1,100 | $48.40 | $53,240 |
| | | 2/27/2008 | 800 | $48.22 | $38,576 |
| | | 2/27/2008 | 700 | $48.02 | $33,614 |
| | | 2/27/2008 | 600 | $48.20 | $28,920 |
| | | 2/27/2008 | 500 | $48.14 | $24,070 |
| | | 2/27/2008 | 400 | $48.06 | $19,224 |
| | | 2/27/2008 | 300 | $48.03 | $14,409 |
| | | 2/27/2008 | 300 | $48.04 | $14,412 |
| | | 2/27/2008 | 200 | $48.18 | $9,636 |
| | | 2/27/2008 | 200 | $48.05 | $9,610 |
| | | 2/27/2008 | 100 | $48.28 | $4,828 |
| | | 2/27/2008 | 100 | $48.13 | $4,813 |
| | | 2/27/2008 | 100 | $48.09 | $4,809 |
| | | | **62,500** | | **$3,009,479** |
| | | | | | |
| **BURT** | **RICHARD** | 12/13/2007 | 19,500 | $44.05 | $858,975 |
| | | 12/13/2007 | 9,900 | $44.10 | $436,590 |
| | | 12/13/2007 | 7,000 | $44.05 | $308,350 |
| | | 12/13/2007 | 6,500 | $44.00 | $286,000 |
| | | 12/13/2007 | 5,100 | $44.15 | $225,165 |
| | | 12/13/2007 | 5,000 | $44.17 | $220,850 |
| | | 12/13/2007 | 4,100 | $43.80 | $179,580 |
| | | 12/13/2007 | 3,500 | $44.12 | $154,420 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 12/13/2007 | 3,500 | $44.11 | $154,385 |
| | | 12/13/2007 | 2,900 | $44.08 | $127,832 |
| | | 12/13/2007 | 2,200 | $44.09 | $96,998 |
| | | 12/13/2007 | 2,100 | $43.75 | $91,875 |
| | | 12/13/2007 | 1,900 | $43.79 | $83,201 |
| | | 12/13/2007 | 1,800 | $44.16 | $79,488 |
| | | 12/13/2007 | 1,600 | $44.14 | $70,624 |
| | | 12/13/2007 | 1,300 | $44.04 | $57,252 |
| | | 12/13/2007 | 1,200 | $43.78 | $52,536 |
| | | 12/13/2007 | 1,100 | $44.13 | $48,543 |
| | | 12/13/2007 | 1,100 | $44.02 | $48,422 |
| | | 12/13/2007 | 1,000 | $44.08 | $44,080 |
| | | 12/13/2007 | 900 | $44.09 | $39,681 |
| | | 12/13/2007 | 900 | $44.07 | $39,663 |
| | | 12/13/2007 | 800 | $43.76 | $35,008 |
| | | 12/13/2007 | 600 | $44.10 | $26,460 |
| | | 12/13/2007 | 400 | $44.18 | $17,672 |
| | | 12/13/2007 | 400 | $44.21 | $17,684 |
| | | 12/13/2007 | 300 | $44.24 | $13,272 |
| | | 12/13/2007 | 300 | $44.23 | $13,269 |
| | | 12/13/2007 | 300 | $44.22 | $13,266 |
| | | 12/13/2007 | 300 | $44.06 | $13,218 |
| | | 12/13/2007 | 200 | $44.20 | $8,840 |
| | | 12/13/2007 | 200 | $43.81 | $8,762 |
| | | 12/13/2007 | 100 | $43.77 | $4,377 |
| | | | **88,000** | | **$3,876,338** |
| | | | | | |
| **CIORCIARI** | **ANTHONY** | 11/12/2007 | 475 | $44.05 | $20,924 |
| | | 11/12/2007 | 360 | $44.05 | $15,858 |
| | | 2/14/2008 | 24,880 | $47.00 | $1,169,360 |
| | | | **25,715** | | **$1,206,142** |
| | | | | | |
| **JOHNSON** | **DAVID** | 12/3/2007 | 1,400 | $43.53 | $60,942 |
| | | | **1,400** | | **$60,942** |
| | | | | | |
| **MATTHEWS** | **THOMAS** | 11/19/2007 | 31,300 | $41.00 | $1,283,300 |
| | | 11/19/2007 | 17,300 | $41.40 | $716,220 |
| | | 11/19/2007 | 11,713 | $41.50 | $486,090 |
| | | 11/19/2007 | 10,100 | $41.11 | $415,211 |
| | | 11/19/2007 | 8,700 | $41.10 | $357,570 |
| | | 11/19/2007 | 6,500 | $41.01 | $266,565 |
| | | 11/19/2007 | 5,400 | $41.09 | $221,886 |
| | | 11/19/2007 | 5,300 | $41.15 | $218,095 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 11/19/2007 | 4,800 | $41.05 | $197,040 |
| | | 11/19/2007 | 4,100 | $41.12 | $168,592 |
| | | 11/19/2007 | 4,100 | $41.02 | $168,182 |
| | | 11/19/2007 | 3,900 | $41.06 | $160,134 |
| | | 11/19/2007 | 3,300 | $41.20 | $135,960 |
| | | 11/19/2007 | 3,300 | $41.16 | $135,828 |
| | | 11/19/2007 | 3,280 | $41.60 | $136,448 |
| | | 11/19/2007 | 3,200 | $41.13 | $131,616 |
| | | 11/19/2007 | 3,000 | $41.65 | $124,950 |
| | | 11/19/2007 | 2,900 | $41.55 | $120,495 |
| | | 11/19/2007 | 2,900 | $41.17 | $119,393 |
| | | 11/19/2007 | 2,800 | $41.07 | $114,996 |
| | | 11/19/2007 | 2,700 | $41.25 | $111,375 |
| | | 11/19/2007 | 2,700 | $41.19 | $111,213 |
| | | 11/19/2007 | 2,600 | $41.14 | $106,964 |
| | | 11/19/2007 | 2,530 | $41.41 | $104,767 |
| | | 11/19/2007 | 2,400 | $41.04 | $98,496 |
| | | 11/19/2007 | 2,200 | $41.56 | $91,432 |
| | | 11/19/2007 | 2,200 | $41.51 | $91,322 |
| | | 11/19/2007 | 2,200 | $41.22 | $90,684 |
| | | 11/19/2007 | 2,000 | $41.62 | $83,240 |
| | | 11/19/2007 | 2,000 | $41.57 | $83,140 |
| | | 11/19/2007 | 2,000 | $41.18 | $82,360 |
| | | 11/19/2007 | 2,000 | $41.08 | $82,160 |
| | | 11/19/2007 | 1,800 | $41.61 | $74,898 |
| | | 11/19/2007 | 1,400 | $41.31 | $57,834 |
| | | 11/19/2007 | 1,200 | $41.67 | $50,004 |
| | | 11/19/2007 | 1,200 | $41.52 | $49,824 |
| | | 11/19/2007 | 1,200 | $41.42 | $49,704 |
| | | 11/19/2007 | 1,200 | $41.43 | $49,716 |
| | | 11/19/2007 | 1,200 | $41.36 | $49,632 |
| | | 11/19/2007 | 1,200 | $41.23 | $49,476 |
| | | 11/19/2007 | 1,200 | $41.03 | $49,236 |
| | | 11/19/2007 | 1,120 | $41.59 | $46,581 |
| | | 11/19/2007 | 1,100 | $41.58 | $45,738 |
| | | 11/19/2007 | 915 | $41.53 | $38,000 |
| | | 11/19/2007 | 900 | $41.63 | $37,467 |
| | | 11/19/2007 | 900 | $41.21 | $37,089 |
| | | 11/19/2007 | 800 | $41.33 | $33,064 |
| | | 11/19/2007 | 800 | $41.32 | $33,056 |
| | | 11/19/2007 | 800 | $41.26 | $33,008 |
| | | 11/19/2007 | 600 | $41.44 | $24,864 |
| | | 11/19/2007 | 600 | $41.45 | $24,870 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 11/19/2007 | 600 | $41.35 | $24,810 |
| | | 11/19/2007 | 600 | $41.24 | $24,744 |
| | | 11/19/2007 | 500 | $41.68 | $20,840 |
| | | 11/19/2007 | 500 | $41.30 | $20,650 |
| | | 11/19/2007 | 400 | $41.64 | $16,656 |
| | | 11/19/2007 | 400 | $41.34 | $16,536 |
| | | 11/19/2007 | 300 | $41.70 | $12,510 |
| | | 11/19/2007 | 200 | $41.54 | $8,308 |
| | | 11/19/2007 | 200 | $41.38 | $8,276 |
| | | 11/19/2007 | 200 | $41.29 | $8,258 |
| | | 11/19/2007 | 200 | $41.07 | $8,214 |
| | | 11/20/2007 | 94,097 | $40.59 | $3,819,397 |
| | | 11/20/2007 | 22,600 | $40.50 | $915,300 |
| | | 11/20/2007 | 13,200 | $41.00 | $541,200 |
| | | 11/20/2007 | 8,300 | $40.55 | $336,565 |
| | | 11/20/2007 | 4,300 | $40.96 | $176,128 |
| | | 11/20/2007 | 3,600 | $40.52 | $145,872 |
| | | 11/20/2007 | 3,300 | $40.95 | $135,135 |
| | | 11/20/2007 | 3,300 | $40.90 | $134,970 |
| | | 11/20/2007 | 2,800 | $40.60 | $113,680 |
| | | 11/20/2007 | 2,600 | $40.98 | $106,548 |
| | | 11/20/2007 | 2,600 | $40.94 | $106,444 |
| | | 11/20/2007 | 2,400 | $40.54 | $97,296 |
| | | 11/20/2007 | 2,400 | $41.01 | $98,424 |
| | | 11/20/2007 | 2,300 | $40.93 | $94,139 |
| | | 11/20/2007 | 2,200 | $40.63 | $89,386 |
| | | 11/20/2007 | 2,000 | $40.61 | $81,220 |
| | | 11/20/2007 | 1,900 | $40.80 | $77,520 |
| | | 11/20/2007 | 1,800 | $40.99 | $73,782 |
| | | 11/20/2007 | 1,800 | $40.86 | $73,548 |
| | | 11/20/2007 | 1,503 | $40.64 | $61,082 |
| | | 11/20/2007 | 1,500 | $40.85 | $61,275 |
| | | 11/20/2007 | 1,500 | $40.58 | $60,870 |
| | | 11/20/2007 | 1,100 | $40.53 | $44,583 |
| | | 11/20/2007 | 1,100 | $41.05 | $45,155 |
| | | 11/20/2007 | 900 | $40.51 | $36,459 |
| | | 11/20/2007 | 800 | $40.92 | $32,736 |
| | | 11/20/2007 | 800 | $40.57 | $32,456 |
| | | 11/20/2007 | 700 | $40.56 | $28,392 |
| | | 11/20/2007 | 700 | $40.66 | $28,462 |
| | | 11/20/2007 | 500 | $41.04 | $20,520 |
| | | 11/20/2007 | 500 | $40.88 | $20,440 |
| | | 11/20/2007 | 500 | $40.62 | $20,310 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|------------|------|--------|-------|----------|
| | | 11/20/2007 | 400 | $40.97 | $16,388 |
| | | | **379,658** | | **$15,545,269** |
| | | | | | |
| **MORRO** | **STEPHEN** | 3/19/2008 | 43,549 | $46.00 | $2,003,254 |
| | | 3/24/2008 | 18,451 | $46.00 | $848,746 |
| | | | **62,000** | | **$2,852,000** |
| | | | | | |
| **PENNINGTON** | **RICHARD** | 12/14/2007 | 6,500 | $44.34 | $288,210 |
| | | 12/14/2007 | 3,300 | $44.39 | $146,487 |
| | | 12/14/2007 | 3,200 | $44.46 | $142,272 |
| | | 12/14/2007 | 2,950 | $44.42 | $131,039 |
| | | 12/14/2007 | 2,600 | $44.29 | $115,154 |
| | | 12/14/2007 | 2,400 | $44.30 | $106,320 |
| | | 12/14/2007 | 2,100 | $44.37 | $93,177 |
| | | 12/14/2007 | 2,000 | $44.31 | $88,620 |
| | | 12/14/2007 | 1,800 | $44.36 | $79,848 |
| | | 12/14/2007 | 1,800 | $44.37 | $79,866 |
| | | 12/14/2007 | 1,600 | $44.32 | $70,912 |
| | | 12/14/2007 | 1,500 | $44.24 | $66,360 |
| | | 12/14/2007 | 1,300 | $44.38 | $57,694 |
| | | 12/14/2007 | 1,200 | $44.48 | $53,376 |
| | | 12/14/2007 | 1,100 | $44.39 | $48,829 |
| | | 12/14/2007 | 1,000 | $44.41 | $44,410 |
| | | 12/14/2007 | 900 | $44.22 | $39,798 |
| | | 12/14/2007 | 900 | $44.23 | $39,807 |
| | | 12/14/2007 | 900 | $44.33 | $39,897 |
| | | 12/14/2007 | 800 | $44.20 | $35,360 |
| | | 12/14/2007 | 800 | $44.35 | $35,480 |
| | | 12/14/2007 | 800 | $44.38 | $35,504 |
| | | 12/14/2007 | 700 | $44.27 | $30,989 |
| | | 12/14/2007 | 700 | $44.33 | $31,031 |
| | | 12/14/2007 | 500 | $44.17 | $22,085 |
| | | 12/14/2007 | 500 | $44.25 | $22,125 |
| | | 12/14/2007 | 500 | $44.28 | $22,140 |
| | | 12/14/2007 | 500 | $44.31 | $22,155 |
| | | 12/14/2007 | 500 | $44.35 | $22,175 |
| | | 12/14/2007 | 400 | $44.24 | $17,696 |
| | | 12/14/2007 | 400 | $44.46 | $17,784 |
| | | 12/14/2007 | 300 | $44.18 | $13,254 |
| | | 12/14/2007 | 300 | $44.21 | $13,263 |
| | | 12/14/2007 | 300 | $44.32 | $13,296 |
| | | 12/14/2007 | 300 | $44.41 | $13,323 |
| | | 12/14/2007 | 300 | $44.44 | $13,332 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 12/14/2007 | 300 | $44.47 | $13,341 |
| | | 12/14/2007 | 200 | $44.25 | $8,850 |
| | | 12/14/2007 | 200 | $44.26 | $8,852 |
| | | 12/14/2007 | 200 | $44.34 | $8,868 |
| | | 12/14/2007 | 200 | $44.49 | $8,898 |
| | | 12/14/2007 | 200 | $44.49 | $8,898 |
| | | 12/14/2007 | 100 | $44.21 | $4,421 |
| | | 12/14/2007 | 100 | $44.22 | $4,422 |
| | | 12/14/2007 | 100 | $44.23 | $4,423 |
| | | 12/14/2007 | 100 | $44.36 | $4,436 |
| | | 12/14/2007 | 100 | $44.37 | $4,437 |
| | | 12/14/2007 | 100 | $44.38 | $4,438 |
| | | 12/14/2007 | 100 | $44.40 | $4,440 |
| | | 12/14/2007 | 100 | $44.40 | $4,440 |
| | | 12/14/2007 | 100 | $44.44 | $4,444 |
| | | 12/14/2007 | 100 | $44.48 | $4,448 |
| | | 12/14/2007 | 50 | $44.43 | $2,222 |
| | | | **50,000** | | **$2,217,346** |
| | | **Total:** | **669,273** | | **$28,767,515** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

79.    At all relevant times, the market for IGT common stock was an efficient market for the following reasons, among others:

(a)    IGT stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, IGT filed periodic public reports with the SEC and the NYSE;

(c)    IGT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 35 -

(d)    IGT was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

80.    As a result of the foregoing, the market for IGT's common stock promptly digested current information regarding IGT from all publicly available sources and reflected such information in IGT's stock price. Under these circumstances, all purchasers of IGT's common stock during the Class Period suffered similar injury through their purchase of IGT common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

81.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IGT who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

82.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

83.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

85.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IGT common stock.  Plaintiff and the Class would not have purchased IGT common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

86.    As a direct and proximate result of these Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of IGT common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of IGT within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of IGT, and their ownership of IGT stock, the Individual Defendants had the power and authority to cause IGT to engage in the wrongful conduct complained of herein.

89.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED:  July 30, 2009             THE O'MARA LAW FIRM, P.C.
                                  WILLIAM M. O'MARA
                                  DAVID C. O'MARA


                                         /s/ William M. O'Mara
                                  WILLIAM M. O'MARA

                                  311 East Liberty Street
                                  Reno, NV  89501
                                  Telephone:  775/323-1321
                                  775/323-4082 (fax)

                                  COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                  SAMUEL H. RUDMAN
                                  JOSEPH RUSSELLO
                                  58 South Service Road, Suite 200
                                  Melville, NY  11747
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)

                                  CAVANAGH & O'HARA
                                  PATRICK J. O'HARA
                                  407 East Adams Street
                                  Springfield, IL  62701
                                  Telephone:  217/544-1771
                                  217/544-9894 (fax)

                                  Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt International Game.doc