THE O'MARA LAW FIRM, P.C.
WILLIAM O. O'MARA (Nevada Bar No. 837)
DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV  89501
Telephone:  775/323-1321
775/323-4082 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
    & DOWD LLP
DARREN J. ROBBINS
ARTHUR C. LEAHY
BRIAN O. O'MARA (Nevada Bar No. 8214)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INTERNATIONAL GAME TECHNOLOGY, et al.,<br><br>Defendants. | No. 3:09-cv-00419-ECR-RAM<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

## INTRODUCTION AND OVERVIEW

1.      Plaintiffs, on behalf of themselves and all other persons and entities similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon the investigation of plaintiffs' counsel, which included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings made by defendant International Game Technology ("IGT" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews of former IGT employees, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a class action for violation of the federal securities laws on behalf of a class of all persons and entities who purchased or otherwise acquired IGT securities between November 1, 2007 and October 30, 2008, inclusive (the "Class Period"), against IGT, Thomas J. Matthews ("Matthews"), the Company's former Chief Executive Officer ("CEO") and Patrick W. Cavanaugh ("Cavanaugh"), IGT's Chief Financial Officer ("CFO").  Plaintiffs allege securities fraud in violation of §10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder, as well as control person claims under §20(a) of the 1934 Act.

3.      IGT is the world's largest gaming company.  It derives its revenues from the distribution of electronic gaming equipment, systems, services and licensing.  Matthews and Cavanaugh are or were officers and/or directors of IGT and ran the Company during the Class Period.

4.      During the Class Period, defendants issued a series of false and misleading statements, and omitted material information, with respect to IGT's business, operations and future

prospects, which artificially inflated the price of the Company's publicly-traded securities. As it became evident over time that defendants had misrepresented IGT's condition and prospects, IGT's stock price declined in response to a series of disclosures of the truth, and plaintiffs and the Class suffered over one billion dollars in damages.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

7.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), as many of the acts complained of herein occurred in substantial part in this district. IGT, a Nevada Corporation, maintains its headquarters, as well as other substantial operations, in this district.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

9.      Court-appointed lead plaintiff Iron Workers District Counsel of Western New York and Vicinity Pension Fund purchased the common stock of IGT during the Class Period and has been damaged thereby.

- 2 -

10.     Named plaintiff International Brotherhood of Electrical Workers Local 697 Pension Fund purchased the common stock of IGT during the Class Period and has been damaged thereby.

11.     Plaintiffs Iron Workers District Counsel of Western New York and Vicinity Pension Fund and International Brotherhood of Electrical Workers Local 697 Pension Fund are collectively referred to herein as "plaintiffs."

**Defendants**

12.     Defendant IGT is a Nevada corporation whose principal offices are located at 9295 Prototype Drive, Reno, Nevada 89521.  IGT is the world's largest gaming company that specializes in the design, manufacture, and marketing of electronic gaming equipment and network systems, as well as licensing and services.  IGT reports the results of its operations in two business segments: North America, which consists of operations in the U.S. and Canada, comprising 76% of consolidated revenues in fiscal 2008, and International, which encompasses the remainder of its operations, comprising 24% of consolidated revenues in fiscal 2008.  IGT reports its financial results on a fiscal year basis.  IGT's fiscal year begins on October 1 and ends on September 30.  IGT's common stock is publicly traded on the New York Stock Exchange ("NYSE") under the symbol "IGT."

13.     Defendant Matthews served as IGT's President, CEO, and Chairman of the Board of Directors during the Class Period.  He later resigned as President and CEO but remained as Chairman.  During the Class Period, Matthews made many of the false and misleading statements about IGT, and failed to disclose material facts about the Company, alleged herein.

14.     Defendant Cavanaugh served as IGT's Vice President of Corporate Finance and Investor Relations during the Class Period.  In addition, during the Class Period, Cavanaugh oversaw certain forecasting activities.  During the Class Period, Cavanaugh made many of the false and

misleading statements, and omitted material information, alleged herein.  Cavanaugh is currently IGT's CFO.

15.     Defendants Matthews and Cavanaugh are collectively referred to herein as the "Individual Defendants," and, together with IGT, as the "defendants."

16.     Defendants Matthews and Cavanaugh, because of their positions with the Company, had access to the material, adverse, undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects alleged herein.  The Individual Defendants had access to such information because of their positions with the Company and because they were involved in the day-to-day operations of IGT. The Individual Defendants had access to such information through their access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings (and committees thereof), and through reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the material, undisclosed, adverse facts specified herein contradicted their public representations.

17.     Each of the Individual Defendants, as an officer of IGT and by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations and decisions of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, future prospects and financial condition.  The Individual Defendants were directly involved in either making, drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.  The Individual

- 4 -

517972_1

Defendants were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue.  The Individual Defendants had this duty so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     Each of the defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of IGT's publicly-traded securities by disseminating materially false and misleading statements and/or omitting material adverse facts.  The scheme:  (i) deceived the investing public regarding IGT's business, operations, future prospects and the intrinsic value of IGT's publicly-traded securities; (ii) enabled certain defendant Matthews and other IGT insiders to sell nearly $29 million of their personally held IGT common stock to the unsuspecting public; and (iii) caused plaintiffs and other shareholders to purchase IGT securities at artificially inflated prices during the Class Period.

## BACKGROUND TO THE CLASS PERIOD

20.     Over the course of the preceding years, the gaming industry was evolving from a technological perspective.  The industry was migrating away from a relatively unsophisticated model

- 5 -

of stand-alone machines toward open-network, server-based ("SB") technology where all the machines would be linked to a common network.

21.     Although prior to and at the beginning of the Class Period (November 1, 2007 through October 30, 2008), gambling machines had evolved to the point where most machines contained software installed within each machine, most machines were not linked together and could not be monitored, controlled or changed from a central location.  Instead, software (and the games it provided) needed to be changed at each machine by hand whenever a modification was desired. This was a very slow, time-consuming and inefficient practice.  The industry was just beginning to move toward the SB model at the beginning of the Class Period.

22.     The reason for the  migration to SB technology was that it was viewed as financially beneficial to casino and other gaming operators.  It gave casino and other gaming operators the ability and flexibility to instantly select and change games and betting and jackpot amounts, which would maximize the amount of money gamblers would spend.  SB technology would allow operators to configure and customize their gambling floors with the right games at the right betting and jackpot amounts at the right time such that it would maximize profits.  SB  technology would also allow operators to customize their machines to gamblers' preferences, targeting specific ads and giveaways to the gamblers' tastes, and to generally make the gambling experience more pleasurable to gamblers, all designed to increase the operators' profits.  The SB technology would also allow the casinos and other gambling operators to better track gamblers' habits and preferences to further enhance profits.

23.     IGT would benefit financially from SB technology because casinos and others would have to purchase the new technology from IGT, as well as new machines that would be compatible with the technology.  In addition, many casino and gaming operators leased machines from IGT;

- 6 -

under those leases, the operators paid IGT a percentage of the money that was gambled through the machines.  Since SB technology allowed gaming operators to configure their floors instantly to maximize the amount of money spent on gambling, IGT would make more money on the leases with SB technology.  Most importantly, SB technology could theoretically be sold at higher profit margins compared to traditional stand-alone machine sales, thus making IGT much more profitable and allowing the Company to generate better earnings per share ("EPS").

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

24.     The Class Period commenced on November 1, 2007.  On that date, IGT issued a press release announcing  "record" financial results for its fourth fiscal quarter and year ended September 30, 2007.  IGT's "*record*"[1] financial results were very impressive in light of a difficult industry downturn driven by fewer new casino openings and slowing demand for gambling machines.

25.     Also on November 1, 2007, defendants held a conference call with securities analysts and investors to discuss IGT's 2007 fourth fiscal quarter and year-end financial results.  Defendant Cavanaugh highlighted IGT's outstanding performance, stating that "IGT delivered record results on nearly every financial measure" even in a difficult economic environment, suggesting that IGT was uniquely positioned such that it was succeeding, and would continue to succeed, regardless of how the rest of the industry faired.

26.     On the November 1, 2007 conference call, defendant Matthews painted a picture of a bright future for IGT.  Matthews stated that the Company's EPS forecast for the coming two quarters would be $0.35 to $0.40 and indicated that he "believe[d] there is a good likelihood that EPS will

---

[1]     All emphasis herein is added.

break out of this range in the second half of '08" due to growth in sales in fiscal "Q2 through 4" of 2008.

27.     On the conference call, Matthews touted IGT's ongoing efforts to develop SB technology, stating that IGT was the "clear technology leader" and "best in class." He also represented that he was "*especially excited about the returns we anticipate in the next few years as [IGT's] server-based technology is rolled out*" and that IGT "remain[ed] *on target* to begin commercializing this product in 2009." Matthews represented that new products like SB technology would "drive market growth in the coming years" and "assure that IGT's future prospects remain[] solid."

28.     Cavanaugh represented in the conference call that IGT's fiscal 2008 total operating expenses would be "between 26 and 28% of total revenues." Cavanaugh also represented that IGT's operating expenses were driven in part by developing innovative technologies such as the SB technology, stating that such "innovation is a key component of our business strategy" and that the Company would continue to invest in developing SB technology.

29.     The foregoing statements by defendants made it appear that IGT was having and would continue to have great financial success even in the current industry downturn, as it was uniquely positioned to succeed regardless of industry conditions. As the market digested this highly positive information, the Company's stock price rose over the next several days. On November 2, 5 and 6, 2007, IGT's stock price rose 2.13% to $43.66 per share, 1.6% to $44.36 per share, and 1.56% to $45.05 per share, respectively.

30.     On November 12, 2007, defendants Cavanaugh and Matthews appeared at an investment forum hosted by Deutsche Bank Securities. In the meeting, defendant Cavanaugh again bullishly portrayed IGT's future, emphasizing that as IGT "become[s] less focused on hardware

- 8 -

deliveries, and more focused on providing software solutions [like SB technology] that that naturally migrates you to a ***higher margin***."

31.    On November 28, 2007, the Company filed its SEC Form 10-K for the fiscal year ended September 30, 2007.  In the Form 10-K, IGT represented that it was poised for continued growth during fiscal year 2008 notwithstanding that "domestic replacement sales are expected to remain at historically low levels in the upcoming year" as defendants "anticipate[d] benefitting from growth in new or expanding domestic markets beginning in the second half of fiscal 2008." Defendants also emphasized that their SB technology would "further differentiate IGT" from its competitors in the future.

32.    In response to these statements, the price of IGT's common stock once again increased, rising 3.2% to $42.89 per share on November 28, 2007, and an additional 1.77% to $43.65 per share on November 29, 2007.

33.    On December 5, 2007, defendants Cavanaugh and Matthews appeared at an investors conference in New York called the "Wachovia's Global Real Estate Securities Conference." Defendants again touted the bright future for IGT and the profitable opportunities ahead for the Company.  Cavanaugh conveyed that there would be growth in future sales based on estimates that there was a lot of new capacity being created by anticipated casino openings throughout the world. Cavanaugh also implied how IGT was impervious to negative industry conditions by pointing out that IGT's sales generated "peak profits[,] cash flow and operating income" "despite having some of the lowest unit shipments [i]n recent memory."

34.    Defendants' statements during November and December 2007 (¶¶24-28, 30-31 and 33) were false and misleading when made.  Defendants knew, or recklessly disregarded, but failed to disclose the following material facts:

(a)     "Play levels," i.e., how much gamblers were gambling, a key metric indicative of whether IGT's business would be good or bad, began to rapidly decrease in November 2007. Defendants were aware of this, and later admitted they knew this as early as November 2007. Significantly lower play levels signaled that IGT was going to suffer financially in the upcoming quarters;

(b)     IGT's SB technology was facing significant issues that was preventing it from being ready for commercial launch in 2009, contrary to defendants' representations that IGT was "on target."  Those issues included:

- IGT was unable to meet internal developmental deadlines; therefore the SB technology initiative was never "on target" to begin commercialization. According to a former Senior Project Manager at IGT (confidential witness or "CW #1") who worked at IGT before and during the entire Class Period, and who was very familiar with the SB technology given his 15 years at the Company, IGT *consistently missed*" deadlines related to the SB technology. At least five other former IGT employees, each of whom worked at the Company during the entire Class Period, and each of whom either were very familiar with the SB technology or worked directly on it, confirmed that IGT repeatedly missed internal deadlines causing the SB development to fall behind schedule.

- Within IGT itself, there was in-fighting between groups of employees about whether or not the Company should even be pursuing the SB technology. This further slowed the project and caused it to not be "on target." According to a former Product Manager in IGT's Networking Systems department ("CW #2"), who worked at the Company both before and during the Class Period – and who worked on the SB technology initiative – employees of the Networking Systems department and Engineering department were engaged in this conflict during the Class Period, resulting in failures to meet deadlines.

- According to a former IGT Project Manager ("CW #3"), who worked on the SB initiative during the entire Class Period, there were numerous delays caused by problems with integrating software systems into the SB technology.  Similarly, according to a former Integration Engineer at IGT ("CW #4"), who worked on testing elements of the SB technology during the Class Period, there were "stability issues" with the SB technology which prevented the technology from being able to network more than 12 to 14

machines at one time.  At the time this former employee terminated his employment with IGT in June 2009, this issue still had not been resolved – the SB system continually crashed when multiple machines were networked. Moreover, according to this former employee, the top executives at the Company, such as the Individual Defendants, were aware of these issues and the missing of deadlines.

- According to CW #2, while IGT publicly represented that SB technology was the Company's number one priority, internally IGT did not make it a priority. Instead, internally there was no real leadership or focus on carrying out or executing the SB technology initiative.  According to a former IGT Software Engineering Manager ("CW #5"), who worked on the SB technology initiative during the entire Class Period, numerous changes in the SB technology managers resulted in decreased productivity and an unclear vision of where the Company was going with the technology.  According to CW #2, there was a lack of leadership and no clear product definition, all of which negatively impacted the development of the technology;

(c)     Contrary to defendants' representations that the sale of SB technology would result in "higher margins," *i.e.*, increased net profit and EPS, defendants had absolutely no basis for making such statements.  This was so because IGT had not yet developed a pricing model for SB products (and never did during the Class Period) and also had not determined what customers would be willing to pay for such products;

(d)     Notwithstanding defendants' representations that operating expenses would be contained at between 26% and 28% of total revenues, IGT had no basis for making these forecasts, as IGT's spending was out of control.  According to a former Engineering Manager for "IGT Labs" ("CW #6"), who worked for the Company for 12 years and who left IGT in December 2008, IGT did not control its expenses well, frequently made imprudent expenditures and spent like it had a "bottomless purse."   According to CW #6, IGT repeatedly wasted money on "end-of-life" components related to the SB technology.  For example, according to CW #6, in many instances IGT purchased memory sticks from vendors for use with the SB technology.  When IGT was informed by the vendors that they were going to discontinue the memory sticks in the near future, IGT would

- 11 -

make large purchases of the memory sticks to ensure it had enough on hand when the sticks were discontinued. By the time IGT was ready to use the sticks, however, they had become obsolete, causing the expenditures to be a waste and useless. These were not isolated issues of imprudent spending. According to CW #6, this was a "continuous issue" that presented itself at least once per quarter during the Class Period. Moreover, these were not small expenditures – according to CW #6, the expenditures involved tens of thousands of parts. In addition, according to CW #2, there was no concerted effort at IGT to attempt to control or monitor costs associated with the SB technology until the end of the Class Period, in October 2008;

(e)     In addition to the fact that defendants were aware play levels were declining, and that that signaled difficult conditions for the coming quarters, defendants were also aware that IGT was losing market share to competitors at ever increasing levels. According to a former IGT Account Executive ("CW #7"), who worked for IGT throughout the Class Period, demand was slipping for IGT's products throughout the Class Period because competitors' machines were more profitable for casino and gaming operators. Competitors' machines generated more profit for operators; thus operators were replacing less-profitable IGT machines with more-profitable competing machines. In addition, according to CW #7, IGT's sales and market share were also declining because IGT was emphasizing the sale of its new "AVP" machines. The new AVP machines were "SB-ready" – that is they were designed to work with the upcoming new SB technology. Customers, however, were not interested in purchasing the AVP machines. According to CW #7, customers did not buy IGT's AVP machines because they were more expensive than current machines, required additional new hardware and wiring, were designed to work with a technology that was not even in the marketplace yet, and such new technology did not have any pricing models out yet so customers could not estimate what their potential costs might be; and

- 12 -

(f)     As a result for all the foregoing, defendants knew that their forecasts of EPS of $0.35 to $0.40 or higher were false, and/or that such forecasts were not reasonable in light of the facts available to them.

35.     On or about January 14, 2008, IGT disseminated its 2007 Annual Report to shareholders.  In the report, IGT represented to shareholders that its focus going forward would be on the SB technology, as it "will be IGT's future business model – more significant contributions from **higher-margin** revenues as gaming floors begin the migration to system-based game delivery and applications."

36.     On January 17, 2008, IGT issued a press release announcing its financial results for the first fiscal quarter of 2008.  IGT reported that it generated EPS of $0.36 for the quarter, in line with defendants' prior forecasts of $0.35-$0.40.

37.     After issuance of the press release, defendants hosted a conference call with investors and analysts on the same day, January 17, 2008.  The theme of the call was that IGT would succeed even in the difficult economic environment.  In the call, defendant Cavanaugh represented that even in a difficult economic climate IGT was unaffected: "despite the lowest demand for replacement machines in North America since the 1990s[,] IGT still posted increased revenues."  Defendant Matthews echoed Cavanaugh's remarks: "[W]e have been operating in a difficult environment.  It has been the weakest replacement demand that we have seen since 1998. . . .  [Nonetheless] we continue at these peak earnings and these [high] margins despite these minimal demand levels."

38.     In the conference call, defendants indicated that IGT would continue to flourish in fiscal 2008 by increasing replacement shipments even though the industry overall was not expecting any increase in such shipments.  Defendant Matthews stated that, contrary to what the rest of the industry was forecasting, IGT was expecting "an **increase in replacement units** in both Q3 and Q4

- 13 -

[of fiscal 2008], as well as the ***tremendous demand of new and expansion units***." These statements had the effect of communicating that IGT was largely immune from the industry downturn.

39.     In the January 17, 2008 conference call, defendants received questions concerning whether defendants saw unusually lower play levels. Defendant Cavanaugh answered in the negative: "there's a lot of factors that affect play levels . . . [b]ut on the surface, ***all we're seeing at this point is normal seasonality***." Similarly, defendant Matthews reassured investors that play levels were normal, representing that "***play levels are very much in line with what we normally see due to seasonal factors***."

40.     Defendant Matthews continued to bullishly portray IGT's future prospects in the conference call. Matthews represented that while defendants were keeping the Company's EPS forecasts in "the range . . . of $0.35 to $0.40, [IGT would] probably operate outside of that range over the course of each of the next three quarters, perhaps a little bit to the weak side of that in Q2 . . . but ***likely to exceed $0.40 of earnings in both Q3 and Q4***." Matthews further represented that "without changing guidance [we] feel very comfortable that we are likely to exceed that range, so as a result have $0.40 plus quarters in each Q3, Q4. So potentially $0.35 or maybe even slightly below for Q2. ***$0.40-plus in Q3, and Q4***."

41.     In the January 17, 2008 conference call, defendants also continued to represent that SB technology was IGT's main focus and was the key to future success. Matthews represented that "[o]n sb, we continue to make progress . . . . As a result of all of this, IGT will be moving to a more service-software revenue orientation that has an ***expanded margin*** associated with that . . . ."

42.     In the conference call, defendant Cavanaugh assured investors that IGT's total operating expenses would "remain between 26% and 29% of total revenues," and that "IGT will continue to be ***prudent*** in its capital deployment."

- 14 -

43. In response to this news, the Company's stock price declined an aggregate of more than 4% on January 17 and 18, 2008, largely as a result of industry-wide forecasts of decreasing demand and the fact that it was anticipated that decreasing demand would negatively affect IGT in the second fiscal quarter of 2008. Nonetheless, IGT's stock price did not decline even more because of defendants' continued bullish (but false) forecasts for IGT for the rest of the fiscal year and their efforts to communicate that the Company was uniquely positioned to succeed compared to its competitors even in the difficult industry environment.

44. On February 13, 2008, IGT announced in a press release that Harrah's Entertainment, Inc. ("Harrah's") had selected IGT's SB technology for installation in more than 60,000 of Harrah's slot machines. An IGT representative stated that the agreement with Harrah's "demonstrates ***IGT's complete commitment to [SB technology]***."

45. On March 12, 2008, defendant Cavanaugh appeared at the Deutsche Bank Securities Hospitality & Gaming Conference. At that conference Cavanaugh again bullishly touted IGT's future prospects regardless of downturns in the industry. Cavanaugh implied that IGT was immune from industry downturns, by noting that in the "past fiscal year [IGT] shipped a third less devices . . . however, made more money on almost every financial metric." Cavanaugh represented that IGT's "sales margins continue to expand[] [a]nd so, the net result of this is ***peak earnings in gross margins***, in spite of some of the lowest units we've seen in recent memory."

46. At the March 12, 2008 conference, Cavanaugh also emphasized IGT's primary focus on SB technology, representing that it would enable IGT to "continue to lead our industry-leading portfolio . . . ***to ensure that we continue those revenues and margins that we've come to enjoy. We're very focused on delivering [SB] games and applications*** . . . ."

- 15 -

47.     At the conference Cavanaugh also again bullishly forecast IGT's future earnings, stating that "[h]opefully we're going to be able to move up in EPS ranges every few months."

48.     Cavanaugh also discussed IGT's costs and capital expenditures on, among other things, SB technology, at the conference on March 12, 2008.  Cavanaugh emphasized that "you're going to see us continue to be **_prudent_** in the deployment of [shareholders] capital" on such projects.

49.     While defendants' statements during January, February and March 2008 indicated for the first time that IGT may actually be slightly negatively affected in the fiscal second quarter of 2008, thus resulting in a partial disclosure of the truth, defendants did not reveal the entire truth – that IGT was actually expecting to be negatively impacted for the remainder of the fiscal year.  Thus, defendants' statements during January, February, and March 2008 (¶¶35-42, 44-48) were false and misleading when made because defendants knew, or recklessly disregarded, but failed to disclose the following:

(a)     Play levels began to uncharacteristically and rapidly decrease in November 2007 and continued to further decline through March of 2008.  Defendants were aware of this, and later admitted they knew this as early as November 2007.  Thus, defendants' representations that they did not see any decline, or that any declines were due to normal "seasonality," were false and misleading when made.  The declining rates of  play levels signaled that IGT was going to suffer financially in the upcoming quarters;

(b)     IGT was not "very focused" or completely committed to SB technology because:

- Within IGT itself, there was in-fighting between groups of employees about whether or not the Company should even be pursuing the SB technology. According to CW #2, employees of the Networking Systems department and Engineering department were constantly engaged in clashes over whether

IGT should be pursing development of the SB technology during the Class Period.

- According to CW #2, there was no real leadership or focus at IGT on carrying out or executing the SB technology initiative. According to CW #5, numerous changes in the SB technology management resulted in decreased productivity and an unclear vision of where the Company was going with the technology. According to CW #2, there was a lack of leadership and no clear product definition during and after the Class Period.

(c)     Contrary to defendants' representations that the sale of SB technology would result in "higher" or "expanded" margins," *i.e.*, more net profit, defendants had absolutely no basis for making such statements. This was so because IGT had not yet developed a pricing model for SB products (and never did during the Class Period) and also had not determined what customers would be willing to pay for such products. Therefore, defendants could not predict what margins the SB technology would yield;

(d)     Notwithstanding defendants' representations that operating expenses would be contained at between 26% and 29% of total revenues and capital expenditures would be "prudent," IGT had no basis for making these forecasts. In fact, IGT's spending was out of control. According to CW #6, IGT did not control its expenses well, frequently made imprudent expenditures and spent like it had a "bottomless purse." According to CW #6, IGT repeatedly wasted money on "end-of-life" components related to the SB technology such as memory sticks and video boards. For example, according to CW #6, in many instances IGT purchased memory sticks from vendors for use with the SB technology. When IGT was informed by the vendors that they were going to discontinue the memory sticks in the near future, IGT would make large purchases of the memory sticks to ensure it had enough on hand when the sticks were discontinued. By the time IGT was ready to use the sticks, however, they had become obsolete, causing the expenditures to be a waste and useless. These were not isolated issues of imprudent spending. According to CW #6, this was a

"continuous issue" that presented itself at least once per quarter during the Class Period.  Moreover, these were not small expenditures – according to CW #6, the expenditures involved tens of thousands of parts.  In addition, according to CW #2, there was no concerted effort at IGT to attempt to control or monitor costs associated with the SB technology until the end of the Class Period, in October 2008;

      (e)    In addition to the fact that defendants were aware play levels were declining, and that that signaled difficult conditions for the coming quarters, defendants were also aware that IGT was losing market share to competitors at ever increasing levels.  According to CW #7, demand was slipping for IGT's products throughout the Class Period because competitors' machines were more profitable for casino and gaming operators.  Competitors' machines generated more profit for operators; thus operators were replacing less-profitable IGT machines with more-profitable competing machines.  In addition, according to CW #7, IGT's sales and market share were also declining because IGT was emphasizing the sale of its new "AVP" machines.  The new AVP machines were "SB-ready" – that is they were designed to work with the upcoming new SB technology.  Customers, however, were not interested in purchasing the AVP machines.  According to CW #7, customers did not buy IGT's AVP machines because they were more expensive, required additional new hardware and wiring, were designed to work with a technology that was not even in the marketplace yet, and such new technology did not have any pricing models out yet so customers could not estimate what their potential costs might be.  Thus, defendants' representations that they saw increased demand in the third and forth fiscal quarters were without basis;

      (f)    Defendants omitted to disclose that, in order to get Harrah's to agree to use the SB technology, IGT was required to provide the technology to Harrah's for free for as long as two

- 18 -

years and therefore this agreement had no prospects of creating revenues for IGT for several years; and

(g)     As a result for all the foregoing, defendants knew that their forecasts of EPS of $0.35 to $0.40 or higher were false, and/or that such forecasts were not reasonable in light of the facts available to them.

50.     On April 17, 2008, IGT issued a press release announcing that it had signed a memorandum of understanding with the CityCenter in Las Vegas, Nevada, "pertaining to installing a server-based network and related IGT sb™ and gaming management system products at the development's resort casino scheduled to open in late 2009."

51.     Also on April 17, 2008, IGT issued a press release announcing the Company's financial results for the second fiscal quarter of 2008.  IGT announced disappointing second fiscal quarter EPS of just $0.22, far below defendants' forecasts of $0.35-$0.40 or "slightly below."  In the press release, defendant Matthews conceded that "IGT's second quarter results were challenged by the current market environment."

52.     After issuing the press releases on April 17, 2008, defendants hosted a conference call with investors and securities analysts on the same day to discuss IGT's second fiscal quarter financial results.  Defendant Cavanaugh discussed the various factors that impacted IGT's performance, indicating that "lower play levels" contributed to IGT's disappointing second quarter performance.  Nonetheless, defendant Matthews attributed the lower play levels to "*seasonality*" as opposed to the overall economic downturn and assured investors that IGT was uniquely positioned to better deal with industry downturns since ***IGT's products were "probably . . . slightly less impacted*** by the overall economic impact on play levels."  Matthews also represented that IGT

- 19 -

expected little negative impact from lower play levels, as the remaining six months of the fiscal year were "*the best six months of the year for game play levels*."

53.     On the conference call Matthews was also still very bullish about IGT's EPS forecasts.  Matthews stated that "*[m]arket expansion continues really in a very robust way* even though there has [sic] been a couple of setbacks."  Matthews further represented that "*we continue to expect an uptick in our business levels* during the second half of [fiscal 2008] as new and expansion opportunities open. . . . *[W]e maintain our guidance [for EPS] at $0.35 to $0.40 for the next four quarters with the possibility of coming in at the high end, if not slightly exceeding this range in the second half of [fiscal 2008]*."  Later in the call, Matthews re-emphasized this: "[W]e think there is still, as we mentioned on the last call, there is still *an opportunity for us to exceed the range* in one or both of the quarters in the back half of '08."

54.     On the April 17, 2008 conference call, Matthews continued to maintain IGT's forecasts of total "*operating expenses at 26% to 28%* [of total revenues] in the back half of the year [fiscal 2008]."  Defendant Cavanaugh represented that "IGT will continue to be *prudent in* its capital deployment . . . ."

55.     Defendants also continued to focus on SB technology in the conference call. Matthews answered numerous questions about and highlighted the SB agreements entered into with Harrah's and CityCenter.  Notwithstanding the disappointing quarter, Matthews represented that IGT "still made progress in achieving our long-term objectives" and "expect[ed] to be selling an awful lot of SB systems" in the not-too-distant future.  With respect to CityCenter, defendant Matthews stated that *IGT was "comfortable that we will accomplish" delivery of version "4.0" of the SB technology* to CityCenter upon CityCenter's opening.

- 20 -

56.     Although the Company's announcement pertaining to CityCenter appears to have been timed to coincide with, and lessen the impact of, the Company's disclosure of its poor second quarter financial results, the CityCenter announcement did not have its intended effect.  Instead, the market's response was overwhelmingly negative, with IGT's stock price declining more than 6% on April 17, 2008 to $35.70 per share on extremely heavy trading volume of nearly 15 million shares, from a closing price of $38.01 per share the day before.  It was starting to become apparent that IGT was not as well positioned to weather industry downturns as defendants had previously led shareholders to believe.  Nonetheless, the true extent of IGT's vulnerability was still not disclosed as defendants' optimistic misrepresentations about the Company and its future caused IGT's securities to continue to trade at artificially inflated amounts.

57.     Defendants' statements during April 2008 (¶¶50-55) were false and misleading when made.  Defendants knew, or recklessly disregarded, but failed to disclose the following:

(a)     Play levels began to uncharacteristically and rapidly decrease in November 2007 and continued to further decline through April of 2008.  Defendants were aware of this, later admitted they knew this as early as November 2007, and were aware that the rapid declines were going to negatively impact IGT's financial performance in the coming quarters.  Thus, defendants' representations that the declines were due to normal "seasonality," that IGT's machines were "less impacted" by such declines, and that the coming six months were the "best" months for play level, were false and misleading when made;

(b)     IGT was unable to deliver version 4.0 of the SB technology to CityCenter when it opened because, as alleged herein, IGT was experiencing major delays in developing the SB technology as it constantly missed internal progress deadlines, experienced numerous integration issues that were not resolved during the Class Period, experienced internal in-fighting about the

- 21 -

technology, and was not really focusing on the technology as it represented.  By the time CityCenter

opened, version 4.0 of the SB technology still had not been developed (according to CW #5), and in

fact was never scheduled to be developed by then, according to CW #3;

        (c)      Notwithstanding defendants' representations that operating expenses would be

contained at between 26% and 28% of total revenues and capital expenditures would be "prudent,"

IGT had no basis for making these statements and forecasts.  In fact, IGT's spending was out of

control.  According to CW #6, IGT did not control its expenses well, frequently made imprudent

expenditures and spent like it had a "bottomless purse."  According to CW #6, IGT repeatedly

wasted money on "end-of-life" components related to the SB technology such as memory sticks and

video boards.  For example, according to CW #6, in many instances IGT was purchasing memory

sticks from vendors for use with the SB technology.  When IGT was informed by the vendors that

they were going to discontinue the memory sticks in the near future, IGT would make large

purchases of the memory sticks to ensure it had enough on hand when the sticks were discontinued.

By the time IGT was ready to use the sticks, however, they had become obsolete, causing the

expenditures to be a waste and useless.  These were not isolated issues of imprudent spending.

According to CW #6, this was a "continuous issue" that presented itself at least once per quarter

during the Class Period.  Moreover, these were not small expenditures – according to CW #6, the

expenditures involved tens of thousands of parts.  In addition, according to CW #2, there was no

concerted effort at IGT to attempt to control or monitor costs associated with the SB technology until

the end of the Class Period, in October 2008;

        (d)      In addition to the fact that defendants were aware that declining play levels

signaled difficult conditions for the coming quarters, defendants were also aware that IGT was losing

market share to competitors at ever increasing levels.  According to CW #7, demand was slipping for

IGT's products throughout the Class Period because competitors' machines were more profitable for casino and gaming operators. Competitors' machines generated more profit for operators; thus operators were replacing less-profitable IGT machines with more-profitable competing machines. In addition, according to CW #7, IGT's sales and market share were also declining because IGT was emphasizing the sale of its new "AVP" machines. The new AVP machines were "SB-ready" – that is they were designed to work with the new upcoming SB technology. Customers, however, were not interested in purchasing the AVP machines. According to CW #7, customers did not buy IGT's AVP machines because they were more expensive then existing machines, required additional new hardware and wiring, were designed to work with a technology that was not even in the marketplace yet, and such new technology did not have any pricing models out yet so customers could not estimate what their potential costs might be. Thus, defendants' representations that they saw "robust" demand and an "uptick in our business" in the second half of fiscal 2008 were without basis;

(e)      According to CW #5 as well as a former IGT Executive Director of Systems Services ("CW #8") during the Class Period, defendants omitted to disclose that, in order to get CityCenter to agree to use the SB technology, IGT was required to provide the technology to CityCenter for free for at least two years and therefore this agreement had no prospects of creating revenues for IGT for several years; and

(f)      As a result for all the foregoing, defendants knew that their forecasts of EPS of $0.35 to $0.40 or higher were false, and/or that such forecasts were not reasonable in light of the facts available to them.

58.      On July 17, 2008, IGT announced its financial results for its third fiscal quarter of 2008. IGT announced EPS of $0.35, in line with prior guidance. Defendant Matthews repeated a

similar theme of his – portraying IGT as uniquely positioned in the industry such that it was much less affected by general industry downturns: "Although the market environment continues to be impacted by unfavorable economic conditions, IGT delivered strong revenues and gross profits during the third quarter . . . ."

59.     Following the issuance of the press release, defendants held a conference call, also on July 17, 2008, with analysts and investors to discuss the Company's financial results.  On the conference call, defendant Cavanaugh highlighted the Company's performance, stating that they were "the second best in the company's history in terms of revenues and gross profits" even though IGT was operating in an "unfavorable economic environment."

60.     Nonetheless, on the July 17, 2008 conference call defendants were no longer able to create the impression that IGT was impervious to general industry downturns.  Defendants acknowledged that there were lower play levels.  And, contrary to their prior representations that they either saw no declining play levels, that IGT was less affected, or that lower levels were due to "seasonality," defendant Matthews now said the play level declines were "unprecedented" and could have some effect on IGT.

61.     Matthews, however, adjusted IGT's EPS forecast only slightly downward, stating that "our guidance for the next three quarters needs to be in a range of $0.30 to $0.35."  But Matthews continued to be upbeat about the future, stating: "I think we are confident that hopefully we will be able to be *at the high end of this range or even outside of the range on the upside* . . . ."

62.     Defendants were also still very upbeat about IGT's coming fourth fiscal quarter of 2008 in the conference call.  Matthews stated that "[w]e still believe that the industry is going to grow, and that that *growth is healthy despite this gaming revenue slowdown*."  Cavanaugh stated that "*we expect a moderate pick-up in replacement demand* in the fourth quarter of 2008 and into

- 24 -

2009" internationally, and Matthews represented that "*[w]e will have a good replacement quarter here in Q4*."

63.     Defendant Cavanaugh represented that "IGT will remain **prudent** in its capital deployment," and maintained IGT's forecasts of **total operating expenses in the "25 to 28%" of total revenues range**.  Matthews conceded that the third fiscal quarter's operating expenses were on the high side, *i.e*., "not at optimal levels," but he reassured investors that **IGT would "manage expenses in a much more prudent and careful way" and "make sure that we will continue to undertake the measures necessary to do that**."  Matthews also stated that "**we can probably act on it [cost containment/cuts] reasonably quickly**," implying the issue would be taken care of rapidly.

64.     In response to these announcements, the price of IGT's common stock declined by nearly 8% on July 17, 2008 to $22.77 per share on extremely heavy volume of nearly 18 million shares traded, from a closing price of $24.66 per share the day before.  The stock price further declined more than 2% in the aggregate on July 18 and 21, 2008.  This decline occurred because it was now becoming more evident that IGT was going to be adversely impacted by the downturn in the gaming industry.  Nonetheless, defendants' continued optimistic misrepresentations about IGT's future and its ability to control its costs clouded the true impact the industry downturn would have on IGT.  As a result, IGT's securities continued to trade at inflated prices.

65.     Defendants' statements during July 2008 (¶¶58-63) were false and misleading when made.  Defendants knew, or recklessly disregarded, but failed to disclose the following:

(a)     While defendants finally conceded that there were "unprecedented" declines in play levels, defendants knew but did not disclose that such declines were going to have a severe negative impact of IGT's future financial results;

- 25 -

(b)     Notwithstanding defendants' representations that operating expenses would be contained at between 25% and 28% of total revenues, that expenses would be managed in a "prudent and careful way," and that the Company's current overspending would remedied "quickly," IGT had no basis for making these statements and forecasts.  In fact, IGT's spending was out of control and would continue to be out of control and in excess of forecasts.  According to CW #6, IGT did not control its expenses well at all, frequently made imprudent expenditures and spent like it had a "bottomless purse."   According to CW #6, IGT repeatedly wasted money on "end-of-life" components related to the SB technology such as memory sticks and video boards.  For example, according to CW #6, in many instances IGT purchased memory sticks from vendors for use with the SB technology.  When IGT was informed by the vendors that they were going to discontinue the memory sticks in the near future, IGT would make large purchases of the memory sticks to ensure it had enough on hand when the sticks were discontinued.  By the time IGT was ready to use the sticks, however, they had become obsolete, causing the expenditures to be a waste and useless.  These were not isolated issues of imprudent spending.  According to CW # 6, this was a "continuous issue" that presented itself at least once per quarter during the Class Period.  Moreover, these were not small expenditures – according to CW #6, the expenditures involved tens of thousands of parts.  In addition, according to CW #2, there was no concerted effort at IGT to attempt to control or monitor costs associated with the SB technology until the end of the Class Period, in October 2008;

(c)     In addition to the fact that defendants were aware that declining play levels signaled difficult conditions for the coming quarters, defendants were also aware that IGT was losing market share to competitors at ever increasing levels.  According to CW #7, demand was slipping for IGT's products throughout the Class Period because competitors' machines were more profitable for casino and gaming operators.  Competitors' machines generated more profit for operators; thus

- 26 -

operators were replacing less-profitable IGT machines with more-profitable competing machines.  In addition, according to CW #7, IGT's sales and market share were also eroding because IGT was emphasizing the sale of its new "AVP" machines.  The new AVP machines were "SB-ready" – that is they were designed to work with the upcoming new SB technology.  Customers, however, were not interested in purchasing the AVP machines.  According to CW #7, customers did not buy IGT's AVP machines because they were more expensive than other machines, required additional new hardware and wiring, were designed to work with a technology that was not even in the marketplace yet, and such new technology did not have any pricing models out yet so customers could not estimate what their potential costs might be.  Thus, defendants' representations that they saw "good" demand or a "moderate pick-up" in demand in the fourth fiscal quarter of 2008 were without basis;

(d)     According to CW #5  and CW #8, defendants omitted to disclose that, in order to get Harrah's and CityCenter to agree to use the SB technology, IGT was required to provide the technology to Harrah's and CityCenter for free for at least two years.  Therefore, these agreements had no prospects of creating revenues for IGT for several years; and

(e)     As a result for all the foregoing, defendants knew that their forecasts of EPS of $0.30 to $0.35 or higher were false, and/or that such forecasts were not reasonable in light of the facts available to them.

66.     By September 2008, the cracks in IGT's façade were becoming more prominent as the media began reporting that the Company was undergoing a management shakeup and rumors surfaced that it had to reduce its workforce to staunch rising costs as a result of development efforts.

67.     For example, on September 7, 2008, the *Las Vegas Review-Journal* published an article entitled "INSIDE GAMING: Signs of trouble from slot giant," reporting on IGT's problems and impending layoffs at the Company, which IGT "vigorously denied":

- 27 -

Twelve months ago, Wall Street analysts never imagined having concerns about International Game Technology. The Reno-based company, which has a large corporate presence in Las Vegas, controls the lion's share of the worldwide slot machine market.

IGT has been an analysts' darling among manufacturers. Its stock price was stable and reviewers heaped praise over its products. ***Despite a casino industry slowdown in the slot machine replacement market, IGT still reported profits. Analysts remained bullish***.

What a difference a year makes.

***Last week's resignation by IGT Chief Operating Officer Steve Morro may have signaled the start of a companywide shake-up. Gaming sources told of layoff rumors, which IGT spokesman Ed Rogich vigorously denied***.

IGT CEO TJ Matthews has said the company is in a restructuring mode. Rogich said all areas will be looked at to reduce expenses.

Matthews, considered one of the industry's brightest executives, is feeling some heat. He will add Morro's COO duties when the resignation is complete. But Matthews is also chairman and president as well as CEO, leaving some analysts worried that management is spread too thin.

***Wall Street expressed concern last week that Morro's exit was symptomatic of IGT's fortunes. The stock price is down almost 60 percent from a 52-week high of $49.41 on Feb. 26***.

***"IGT's fundamentals, market share position, new device platform, game theme and system development progress are not likely to improve in the near term, and may have worsened since the company last communicated with investors," Merrill Lynch gaming analyst Rachael Rothman wrote***.

UBS Securities analyst Robin Farley didn't think IGT's strategic examination would help increase earnings until the second half of 2009.

"This review will ultimately include a cost-cutting component," Farley said, adding that the current focus is on management structure.

68.     Then, on September 17, 2008, *Las Vegas Review-Journal* published an article entitled

"IGT to impose layoffs," confirming that IGT was implementing layoffs and that defendant

Matthews had informed the workforce via an internal e-mail:

- 28 -

Slot machine giant International Game Technology said Tuesday it will lay off a yet-to-be determined number of employees by Jan. 5 due to the troubled economy.

In an e-mail to employees, IGT Chairman and Chief Executive Officer TJ Matthews said the number of layoffs will be based on how many workers accept a voluntary separation program that was introduced last week.  IGT spokesman Ed Rogich said roughly 500 employees, age 55 and over, were offered buyouts.

*      *      *

Macquarie Capital gaming analyst Joel Simkins said he was not surprised by news of the impending layoffs.  He said the slot machine maker has about 1,200 workers in engineering, an area he said could be reduced.

IGT has also spent millions on server-based gaming, which may not be introduced to casinos as quickly as hoped.  IGT spent $76 million in June to acquire a European slot machine rival as part of its server-based gaming efforts.

"The company needs to get leaner," Simkins said.  "There are a lot of incremental expenses that can be cut."

Matthews told IGT workers the company was not closing its Reno headquarters nor are the layoffs focused in one department.  A decision regarding the layoffs is expected to be made by November with the jobs being eliminated in January.

"My hope is that through these efforts, we can stabilize our spending to be aligned with our revenue forecasts and be in a position to weather the near-term uncertainty that is prevalent in our industry and our economy in general," Matthews said.

69.     The same day, Macquarie Research ("Macquarie"), an analyst that follows IGT,

issued a report entitled "Changes on IGT Island, lowering TP and estimates," in which it lowered its

target price for the Company's common stock and highlighted concerns raised by the Company's

delayed cost saving measures, including the impending downsizing efforts reported by the *Las Vegas*

*Review-Journal*.  Specifically, Macquarie expressed concern that the Company's efforts to revise its

cost structure came far too late, reporting, in pertinent part, as follows:

While we are pleased that ***IGT is starting to take the right steps to right size its cost structure*** in light of the current environment, it may not be enough to offset a top line

- 29 -

slow down.  We have reduced estimates as detailed further in our note, largely trimming expectations for participation game placements and revenue, as well as domestic/international game sales.

$$* \qquad * \qquad *$$

- While IGT has been pounded YTD, down 57% versus 17/16% declines in the S&P 500 and Russell 3000, we recommend that investors continue to hold off buying the shares. ***Although IGT appears to be focusing on developing more innovative content to offset market share losses, rather than an all-out effort to force migration to server-based, we are concerned that it could be on the verge of permanent displacement of share to its key rivals***.

70.     Macquarie also characterized the planned layoffs as one of several "***drastic measures to align the cost structure*** (500 employees to be involuntarily reduced with potential restructurings to follow)."

71.     On this news, the price of IGT's stock price declined nearly 6% to $17.70 per share, as IGT's true, disastrous condition was partially revealed.

72.     Finally, on October 30, 2008, IGT issued a press release reporting extremely disappointing financial results for its fourth fiscal quarter and fiscal year of 2008.  The results were well below IGT's recent EPS guidance, with IGT earning only $0.18 per share compared to its previous forecasts of $0.30-$0.35 per share and higher.  In response to this surprisingly large miss on EPS, IGT's stock price fell nearly 5%, to $12.01 per share, as investors were stunned by IGT's poor performance and it was now clear that the industry downturn was negatively affecting IGT.

73.     Also on October 30, 2008, following the issuance of the press release, defendants Matthews and Cavanaugh held a conference call with analyst and investors, in which they attempted to explain IGT's dismal performance.  On this call, defendants painted a much bleaker picture of the future than they previously had.  Contrary to defendants' prior misrepresentations that they did not see lower play levels, or that lower levels were due to seasonality, or that IGT was less affected by

- 30 -

lower play levels, Cavanaugh disclosed that IGT's terrible financial results were caused in large part by "lower play levels resulting from the current economic environment."  Matthews admitted that defendants were aware of this factor affecting IGT's business as early as the beginning of the Class Period: "[W]e have seen play levels decline really since last November [2007] that accelerated a bit in April [2008] and appears to have accelerated even a bit further in October [2008]."

74.     In the conference call, Matthews communicated a much less rosy future for IGT and essentially admitted that the industry downturn did in fact negatively impact IGT, contrary to his prior attempts to imply otherwise.  Matthews stated that because of negative conditions in the industry, defendants now "anticipate that our EPS will probably come in *at the lower end or maybe even slightly below* our previous guidance of $0.30 to $0.35."  This was a far cry from defendants' earlier, bullish Class Period EPS forecasts of $0.35-$0.45 and higher.

75.     And notwithstanding defendants' constant Class Period touting of SB technology as IGT's focus, the wave of the future, and the strategy to increased revenues and EPS, defendant Matthews admitted in the conference call that this was not so but that the real road to future profitability for IGT was game content.  Matthews stated that "it's too bad that [game] content ever seems to take a back seat, because [IGT] is built around games [and] [i]t's focus is games . . . .  I think [game] content will be the star of the [Global Gaming Expo] this year."  This was a major de-emphasis of SB technology, which investors had been previously led to believe was IGT's focus and the driver of future revenues.

76.     In the October 30, 2008 conference call, Matthews also essentially admitted that the Company was not prudent with its operating and capital expenditures, contrary to prior representations.  Defendants disclosed that IGT's total operating expenses for the 2008 fourth fiscal quarter and year were 32% and 30%, respectively, of total revenues.  These results were higher than

defendants' prior representations that total operating expenses would be between 26% and 29% of

total revenues.  Moreover, Matthews also was essentially forced to admit that defendants had not

taken care of the overspending problem "quickly," as he had previously represented.  Matthews

stated:

> [J]ust on expense reduction, that we wanted to make sure that we did it right, that we've spent about $700 million in operating expenses in the course of 2007, **got ourselves to a run rate of $800 million or so by the end of this fiscal year 2008, and it was too much**. . . .
>
> I mean, really, we are looking at every expense and refocusing IGT on the idea that expenses matter.  So it's cost of goods, it's SG&A, it's R&D, it's other expenses, it's taxes.  Five big categories for us to have focus on, making sure that whether it's access to capital, or it's better planning from a tax perspective.  It's making sure that our R&D priorities are correct, that the SG&A staffing supports the current level of business, that our cost of goods demonstrates efficiencies wherever possible.  All of that is being focused.  And so I really expect that we will exceed that run rate as the course of the year progresses, and that $175 million a quarter or less still is the goal in total operating expenses.  **And so it may seem like it's taking a little while, but maybe it just took us a little while to say that we were committed to it**, which we did last call, and I think got on it pretty quickly here with kind of this final action in November.

77.     As previously alleged, in response to these revelations, IGT's stock price declined by

nearly 5%, as it became evident to investors that IGT was not going to perform as defendants

represented and the full extent of the Company's problems was now known.

78.     In November 2008, IGT finally implemented its workforce reduction, which the press

reported on November 14, 2008.  The layoffs eliminated roughly 10% of the Company's workforce

and had an equally profound effect on its stock price, sparking a decline that drove the stock down to

$7.58 per share on November 20, 2008.

### ADDITIONAL INDICIA OF SCIENTER

79.     As alleged herein, defendants acted with scienter in that they knew or recklessly

disregarded that their public statements issued or disseminated in the name of the Company were

materially false and misleading when made.  Moreover, defendants' scienter is further established by the fact that they received information indicating that their statements were false and misleading prior to making such statements, yet made the false and misleading statements anyway.  Defendants' scienter is also established by the facts that they were the top executives of the Company and were personally involved in the day-to-day overseeing and executing IGT's business strategies and were personally involved with IGT's core operations and important transactions.  Further, defendants' scienter is established by the fact that defendants repeatedly spoke about IGT's EPS forecasts, operating expenses, SB technology, play levels, and the like, and therefore were well-informed about, and knew the true, adverse, non-disclosed facts concerning these issues.  In addition, as alleged herein, defendants made admissions revealing that their representations were false and misleading.

80.     In addition to the foregoing, during the Class Period, defendant Matthews and other Company insiders sold shares of their personally held IGT common stock for proceeds of nearly $29 million at prices near the all-time and Class Period highs for such stock.  Among these insiders were: (i) defendant Matthews, the Company's President, CEO and Chairman; (ii) Robert Bittman, who served as a member of the Board since May 2000; (iii) Richard Burt, who served as a member of the Board since December 2001; (iv) Anthony Ciorciari, who served as the Executive Vice President, Operations; (v) David Johnson, who served as the Executive Vice President, General Counsel and Secretary; (vi) Stephen Morro, who served as the Chief Operating Officer; and (vii) Richard Pennington, who served as the Executive Vice President, Corporate Strategy.  Their Class Period sales are depicted in the following chart:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| **BITTMAN** | **ROBERT** | 2/27/2008 | 15,900 | $48.12 | $765,108 |
| | | 2/27/2008 | 14,100 | $48.25 | $680,325 |

- 33 -

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 2/27/2008 | 14,000 | $48.00 | $672,000 |
| | | 2/27/2008 | 4,000 | $48.21 | $192,840 |
| | | 2/27/2008 | 2,900 | $48.23 | $139,867 |
| | | 2/27/2008 | 2,700 | $48.26 | $130,302 |
| | | 2/27/2008 | 2,300 | $48.24 | $110,952 |
| | | 2/27/2008 | 1,200 | $48.27 | $57,924 |
| | | 2/27/2008 | 1,100 | $48.40 | $53,240 |
| | | 2/27/2008 | 800 | $48.22 | $38,576 |
| | | 2/27/2008 | 700 | $48.02 | $33,614 |
| | | 2/27/2008 | 600 | $48.20 | $28,920 |
| | | 2/27/2008 | 500 | $48.14 | $24,070 |
| | | 2/27/2008 | 400 | $48.06 | $19,224 |
| | | 2/27/2008 | 300 | $48.03 | $14,409 |
| | | 2/27/2008 | 300 | $48.04 | $14,412 |
| | | 2/27/2008 | 200 | $48.18 | $9,636 |
| | | 2/27/2008 | 200 | $48.05 | $9,610 |
| | | 2/27/2008 | 100 | $48.28 | $4,828 |
| | | 2/27/2008 | 100 | $48.13 | $4,813 |
| | | 2/27/2008 | 100 | $48.09 | $4,809 |
| | | | **62,500** | | **$3,009,479** |
| | | | | | |
| **BURT** | **RICHARD** | 12/13/2007 | 19,500 | $44.05 | $858,975 |
| | | 12/13/2007 | 9,900 | $44.10 | $436,590 |
| | | 12/13/2007 | 7,000 | $44.05 | $308,350 |
| | | 12/13/2007 | 6,500 | $44.00 | $286,000 |
| | | 12/13/2007 | 5,100 | $44.15 | $225,165 |
| | | 12/13/2007 | 5,000 | $44.17 | $220,850 |
| | | 12/13/2007 | 4,100 | $43.80 | $179,580 |
| | | 12/13/2007 | 3,500 | $44.12 | $154,420 |
| | | 12/13/2007 | 3,500 | $44.11 | $154,385 |
| | | 12/13/2007 | 2,900 | $44.08 | $127,832 |
| | | 12/13/2007 | 2,200 | $44.09 | $96,998 |
| | | 12/13/2007 | 2,100 | $43.75 | $91,875 |
| | | 12/13/2007 | 1,900 | $43.79 | $83,201 |
| | | 12/13/2007 | 1,800 | $44.16 | $79,488 |
| | | 12/13/2007 | 1,600 | $44.14 | $70,624 |
| | | 12/13/2007 | 1,300 | $44.04 | $57,252 |
| | | 12/13/2007 | 1,200 | $43.78 | $52,536 |
| | | 12/13/2007 | 1,100 | $44.13 | $48,543 |
| | | 12/13/2007 | 1,100 | $44.02 | $48,422 |
| | | 12/13/2007 | 1,000 | $44.08 | $44,080 |
| | | 12/13/2007 | 900 | $44.09 | $39,681 |
| | | 12/13/2007 | 900 | $44.07 | $39,663 |
| | | 12/13/2007 | 800 | $43.76 | $35,008 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|------------|------|--------|-------|----------|
| | | 12/13/2007 | 600 | $44.10 | $26,460 |
| | | 12/13/2007 | 400 | $44.18 | $17,672 |
| | | 12/13/2007 | 400 | $44.21 | $17,684 |
| | | 12/13/2007 | 300 | $44.24 | $13,272 |
| | | 12/13/2007 | 300 | $44.23 | $13,269 |
| | | 12/13/2007 | 300 | $44.22 | $13,266 |
| | | 12/13/2007 | 300 | $44.06 | $13,218 |
| | | 12/13/2007 | 200 | $44.20 | $8,840 |
| | | 12/13/2007 | 200 | $43.81 | $8,762 |
| | | 12/13/2007 | 100 | $43.77 | $4,377 |
| | | | **88,000** | | **$3,876,338** |
| | | | | | |
| **CIORCIARI** | **ANTHONY** | 11/12/2007 | 475 | $44.05 | $20,924 |
| | | 11/12/2007 | 360 | $44.05 | $15,858 |
| | | 2/14/2008 | 24,880 | $47.00 | $1,169,360 |
| | | | **25,715** | | **$1,206,142** |
| | | | | | |
| **JOHNSON** | **DAVID** | 12/3/2007 | 1,400 | $43.53 | $60,942 |
| | | | **1,400** | | **$60,942** |
| | | | | | |
| **MATTHEWS** | **THOMAS** | 11/19/2007 | 31,300 | $41.00 | $1,283,300 |
| | | 11/19/2007 | 17,300 | $41.40 | $716,220 |
| | | 11/19/2007 | 11,713 | $41.50 | $486,090 |
| | | 11/19/2007 | 10,100 | $41.11 | $415,211 |
| | | 11/19/2007 | 8,700 | $41.10 | $357,570 |
| | | 11/19/2007 | 6,500 | $41.01 | $266,565 |
| | | 11/19/2007 | 5,400 | $41.09 | $221,886 |
| | | 11/19/2007 | 5,300 | $41.15 | $218,095 |
| | | 11/19/2007 | 4,800 | $41.05 | $197,040 |
| | | 11/19/2007 | 4,100 | $41.12 | $168,592 |
| | | 11/19/2007 | 4,100 | $41.02 | $168,182 |
| | | 11/19/2007 | 3,900 | $41.06 | $160,134 |
| | | 11/19/2007 | 3,300 | $41.20 | $135,960 |
| | | 11/19/2007 | 3,300 | $41.16 | $135,828 |
| | | 11/19/2007 | 3,280 | $41.60 | $136,448 |
| | | 11/19/2007 | 3,200 | $41.13 | $131,616 |
| | | 11/19/2007 | 3,000 | $41.65 | $124,950 |
| | | 11/19/2007 | 2,900 | $41.55 | $120,495 |
| | | 11/19/2007 | 2,900 | $41.17 | $119,393 |
| | | 11/19/2007 | 2,800 | $41.07 | $114,996 |
| | | 11/19/2007 | 2,700 | $41.25 | $111,375 |
| | | 11/19/2007 | 2,700 | $41.19 | $111,213 |
| | | 11/19/2007 | 2,600 | $41.14 | $106,964 |
| | | 11/19/2007 | 2,530 | $41.41 | $104,767 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 11/19/2007 | 2,400 | $41.04 | $98,496 |
| | | 11/19/2007 | 2,200 | $41.56 | $91,432 |
| | | 11/19/2007 | 2,200 | $41.51 | $91,322 |
| | | 11/19/2007 | 2,200 | $41.22 | $90,684 |
| | | 11/19/2007 | 2,000 | $41.62 | $83,240 |
| | | 11/19/2007 | 2,000 | $41.57 | $83,140 |
| | | 11/19/2007 | 2,000 | $41.18 | $82,360 |
| | | 11/19/2007 | 2,000 | $41.08 | $82,160 |
| | | 11/19/2007 | 1,800 | $41.61 | $74,898 |
| | | 11/19/2007 | 1,400 | $41.31 | $57,834 |
| | | 11/19/2007 | 1,200 | $41.67 | $50,004 |
| | | 11/19/2007 | 1,200 | $41.52 | $49,824 |
| | | 11/19/2007 | 1,200 | $41.42 | $49,704 |
| | | 11/19/2007 | 1,200 | $41.43 | $49,716 |
| | | 11/19/2007 | 1,200 | $41.36 | $49,632 |
| | | 11/19/2007 | 1,200 | $41.23 | $49,476 |
| | | 11/19/2007 | 1,200 | $41.03 | $49,236 |
| | | 11/19/2007 | 1,120 | $41.59 | $46,581 |
| | | 11/19/2007 | 1,100 | $41.58 | $45,738 |
| | | 11/19/2007 | 915 | $41.53 | $38,000 |
| | | 11/19/2007 | 900 | $41.63 | $37,467 |
| | | 11/19/2007 | 900 | $41.21 | $37,089 |
| | | 11/19/2007 | 800 | $41.33 | $33,064 |
| | | 11/19/2007 | 800 | $41.32 | $33,056 |
| | | 11/19/2007 | 800 | $41.26 | $33,008 |
| | | 11/19/2007 | 600 | $41.44 | $24,864 |
| | | 11/19/2007 | 600 | $41.45 | $24,870 |
| | | 11/19/2007 | 600 | $41.35 | $24,810 |
| | | 11/19/2007 | 600 | $41.24 | $24,744 |
| | | 11/19/2007 | 500 | $41.68 | $20,840 |
| | | 11/19/2007 | 500 | $41.30 | $20,650 |
| | | 11/19/2007 | 400 | $41.64 | $16,656 |
| | | 11/19/2007 | 400 | $41.34 | $16,536 |
| | | 11/19/2007 | 300 | $41.70 | $12,510 |
| | | 11/19/2007 | 200 | $41.54 | $8,308 |
| | | 11/19/2007 | 200 | $41.38 | $8,276 |
| | | 11/19/2007 | 200 | $41.29 | $8,258 |
| | | 11/19/2007 | 200 | $41.07 | $8,214 |
| | | 11/20/2007 | 94,097 | $40.59 | $3,819,397 |
| | | 11/20/2007 | 22,600 | $40.50 | $915,300 |
| | | 11/20/2007 | 13,200 | $41.00 | $541,200 |
| | | 11/20/2007 | 8,300 | $40.55 | $336,565 |
| | | 11/20/2007 | 4,300 | $40.96 | $176,128 |
| | | 11/20/2007 | 3,600 | $40.52 | $145,872 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 11/20/2007 | 3,300 | $40.95 | $135,135 |
| | | 11/20/2007 | 3,300 | $40.90 | $134,970 |
| | | 11/20/2007 | 2,800 | $40.60 | $113,680 |
| | | 11/20/2007 | 2,600 | $40.98 | $106,548 |
| | | 11/20/2007 | 2,600 | $40.94 | $106,444 |
| | | 11/20/2007 | 2,400 | $40.54 | $97,296 |
| | | 11/20/2007 | 2,400 | $41.01 | $98,424 |
| | | 11/20/2007 | 2,300 | $40.93 | $94,139 |
| | | 11/20/2007 | 2,200 | $40.63 | $89,386 |
| | | 11/20/2007 | 2,000 | $40.61 | $81,220 |
| | | 11/20/2007 | 1,900 | $40.80 | $77,520 |
| | | 11/20/2007 | 1,800 | $40.99 | $73,782 |
| | | 11/20/2007 | 1,800 | $40.86 | $73,548 |
| | | 11/20/2007 | 1,503 | $40.64 | $61,082 |
| | | 11/20/2007 | 1,500 | $40.85 | $61,275 |
| | | 11/20/2007 | 1,500 | $40.58 | $60,870 |
| | | 11/20/2007 | 1,100 | $40.53 | $44,583 |
| | | 11/20/2007 | 1,100 | $41.05 | $45,155 |
| | | 11/20/2007 | 900 | $40.51 | $36,459 |
| | | 11/20/2007 | 800 | $40.92 | $32,736 |
| | | 11/20/2007 | 800 | $40.57 | $32,456 |
| | | 11/20/2007 | 700 | $40.56 | $28,392 |
| | | 11/20/2007 | 700 | $40.66 | $28,462 |
| | | 11/20/2007 | 500 | $41.04 | $20,520 |
| | | 11/20/2007 | 500 | $40.88 | $20,440 |
| | | 11/20/2007 | 500 | $40.62 | $20,310 |
| | | 11/20/2007 | 400 | $40.97 | $16,388 |
| | | | **379,658** | | **$15,545,269** |
| | | | | | |
| **MORRO** | **STEPHEN** | 3/19/2008 | 43,549 | $46.00 | $2,003,254 |
| | | 3/24/2008 | 18,451 | $46.00 | $848,746 |
| | | | **62,000** | | **$2,852,000** |
| | | | | | |
| **PENNINGTON** | **RICHARD** | 12/14/2007 | 6,500 | $44.34 | $288,210 |
| | | 12/14/2007 | 3,300 | $44.39 | $146,487 |
| | | 12/14/2007 | 3,200 | $44.46 | $142,272 |
| | | 12/14/2007 | 2,950 | $44.42 | $131,039 |
| | | 12/14/2007 | 2,600 | $44.29 | $115,154 |
| | | 12/14/2007 | 2,400 | $44.30 | $106,320 |
| | | 12/14/2007 | 2,100 | $44.37 | $93,177 |
| | | 12/14/2007 | 2,000 | $44.31 | $88,620 |
| | | 12/14/2007 | 1,800 | $44.36 | $79,848 |
| | | 12/14/2007 | 1,800 | $44.37 | $79,866 |
| | | 12/14/2007 | 1,600 | $44.32 | $70,912 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | 12/14/2007 | 1,500 | $44.24 | $66,360 |
| | | 12/14/2007 | 1,300 | $44.38 | $57,694 |
| | | 12/14/2007 | 1,200 | $44.48 | $53,376 |
| | | 12/14/2007 | 1,100 | $44.39 | $48,829 |
| | | 12/14/2007 | 1,000 | $44.41 | $44,410 |
| | | 12/14/2007 | 900 | $44.22 | $39,798 |
| | | 12/14/2007 | 900 | $44.23 | $39,807 |
| | | 12/14/2007 | 900 | $44.33 | $39,897 |
| | | 12/14/2007 | 800 | $44.20 | $35,360 |
| | | 12/14/2007 | 800 | $44.35 | $35,480 |
| | | 12/14/2007 | 800 | $44.38 | $35,504 |
| | | 12/14/2007 | 700 | $44.27 | $30,989 |
| | | 12/14/2007 | 700 | $44.33 | $31,031 |
| | | 12/14/2007 | 500 | $44.17 | $22,085 |
| | | 12/14/2007 | 500 | $44.25 | $22,125 |
| | | 12/14/2007 | 500 | $44.28 | $22,140 |
| | | 12/14/2007 | 500 | $44.31 | $22,155 |
| | | 12/14/2007 | 500 | $44.35 | $22,175 |
| | | 12/14/2007 | 400 | $44.24 | $17,696 |
| | | 12/14/2007 | 400 | $44.46 | $17,784 |
| | | 12/14/2007 | 300 | $44.18 | $13,254 |
| | | 12/14/2007 | 300 | $44.21 | $13,263 |
| | | 12/14/2007 | 300 | $44.32 | $13,296 |
| | | 12/14/2007 | 300 | $44.41 | $13,323 |
| | | 12/14/2007 | 300 | $44.44 | $13,332 |
| | | 12/14/2007 | 300 | $44.47 | $13,341 |
| | | 12/14/2007 | 200 | $44.25 | $8,850 |
| | | 12/14/2007 | 200 | $44.26 | $8,852 |
| | | 12/14/2007 | 200 | $44.34 | $8,868 |
| | | 12/14/2007 | 200 | $44.49 | $8,898 |
| | | 12/14/2007 | 200 | $44.49 | $8,898 |
| | | 12/14/2007 | 100 | $44.21 | $4,421 |
| | | 12/14/2007 | 100 | $44.22 | $4,422 |
| | | 12/14/2007 | 100 | $44.23 | $4,423 |
| | | 12/14/2007 | 100 | $44.36 | $4,436 |
| | | 12/14/2007 | 100 | $44.37 | $4,437 |
| | | 12/14/2007 | 100 | $44.38 | $4,438 |
| | | 12/14/2007 | 100 | $44.40 | $4,440 |
| | | 12/14/2007 | 100 | $44.40 | $4,440 |
| | | 12/14/2007 | 100 | $44.44 | $4,444 |
| | | 12/14/2007 | 100 | $44.48 | $4,448 |
| | | 12/14/2007 | 50 | $44.43 | $2,222 |
| | | | **50,000** | | **$2,217,346** |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | Total: | 669,273 | | $28,767,515 |

81.    Many of the above sales were unusual and suspicious in terms of timing and/or amount.  For example, Robert Bittman sold 62,500 shares of IGT stock during the twelve-month long Class Period.  Bittman sold all 62,500 shares on one day (February 27, 2008).  This represented approximately 38% of all IGT shares Bittman owned.  By comparison, in the twelve-month period immediately prior to the Class Period, Bittman sold *zero* shares.  Moreover, Bittman sold his shares during the Class Period at approximately $48 per share, just one dollar and change off the Class Period and all-time high of $49.41 per share and nearly five times higher than IGT's share price near the end of the Class Period – approximately $10 per share (IGT's shares currently trade at about $21 per share).

82.    Richard Burt sold 88,000 shares of IGT stock , all on one day during the Class Period, at approximately $44 per share, just a few dollars off IGT's all-time and Class Period high.  Burt sold approximately 94% of the shares he owned.  For comparison purposes, in the twelve-month period immediately before the Class Period, Burt sold *zero* shares.

83.    Defendant Matthews sold *zero* shares of IGT stock in the twelve-month period prior to the Class Period, but during the Class Period, he sold 379,658 shares in two days at approximately $41 per share, not far from the all-time and Class Period high price.  These sales represented almost 27% of the total shares he owned.

84.    Stephen Morro sold 62,000 shares of IGT stock during the Class Period on two different trading days at $46 per share, close to the all-time and Class Period high price.  This represented approximately 39% of the shares he owned.  In the twelve months before the Class Period, Morro sold *zero* shares.

- 39 -

**LOSS CAUSATION/ECONOMIC LOSS**

85.     The market for IGT securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose alleged herein, IGT securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired IGT securities relying upon the integrity of the market price of IGT securities and market information relating to IGT, and have been damaged thereby.

86.     During the Class Period, defendants materially misled the investing public and presented a misleading picture of IGT's business, operations and prospects, thereby inflating the price of IGT securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, operations and prospects, as alleged herein.

87.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about IGT's business, operations and prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of IGT and its business, operations and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' misrepresentations and omissions caused IGT's common stock price to reach its all-time and Class Period high of $49.41

- 40 -

per share in February 2008. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the company's securities at artificially inflated prices, thus causing the damages complained of herein.

88.     As a direct result of a series of public revelations slowly and partially revealing the truth about IGT's business, operations and prospects on January 17, 2008, April 17, 2008, July 17, 2008, September 17, 2008, October 30, 2008, and November 20, 2008, IGT's stock price declined from the Class Period high of $49.41 per share on February 26, 2008, to as low as $7.58 per share on November 20, 2008. These declines removed the inflation from IGT's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased the publicly-traded securities of IGT during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

90.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IGT securities were actively traded on the NYSE and other exchanges. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IGT or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

92.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

93.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of IGT;

(c)    whether defendants omitted material information concerning the business, operations and prospects of IGT;

(d)    whether defendants acted knowingly, intentionally or recklessly; and

(e)    whether and to what extent the members of the Class have sustained damages and the proper measure of damages.

94.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### NO SAFE HARBOR

95.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IGT who knew that those statements were false when made.

### COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

96.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

97.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

99.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IGT securities.  Plaintiffs and the Class would not have purchased IGT securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

100.     As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of IGT securities during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

101.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

102.     The Individual Defendants acted as controlling persons of IGT within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of IGT, and their ownership of IGT stock, the Individual Defendants had the power and authority to cause IGT to engage in the wrongful conduct complained of herein.

103.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Class Counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

DATED:  April 26, 2010               ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                     DARREN J. ROBBINS
                                     ARTHUR C. LEAHY
                                     BRIAN O. O'MARA


                                     _____
                                         s/ Arthur C. Leahy
                                       ARTHUR C. LEAHY

                                     655 West Broadway, Suite 1900
                                     San Diego, CA  92101
                                     Telephone:  619/231-1058
                                     619/231-7423 (fax)

- 45 -

Lead Counsel for Plaintiff

THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
DAVID C. O'MARA
311 East Liberty Street
Reno, NV  89501
Telephone:  775/323-1321
775/323-4082 (fax)

Liaison Counsel

517972_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 26, 2010.

      s/ Arthur C. Leahy
      ARTHUR C. LEAHY

      ROBBINS GELLER RUDMAN
         & DOWD LLP
      655 West Broadway, Suite 1900
      San Diego, CA  92101-3301
      Telephone:  619/231-1058
      619/231-7423 (fax)

      E-mail:artl@rgrdlaw.com

# Mailing Information for a Case 3:09-cv-00419-ECR-RAM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Richard G. Campbell , Jr**
  rcampbell@armstrongteasdale.com,bmeich@armstrongteasdale.com,zbuzzone@armstrongteasdale.com

- **Boris Feldman**
  boris.feldman@wsgr.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com,risac@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William M. O'Mara**
  bill@omaralaw.net

- **David C OMara**
  david@omaralaw.net,val@omaralaw.net

- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Nikki Stitt Sokol**
  nsokol@wsgr.com,ijames@wsgr.com,rdean@wsgr.com,38922.501ecfClassAction.palib1@matters.wsgr.com

- **David S. Steuer**
  dsteuer@wsgr.com

- **Jacob Thayer Veltman**
  jveltman@wsgr.com

- **Jonathan J Whitehead**
  jonathan@jjwhitehead.com,joanna@jjwhitehead.com,pkindall@sbcglobal.net

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)