1  RICHARD G. CAMPBELL, JR., State Bar No. 1832
   (rcampbell@armstrongteasdale.com)
2  ARMSTRONG TEASDALE LLP
   50 West Liberty, Suite 950
3  Reno, NV 89501
   Telephone: (775) 322-7400
4  Facsimile: (775) 322-9049

5  BORIS FELDMAN, *pro hac vice*
   (boris.feldman@wsgr.com)
6  DAVID S. STEUER, *pro hac vice*
   (dsteuer@wsgr.com)
7  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
8  650 Page Mill Road
   Palo Alto, CA 94304-1050
9  Telephone:  (650) 493-9300
   Facsimile:   (650) 565-5100

10

11 Attorneys for Defendants

12                    UNITED STATES DISTRICT COURT

13                          DISTRICT OF NEVADA

14
   INTERNATIONAL BROTHERHOOD OF          )   Case No. 3:09-cv-00419-ECR-RAM
15 ELECTRICAL WORKERS LOCAL 697          )
   PENSION FUND, Individually and On Behalf of )   CLASS ACTION
16 All Others Similarly Situated,        )   _____
                                         )
17                         Plaintiff,    )   NOTICE OF MOTION AND
                                         )   MOTION TO DISMISS
18          vs.                          )   CONSOLIDATED COMPLAINT;
                                         )   SUPPORTING MEMORANDUM
19 INTERNATIONAL GAME TECHNOLOGY,        )   OF POINTS AND AUTHORITIES
   THOMAS J. MATTHEWS, and PATRICK W.    )
20 CAVANAUGH,                            )   ORAL ARGUMENT REQUESTED
                                         )
21                         Defendants.   )
   _____)
22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

<u>Page</u>

3    INTRODUCTION .................................................................................................1

4    BACKGROUND AND SUMMARY OF ALLEGATIONS .................................2

5    ARGUMENT ......................................................................................................5

6    I.     LEGAL STANDARDS .............................................................................5

7    II.    THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE
            MISSTATEMENT OR OMISSION...........................................................6

8

9          A.     The Complaint Does Not Challenge IGT's Actual Financial Results ....................6

           B.     The Forward-Looking Statements Cannot Be The Basis Of Liability .................7

10
                  1.     The EPS projections were accompanied by meaningful cautionary
11                        statements...........................................................................9

12                        (a)     1Q08 and 3Q08 EPS guidance..........................................9

13                        (b)     2Q08 EPS guidance ..........................................................9

14                        (c)     4Q08 EPS guidance ..........................................................13

15                2.     Projections of operating expenses as a percentage of revenues are
                         protected by the Safe Harbor ...........................................................15

16
                  3.     Defendants warned of the risks to expected demand................................16

17
                  4.     The game play level statements are protected by the Safe Harbor...........17

18
                  5.     IGT's statements concerning server-based gaming technology were
19                        accompanied by meaningful warnings.......................................................18

20         C.     The Alleged Omissions From Announcements Concerning Harrah's and
                  CityCenter Are Not Actionable ...................................................................21

21
           D.     Vague Statements Of Corporate Optimism Are Not Actionable.........................22

22
     III.   THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
23          SCIENTER .............................................................................................23

24         A.     The "CW" Allegations Do Not Support a Strong Inference of Scienter ..............24

25         B.     The Alleged Stock Sales Do Not Support A Strong Inference of Scienter ..........27

26   CONCLUSION...................................................................................................31

27

28

1

**TABLE OF AUTHORITIES**

2
**Page(s)**

3

**CASES**

4

*Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008).................................22, 26

5

*Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680 (E.D. Ky. 2002)...............................27

6

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ......................................................5

7

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004) ................................................................ *passim*

8

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F. 3d 367 (9th Cir. 2003)...............20, 22

9

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) ....................................................23

10

*Grossman v. Novell*, 120 F.3d 1112 (10th Cir. 1997)......................................................22

11

*Harris v. IVAX Corp.*, 182 F.3d 799 (11th Cir. 1999) .......................................................8

12

*In re American Bus. Fin. Servs. Inc. Sec. Litig.*, 413 F. Supp. 2d 378 (E.D. Pa.
    2005) .................................................................................................23, 26

13

*In re Ascend Commc'ns Sec. Litig.*, No. 97-cv-8861, slip op. (C.D. Cal. Feb. 5,
    1999) .................................................................................................20, 24

14

15

*In re ATI Techs. Inc. Sec. Litig.* No. 05-4414, 2007 WL 2301151 (E.D. Pa. Aug.
    8, 2007) ............................................................................................20, 22

16

*In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) .................21, 23

17

*In re Broadcom Corp. Sec. Litig.*, No. 01-cv-275, 2004 WL 3390052 (C.D. Cal.
    Nov. 23, 2004) ....................................................................................8, 12

18

19

*In re Calpine Corp. Sec Litig.*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003) .........................22

20

*In re Century Bus. Servs. Sec. Litig.*, No. 99-cv-2200, 2002 WL 32254513 (N.D.
    Ohio June 27, 2002)..................................................................................27

21

*In re Connetics Corp. Sec. Litig.*, No. C-07-02940 SI, 2008 WL 3842938 (N.D.
    Cal. Aug. 14, 2008).................................................................................24

22

23

*In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991).................................7

24

*In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857 (N.D. Cal. 2004)........8, 18, 22

25

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ..............................24, 25

26

*In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150 (S.D. Cal. 2008) ............. 26, 27

27

28

*In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06-cv-228, 2009 WL 734296 (S.D. Cal. Mar. 18, 2009)..........................................................................................8

*In re DSP Group, Inc. Sec. Litig.*, No. C-95-4025 CAL, 1997 WL 678151 (N.D. Cal. Mar. 5, 1997)....................................................................21, 22

*In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................27

*In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004).........................................22

*In re FoxHollow Techs., Inc. Sec. Litig.*, No. 06-cv-4595, 2008 WL 2220600 (N.D. Cal. May 27, 2008), *aff'd*, 359 Fed. Appx. 802 (9th Cir. 2009).....................8

*In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031 (N.D. Cal. 2000), *aff'd*, 32 Fed. Appx. 338 (9th Cir. 2002)...............................................................................28

*In re Glenfed Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) ...........................................5

*In re Guess?, Inc. Sec. Litig.*, 174 F. Supp. 2d 1067 (C.D. Cal. 2001)...........................30

*In re Hutchinson Tech., Inc. Sec. Litig.*, 502 F. Supp. 2d 884 (D. Minn. 2007), *aff'd*, 536 F.3d 952 (8th Cir. 2008)..............................................................9

*In re Hypercom Corp. Sec. Litig.*, No. 05-cv-455, 2006 WL 726791 (D. Ariz. Jan. 25, 2006) .......................................................................................27

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ................9

*In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004) ................30

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) ..................................................................................8, 20, 26

*In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007).........12

*In re Ligand Pharms., Inc. Sec. Litig.*, No. 04-cv-1620, 2005 WL 2461151 (S.D. Cal. Sept. 27, 2005)..............................................................................15, 26

*In re The Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2003 WL 22436233 (E.D. Pa. July 16, 2003)...................................................................................23

*In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192 (D. Ariz. 2009).............25

*In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003) .............27

*In re Metris Cos. Sec. Litig.*, 428 F. Supp. 2d 1004 (D. Minn. 2006) .........................23

*In re Mikohn Gaming Corp. Sec. Litig.*, No. 05-cv-1410, 2006 WL 2547095 (D. Nev. Sept. 1, 2006) ......................................................................................12

*In re Network Assocs., Inc. Sec. Litig.*, No. C-99-01729-WHA, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ................................................................24

*In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................17

*In re NorthPoint Commc'ns Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090
    (N.D.Cal. 2002)................................................................................................................24

*In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096 (N.D. Cal. 2006) ......................................28

*In re Portal Software, Inc. Sec. Litig.*, No. 03-cv-5138, 2006 WL 2385250 (N.D.
    Cal. Aug. 17, 2006)...........................................................................................................8

*In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181 (N.D. Cal. 2000) ...................30

*In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003) ....................................25

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)...................... *passim*

*In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059 (N.D. Cal.
    2001) .......................................................................................................................7, 8, 22

*In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086 (N.D. Cal. 1994), *aff'd*, 95 F.3d
    922 (9th Cir. 1996)....................................................................................................16, 22

*In re Taleo Corp. Sec. Litig.*, No. 09-cv-151, 2010 WL 597987 (N.D. Cal. Feb.
    17, 2010) ...................................................................................................................28, 29

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) .............................5, 25, 28

*In re Verifone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140, 2009 WL 1458211
    (N.D. Cal. May 26, 2009) ...............................................................................................30

*In re Verifone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993).............................................7, 21

*In re Versant Object Tech. Corp.*, No. 98-cv-299, 2001 WL 34065027 (N.D. Cal.
    Dec. 4, 2001) ...................................................................................................................27

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993).................................................7

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ....................................7

*Kairalla v. Advanced Med. Optics, Inc.*, No. 07-cv-5569, 2008 WL 2879087
    (C.D. Cal. June 6, 2008) .................................................................................................29

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ................................22

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002)..........................................5

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) .......................28

*Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*, No. 08-cv-5723,
    2010 WL 1379735 (D.N.J. Mar. 30, 2010)....................................................................27

*Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290 (D. Mass. 2004)......................22

1   *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144 (S.D. Cal. 2003) ........................................30

2   *Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998)....................................27, 30

3   *Raab. v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993) ...............................16, 22

4   *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001)..........................................26, 29, 30

5   *Siegel v. Lyons*, No. C-95-3588 DLJ, 1996 WL 634206 (N.D. Cal. Sept. 16, 1996) ...................14

6   *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............................23

7   *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007)...............................27

8   *Wenger v. Lumisys*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998)..................................... *passim*

9   *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201 (D. Or. 2006),
        *aff'd*, 552 F.3d 981 (9th Cir. 2009).......................................................24, 27

10

11  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ............................. *passim*

12                          **STATUTES**

13  15 U.S.C. § 78u-4 .......................................................................................1

14  15 U.S.C. § 78u-4(b)(1) ...........................................................................6

15  15 U.S.C. § 78u-4(b)(2) ...........................................................................6

16  15 U.S.C. § 78u-4(b)(3)(A)......................................................................6

17  15 U.S.C. § 78u-5 .......................................................................................1

18  15 U.S.C. § 78u-5(i)(1)(A) ..................................................................9, 15

19  15 U.S.C. § 78u-5(i)(1)(A)-(D)...............................................................8

20  15 U.S.C. § 78u-5(i)(1)(B).....................................................................18

21  15 U.S.C. § 78u-5(i)(1)(D)...............................................................16, 17

22  15 U.S.C. § 78u-5(c) ...............................................................................6

23  15 U.S.C. § 78u-5(c)(1)(A)(i)................................................................7

24  15 U.S.C. § 78u-5(c)(1)(A)(ii)..............................................................22

25  15 U.S.C. § 78u-5(c)(1)(B)(ii)(II)........................................................24

26  15 U.S.C.§ 78u-5(c)(2)(B)......................................................................8

27

28

15 U.S.C. § 78u-5(e) .................................................................................................9, 18

**RULES**

Federal Rule of Civil Procedure 9(b) ..............................................................................1

Federal Rule of Civil Procedure 12(b)(6) .......................................................................1

Rule 10b-5 .......................................................................................................................5

**MISCELLANEOUS**

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995) .......................................1

1  Defendants International Game Technology ("IGT" or the "Company"), Thomas J.

2  Matthews, and Patrick W. Cavanaugh hereby move to dismiss the Consolidated Class Action

3  Complaint for Violation of the Federal Securities Laws (the "Complaint") pursuant to the

4  Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), 15 U.S.C. §§

5  78u-4, 78u-5, and Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The motion is based on

6  this notice; the accompanying memorandum of points and authorities; the Declaration of Jacob

7  T. Veltman and exhibits thereto ("Ex. __"); the Request for Judicial Notice; the papers, records

8  and pleadings in this action; such other papers that may be filed at or before the hearing on this

9  motion; and any other matters properly before the Court.

10  Defendants respectfully request that the Court hold oral argument on this Motion.

11  **INTRODUCTION**

12  This is a classic "missed quarter" securities case.  IGT did not foresee the extent of the

13  recent recession or the toll this would take on the gaming industry and the Company during

14  2008.  Over the course of that year, it became apparent that casino operators generally would

15  not have the capital or credit to fund new construction, expansion, or major machine

16  replacements in the near future.  IGT warned that the faltering economy would likely impact its

17  business.  IGT lowered its financial projections.  In order to generate additional near-term sales,

18  the Company refocused some of its efforts from the ongoing development of server-based

19  gaming technology to emphasize development of individual games.  Ultimately, however, IGT

20  did not meet its revised earnings forecasts for the second and fourth quarters of fiscal 2008

21  (ended March and September 2008) and this lawsuit followed.

22  The Reform Act was designed to address and deter precisely this type of litigation.  "If

23  a company fails to satisfy its announced earnings projections – because of changes in the

24  economy . . . – the company is likely to face a lawsuit."  H.R. Conf. Rep. No. 104-369, 104th

25  Cong., 1st Sess. at 43 (1995), *reprinted in* 1995 U.S.C.A.A.N. 697, 740 ("Conference Report").

26  Congress enacted heightened substantive and pleading standards to "put an end to the practice

27

28  MOTION TO DISMISS, MEMO OF PS&AS          -1-
    CASE NO. 3:09-cv-00419-ECR-RAM

1   of pleading 'fraud by hindsight.'" *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988

2   (9th Cir. 1999).  The Reform Act also expressly eliminated any private cause of action based on

3   forward-looking statements accompanied by meaningful warnings.  Because IGT provided just

4   such cautionary language, the Complaint should be dismissed.

5                    **BACKGROUND AND SUMMARY OF ALLEGATIONS**

6           IGT is a global company specializing in the design, manufacture, and marketing of

7   computerized gaming equipment (such as its "Wheel of Fortune" slot machines), network

8   systems, licensing and services.  ¶ 3[1]; *see* Ex. 9 (2007 Annual Report) at 3-15.  The Company is

9   Nevada's largest manufacturer, with the majority of its 4,000 North American employees

10  located in the state.  Ex. 22 (2009 Annual Report) at 11.  IGT reports two revenue streams –

11  gaming operations and product sales.  *See, e.g.*, Ex. 7 (2007 Form 10-K) at 4.  The majority of

12  IGT's revenue comes from gaming operations, *e.g.*, sharing recurring slot machine revenues on

13  a participation basis and other similar arrangements.  Ex. 9 at 4.  Product sales include machine

14  sales (slots and other machines) as well as non-machine sales (network systems, parts, game

15  conversion kits, equipment, services and licenses).  *Id.*

16          The proposed Class Period in this action runs from November 1, 2007 through October

17  30, 2008.  ¶ 2.  Even before this time, IGT had started developing server-based ("sb™" or

18  "SB") gaming technology.  *See* ¶¶ 20-23.  Server-based technology offers a new business

19  model for machine games.  Today, most slot machines are single-purpose boxes where just

20  changing the game offered requires physical installation of new hardware and software.

21  Migration to server-based gaming eventually will allow gaming machines to be monitored,

22  controlled or changed from a central location with the "flip of a switch" – giving additional

23  flexibility to casino operators and providing gamblers with an experience that might be tailored

24  to their individual preferences.  *See* ¶ 22.  More than that, the new technology will allow the

---

[1] Specific paragraphs of the Complaint are referred to as "¶ __."

28  MOTION TO DISMISS, MEMO OF Ps&As          -2-
    CASE NO. 3:09-cv-00419-ECR-RAM

operator to engage and interact with players on the machines (*e.g.*, to make show reservations or provide complimentary meals) and provide an experience tailored to the players' individual preferences. *See id.* This exciting new technology has been a long time in the making. In 2007, ***IGT advised that it did not even plan to market sb™ products commercially until some point in 2009.*** ¶ 27; *see* Ex. 7 at 24. IGT warned investors that innovations like server-based gaming products would be important to the Company's long-term success. *See, e.g.*, Ex. 3 (8/6/07 Form 10-Q) at 34.

During 2007 and 2008, the economy was spiraling downward into a recession. As the Complaint concedes, there was a "difficult industry downturn driven by fewer new casino openings and slowing demand for gambling machines." ¶ 24.



IGT cautioned that the economic downturn could have a negative impact on its business and results. *See, e.g.*, Ex. 9 at 18. The Company provided guidance as to projected quarterly

earnings per share ("EPS") in a series of quarterly earnings conference calls from November 1, 2007 to July 17, 2008.  ¶¶ 26, 40, 53, 61.  As the year went on and the economy worsened, IGT disclosed downward revisions in its expectations for future quarters and warned about specific negative trends.  IGT's stock price declined after each of its fiscal 2008 quarterly earnings announcements.  *See* Ex. 1 (IGT historical stock prices); ¶¶ 29, 43, 56, 64.  The Company, however, did not foresee the depth and length of the recession.  While IGT met its projected EPS range in the first and third quarters of fiscal 2008, it fell short of lowered expectations in the second quarter (ended March 2008) and fourth quarter (ended September 2008).

In July 2009, nine months after IGT announced its fourth quarter earnings shortfall, plaintiffs filed this action.  The original complaint challenged the EPS projections made on the conference calls, alleging among other things that

> Defendants had diverted substantial funds to the development of the Company's SB and AVP gaming platforms, which materially compromised the Company's growth prospects and undermined Defendants' optimistic statements;

and that

> IGT was unable to develop and market its SB and AVP gaming platforms within the time frame that Defendants had represented[.]

Dkt. No. 1, ¶ 30.  Plaintiffs have since dropped their claims related to IGT's AVP products and changed their story on server-based gaming development.  The theory that IGT was unable to develop and market its sb™ products was no longer viable after IGT announced its successful sb™ technology installation at Las Vegas' CityCenter, which opened in December 2009.  Ex. 23 (12/21/09 press release) at 1.  Thus, plaintiffs no longer allege that IGT was unable to develop and market sb™ products; instead they complain that CityCenter did not get "version 4.0" of sb™.  *See* ¶ 57(b).  Plaintiffs no longer allege that IGT spent too much developing sb™; instead they contend that IGT "did not make it a priority."  ¶¶ 34(b), 49(b).

The current Complaint still focuses on IGT's conference call EPS projections, but it also takes issue with certain statements at analyst conferences and in two press releases

1    announcing sb™ deals.  Plaintiffs concede that defendants' statements were a "series of

2    disclosures of the truth."  ¶ 4.  Plaintiffs, however, contend that these disclosures were not

3    proper attempts to adjust expectations as the economy worsened in 2008, as they only "slowly

4    and partially reveal[ed] the truth about IGT's business, operations and prospects."  ¶ 88.  The

5    Complaint alleges that during the Class Period, defendants knew but failed to provide prompt

6    disclosure of issues associated with server-based technology (¶¶ 34(b)-(c), 49(b)-(c), 49(f),

7    57(b), 57(e), 65(d)); the extent and impact of declines in game play levels (¶¶ 34(a), 49(a),

8    57(a), 65(a)); that demand would be hurt by competition and lack of interest in IGT's products

9    (¶¶ 34(e), 49(e), 57(d), 65(c)); and that IGT did not control expenses (¶¶ 34(d), 49(d), 57(c),

10   65(b)).  Plaintiffs contend that as a result, defendants knew that IGT's EPS forecasts were

11   unreasonable.  ¶¶ 34(f), 49(g), 57(f), 65(e).

12                                                    **ARGUMENT**

13   **I.       LEGAL STANDARDS**

14           To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule

15   10b-5, a complaint must allege:  (1) a false statement or omission of material fact, (2) scienter,

16   (3) transaction causation, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharms.,*

17   *Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Section 20(a) claims for "controlling person

18   liability" require a primary violation of the federal securities laws; if there is no viable Section

19   10(b) claim, the Section 20(a) claim also fails.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

20   1035 n.15 (9th Cir. 2002).

21           Plaintiffs' securities claims are subject to the stringent pleading standards of the Reform

22   Act.[2]  "The purpose of [the Reform Act's] heightened pleading requirement was generally to

23   eliminate abusive securities litigation and particularly to put an end to the practice of pleading

24   _____

25   [2] Securities fraud complaints also are subject to Rule 9(b)'s requirement of pleading with
     particularity.  *In re Glenfed Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994).

26

27

28   MOTION TO DISMISS, MEMO OF PS&AS                        -5-
     CASE NO. 3:09-CV-00419-ECR-RAM

1   'fraud by hindsight.'"   *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).

2   To state a claim, a complaint must:

3           specify each statement alleged to have been misleading, the reason or reasons why
            the statement is misleading, and, if an allegation regarding the statement or omission
4           is made on information and belief, the complaint shall state with particularity all facts
            on which that belief is formed.

5

6   15 U.S.C. § 78u-4(b)(1), and

7           with respect to each act or omission alleged to violate this chapter, state with
            particularity facts giving rise to a strong inference that the defendant acted with the
8           required state of mind.

9   15 U.S.C. § 78u-4(b)(2).   A complaint shall be dismissed if it does not satisfy these

10   requirements.   15 U.S.C. § 78u-4(b)(3)(A).

11           In addition to these general requirements, the Reform Act also created a "Safe Harbor"

12   for forward-looking statements accompanied by meaningful cautionary language.   15 U.S.C.

13   § 78u-5(c); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353

14   F.3d 1125, 1132 (9th Cir. 2004).   As explained further below, such statements cannot be the

15   basis of liability for securities fraud.   *Id.* at 1133 (affirming summary judgment; "we conclude

16   that sufficient warnings accompanied the [forward-looking statements] and Clorox is protected

17   from liability under the safe harbor provision").

18   **II.     THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT
             OR OMISSION**
19

20           **A.     The Complaint Does Not Challenge IGT's Actual Financial Results**

21           Plaintiffs do not dispute that IGT actually achieved the "record results" and "peak

22   earnings and margins" announced during fiscal 2007 and the first quarter of fiscal 2008.   ¶¶ 25,

23   29, 33, 37-38, 43, 45, 58-59.   Instead, the Complaint alleges that IGT's truthful reporting of

24   these financial results implied or suggested that the Company would not be impacted by the

25   recession.   ¶¶ 25, 29, 38, 45.   Plaintiffs are wrong:   IGT expressly warned that "[h]istorical

26   results achieved are not necessarily indicative of future prospects of IGT."   Ex. 5 (11/1/07

27

28

earnings release) at 3; Ex. 4 (11/1/07 Transcript) at 1 ("reported results should not be

considered an indication of future performance"); Ex. 16 (4/17/08 earnings release) at 1 (same).

In addition, as a matter of law, the federal securities laws do not impose any duty to disclose

that "future prospects may not be as bright as past performance." *In re Verifone Sec. Litig.*, 11

F.3d 865, 869 (9th Cir. 1993); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir.

1993) (factually accurate statements of "past performance" are "clearly not materially

misleading").  Thus, a securities fraud claim cannot be premised upon disclosure of accurate

historical data.  *See In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 512-13 (9th Cir. 1991).[3]

**B.     The Forward-Looking Statements Cannot Be The Basis Of Liability**

The Reform Act's Safe Harbor was based on the "bespeaks caution" doctrine:  "a

mechanism by which a court can rule as a matter of law . . . that defendants' forward looking

representation contained enough cautionary language or risk disclosure to protect the defendant

against claims of securities fraud." *Clorox*, 353 F.3d at 1132 (quoting *In re Worlds of Wonder

Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).  The statute provides that:

> [A defendant] ***shall not be liable*** with respect to any forward looking statement,
> whether written or oral, if and to the extent that
>
> (A) the forward-looking statement is
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful
> cautionary statements identifying important factors that could cause actual results to
> differ materially from those in the forward-looking statements[.]

15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added).

Congress did not intend for companies to have to perform contortions to trigger the Safe

Harbor.  Thus, the Reform Act broadly defines "forward-looking statement" to encompass

---

[3] *See also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1078 (N.D. Cal. 2001) ("'[s]tatements regarding past events contain no implicit prediction that those events or conditions will continue in the future'"); *Wenger v. Lumisys*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").

1   financial projections, management's plans or objectives relating to the company's products or

2   services, statements of future economic performance, and the assumptions underlying those

3   types of statements.  15 U.S.C. § 78u-5(i)(1)(A)-(D).[4]  The Safe Harbor may be invoked by

4   "stating generally that forward-looking statements . . . are made"; in other words, "statement-by-

5   statement identification is not required."[5]  In oral presentations, speakers may refer to written

6   documents containing warnings rather than having to repeat the text of the warnings themselves.

7   *See* 15 U.S.C.§ 78u-5(c)(2)(B); *Clorox*, 353 F.3d at 1133.  The statute's requirement that

8   warnings be "meaningful" "does not require a listing of **all** factors that might make results

9   different from those forecasted."[6]  Nor does it require that the cautionary language warn about

10   the particular event that ultimately caused the forward-looking statement not to come true.  *See*

11   Conference Report at 44.  The provision is satisfied so long as the cautionary language lists

12   "important factors of similar significance to those actually realized."[7]  "'[I]f a statement is

13   accompanied by meaningful cautionary language, the defendants' state of mind is irrelevant.'"[8]

14         The Reform Act's Safe Harbor also requires that on a motion to dismiss "the court shall

15   consider any statement cited in the complaint and any cautionary statement accompanying the

16

17   [4] A present-tense statement qualifies as forward-looking "as long as the truth or falsity of the
statement cannot be discerned until some point in time after the statement is made."  *Splash*, 160

18   F. Supp. 2d at 1067; *see Harris v. IVAX Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).

19   [5] *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004); *In re Broadcom
Corp. Sec. Litig.*, No. 01-cv-275, 2004 WL 3390052, at *2 (C.D. Cal. Nov. 23, 2004).

20   [6] *Copper Mountain*, 311 F. Supp. 2d at 882 (emphasis in original).

21   [7] *Copper Mountain*, 311 F. Supp. 2d at 882; *see also In re Dot Hill Sys. Corp. Sec. Litig.*, No.

22   06-cv-228, 2009 WL 734296, at *12 (S.D. Cal. Mar. 18, 2009) (same); *In re Impac Mortgage
Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1098  (C.D. Cal. 2008) (Safe Harbor applied

23   where company cautioned that deficiencies in internal controls might impact financial results);
*In re FoxHollow Techs., Inc. Sec. Litig.*, No. 06-cv-4595, 2008 WL 2220600, at *19 (N.D. Cal.

24   May 27, 2008) (Safe Harbor applied where company cautioned that projections could be
impacted by departure of senior management), *aff'd*, 359 Fed. Appx. 802 (9th Cir. 2009).

25   [8] *In re Portal Software, Inc. Sec. Litig.*, No. 03-cv-5138, 2006 WL 2385250, at *12 (N.D. Cal.

26   Aug. 17, 2006) (citation omitted); *see Clorox*, 353 F.3d at 1131-32.

27

28

forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e).  Each of the challenged IGT SEC filings, press releases, earnings calls and analyst conferences included Safe Harbor language and was accompanied by meaningful cautionary statements.  Accordingly, the Safe Harbor and bespeaks caution doctrine foreclose liability based on the forward-looking statements challenged here.

**1.    The EPS projections were accompanied by meaningful cautionary statements**

**(a)  1Q08 and 3Q08 EPS guidance**

At its core, this is a missed forecast case.  *See* ¶¶ 34(f), 49(g), 57(f), 65(e).  The Complaint concedes that IGT met its EPS projections in the first and third quarters, and therefore plaintiffs cannot plead that those forecasts were false or misleading.[9]

**(b)  2Q08 EPS guidance**

IGT did fall short of its EPS forecasts for the second and fourth quarters of fiscal 2008, which were made on a series of conference calls.  ¶¶ 26, 40, 53, 61.  Statements predicting future earnings are forward-looking.  *See* 15 U.S.C. § 78u-5(i)(1)(A) (defining "forward looking statement" to include "a statement containing a projection of . . . earnings").  Defendants properly invoked the Safe Harbor on each of the conference calls by identifying statements with "forward-looking information, including forecasts of future financial performance and estimates of amounts not yet determinable, as well as our future prospects and proposed new products, services, developments or business strategies" and warning that "actual results may differ materially."  Ex. 4 at 1, Ex. 10 at 1, Ex. 14 at 1, Ex. 17 at 1.  Defendants also provided ample cautionary language both on the conference calls and in referenced IGT SEC filings.

---

[9] *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586-87 (S.D.N.Y. 2007) (financial projection was not an actionable misrepresentation where it was achieved).  *See also In re Hutchinson Tech., Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 898 (D. Minn. 2007) (dismissing all claims of misleading earnings projections where company met forecasts for most of class period), *aff'd*, 536 F.3d 952 (8th Cir. 2008).

1    IGT's SEC filings warned of vulnerability to changing economic conditions:

2    **Our business is vulnerable to changing economic conditions.**

3    Unfavorable changes in general economic conditions including recession, economic
     slowdown, or higher fuel or other transportation costs, may reduce disposable
4    income of casino patrons or result in fewer patrons visiting casinos. Such a decline in
     the relative health of the gaming industry would likely result in a decline in the
5    amount of resources our customers have to purchase our products and services. ***This
     may also result in reduced play levels, which could cause our cash flows and
6    revenues from revenue sharing products to decline.*** Our operating results may be
     negatively impacted by a decrease in interest rates causing an increase in jackpot
7    expense and a reduction of investment income.

8    Ex. 3 at 34 (emphasis added); *see also* Ex. 9 at 18 (similar).

9    **Slow growth in the number of new casinos or the rate of replacement of existing
     gaming machines could limit or reduce our future profits.**

10
11   Demand for our products is driven substantially by the replacement of existing
     gaming machines, the establishment of new gaming jurisdictions, and the addition of
     new casinos or expansion of existing casinos within existing gaming jurisdictions. . .
12   . ***[T]he rate of growth in the North American marketplace has diminished. A
     continued reduction in growth or in the number of gaming jurisdictions or delays
13   in the opening of new or expanded casinos could reduce the demand for our
     products***.

14

15   Ex. 3 at 33 (emphasis added).  The Company also advised that its future results would depend

16   on successful new product introductions:

17   **Our success in the competitive gaming industry depends in large part on our
     ability to develop and manage frequent introductions of innovative products.**
18
19   The gaming industry is intensely competitive, and many of our competitors have
     substantial resources and specialize in the development and marketing of their
20   products. Because the gaming industry is characterized by dynamic customer
     demand and rapid technological advances, we must continually introduce and
     successfully market new themes and technologies in order to remain competitive and
21   effectively stimulate customer demand. Our customers will accept a new product
     only if it is likely to increase operator profits more than competitors' products. ***There
22   is no guarantee that our new products will attain this market acceptance or that
     our competitors will not more effectively anticipate or respond to changing
23   customer preferences. In addition, any delays by us in introducing new games on
     schedule could negatively impact our operating results*** by providing an opportunity
24   for our competitors to introduce new products and gain market share ahead of us.

25   Ex. 3 at 34 (emphasis added).  IGT's SEC filings also warned that risks and uncertainties

26   affecting the Company's business included "a decline in play levels" and "[d]ecreases in interest

27

28   MOTION TO DISMISS, MEMO OF Ps&As          -10-
     CASE NO. 3:09-cv-00419-ECR-RAM

rates, which in turn increases our costs to fund jackpots." Ex. 16 at 4.  Defendants also included additional cautionary statements on the conference calls themselves.

On the November 1, 2007 call, Mr. Cavanaugh stated at the outset:

> ***Actual results may differ materially from current expectations, based on a number of factors affecting IGT's businesses, including*** unfavorable changes to regulations or problems with obtaining needed licenses or approvals, a decrease in the popularity of our reoccurring revenue [games] or unfavorable changes in player and operator preferences, ***slow growth in the number of new casinos or the rate of replacement [of] existing gaming machines, [and] failure to successfully develop and manage frequent introductions of innovative products.***

Ex. 4 at 1 (emphasis added).  Defendants subsequently warned that "IGT continued to see a market-wide reduction in North American replacement demand," *id.* at 3, and that "the demand for domestic replacement is likely to remain soft throughout fiscal '08."  *Id.* at 6.  Mr. Matthews explained his belief that among the factors impacting replacement sales was a "wait-and-see mindset" among customers given "that there is so much new technology kind of waiting in the wings, and that unfortunately freezes the market a little bit in terms of purchasing decisions."  *Id.* at 14.  Mr. Cavanaugh provided a reminder that IGT's results would be subject to interest rate fluctuations:  "margins and gross profit come in slightly lower when interest rates go down, and they increase when rates go up, as the cost of fund[ing] jackpots is inversely related to movements in interest rates."  *Id.* at 2.

On the January 17, 2008 call, Mr. Cavanaugh again listed factors that could affect IGT's business, such as "slow growth in the number of casinos or the rate of replacement of existing machines."  Ex. 10 (1/17/08 Transcript) at 1.  He noted that "[f]or the second quarter, we anticipate replacement demand will remain at historically low levels."  *Id.* at 3.  Mr. Matthews echoed these concerns:

> ***Obviously, we've been operating in a difficult environment.  It has been the weakest replacement demand that we've seen since 1998. This is going to continue into Q2,*** but we expect that we'll start seeing improvements to replacement demand in Q3 and Q4 coinciding with some of our product efforts.

*Id.* at 4.  Defendants also expressed caution as to game play levels:

1
2
3

> [O]n the surface, all we're seeing at this point is normal seasonality, ***but we're also conscious of the fact that without exception almost every major market in the US has reported down quarter-over-quarter gaming revenues.*** So we'll continue to keep a close eye on it going forward.

4
5
6

> ***[W]here you're seeing declines in year-over-year comparisons in individual markets through most of December,*** we do have our eye on kind of the overall trends throughout all markets and we'll be probably just as interested as all of you on what operators have got to say about what they're seeing, what kind of trends they're seeing in player demands. But otherwise, play levels are very much in line with what we'd normally see due to seasonal factors.

7   *Id.* at 7, 10 (emphasis added). Mr. Matthews warned of competitive risks: "our struggle is

8   really the fact that IGT has penetrated existing floors so well in the past, that we do see that

9   very slight increases of performance from certain of our competitors has allowed them to

10  increase their ship share against our efforts." *Id.* at 10. The Company lowered EPS projections

11  for the fiscal second quarter to be "perhaps a little bit to the weak side of [$0.35 to $0.40] in Q2

12  because of lack of visibility to new and expansion units" and warned that:

13
14
15

> IGT will be moving to a more service-software revenue orientation that has an expanded margin associated with that and really less reliance on product sales at some point in the future. So our guidance, as a result of these drivers, is . . . because of the new product introductions, ***but also some uncertainty surrounding the future market conditions especially replacement demand in the second quarter***

16  *Id.* at 5 (emphasis added); *see* ¶ 41. Later in the call, Mr. Matthews reiterated that "we would

17  not be surprised if not only do we trail towards the lower end of that guidance, but that,

18  perhaps, we even miss on the low end." *Id.* at 12.

19          These disclosures identified important factors that might – and ultimately did – cause

20  IGT to fall short of its second quarter EPS projection: weak replacement demand and falling

21  interest rates. *See* Ex. 16 at 1 (reporting $0.22 EPS ($0.28 excluding one-time charges)); ¶ 51.

22  Accordingly, the Safe Harbor forecloses plaintiffs' claims based on IGT's missed second

23  quarter EPS forecast.[10]

24
_____

25  [10] *See, e.g. In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1045-46 (N.D. Cal. 2007) (applying Safe Harbor to grant motion to dismiss claim of false earnings projections); *In re Mikohn Gaming Corp. Sec. Litig.*, No. 05-cv-1410, 2006 WL 2547095, at *15 (D. Nev. Sept. 1, 2006) (same); *Wenger*, 2 F. Supp. 2d at 1242 (same); *Broadcom Corp. Sec. Litig.*, No.

27

28

1

**(c)  4Q08 EPS guidance**

2          Defendants also disclosed additional factors that could impact IGT's fourth quarter

3   EPS, originally projected potentially to exceed $0.40.  On the January call, IGT explained that

4   the possibility of exceeding that range was "subject to, of course, timely delivery of our new

5   products, and that of having associated demand that we can fill, and the timing of new and

6   expansion units taking place in accordance with what we have currently forecast."  Ex. 10 at 9.

7          Mr. Cavanaugh added a new risk factor to his Safe Harbor language at the outset of the

8   April 17, 2008 call:

9          Actual results may differ materially from the current expectations based on a number
           of factors affecting IGT's businesses.  Including . . . *a general decline in play levels* . .
10         . .

11  Ex. 14 (4/17/08 Transcript) at 1 (emphasis added).  Mr. Matthews elaborated on this risk:

12         I think that the primary impact on play levels this quarter is seasonality.  That's why
           they're up sequentially.  But that year-over-year comparison, I think really going into
13         the quarter, *we would have expected a slightly bigger uptick due to seasonal factors*.
           And as we started measuring both directly, since we can with our wide area
14         progressive systems, and indirectly, just seeing some of the results of the market,
           *there's no doubt that play levels maybe weren't as robust this year as were hoped*
15         *for.*  Our games always – they work because they're the most popular, and so we've
           always said that we think they're the first games played and the last games to stop
16         being played.  And so yes, I mean, we think that our products probably are slightly
           less impacted by the overall economic impact on play levels than are other of our
17         nonparticipation games.  But that said, *if there's less total spend going on in a*
           *casino environment, our games are going to be included in that.*
18

19  *Id.* at 8-9 (emphasis added); *compare* ¶ 52.  He also discussed the risk posed by competition:

20  "Competitors are doing a better job right now, both having access to current technologies and

21  doing a better job with their games."  Ex. 14 at 8.  The Company advised that its EPS guidance

22  for the second half of fiscal 2008 would remain at $0.35-$0.40.  *Id.* at 6.[11]

23  _____

24  SACV01275GLTMLGX, 2004 WL 3390052 (C.D. Cal. Nov. 23, 2004) (applying Safe Harbor
    to grant partial summary judgment on claims of misleading financial projections).

25  [11] The Complaint also cites Mr. Cavanaugh's remark at the end of a March 12, 2008 analyst
26  conference that "Hopefully, we are going to be able to move up in EPS ranges every few
    months as visibility into new markets, products, et cetera improves."  Ex. 13 at 7; ¶ 47.  This

27

28  MOTION TO DISMISS, MEMO OF Ps&As           -13-
    CASE NO. 3:09-cv-00419-ECR-RAM

1    While IGT met this forecast in its third quarter, defendants provided additional

2 warnings about the declining economy generally, and play levels in particular, during the July

3 17, 2008 call.

4    ***[T]he conditions that we see in the marketplace are looking like they're going to
continue for the foreseeable future, they're unprecedented, we've never really seen
5    gaming play levels fall across all markets as we have in the first half of the year***, if
that continues that's going to probably weigh a little bit on our game ops business
6    and it's probably also going to effect some amount of casino spend activity . . . .

7 Ex. 17 (7/17/08 Transcript) at 5 (emphasis added).  Mr. Matthews disclosed that:

8    ***what had happened in the first [calendar] quarter was somewhat unprecedented, . .
. in that you had gaming play levels down and you had gaming play levels down for
9    a whole host of different reasons*** in different markets, some of it was competitive
pressures, some of it was smoking bans, some of it was the economy.  You didn't
10    have a whole lot of kind of public acknowledgement of it yet because you didn't
have necessarily very good visibility as to how, if, and at what degree it will
11    continue.  And so I think there was some hope that it was short term in nature.  ***It
turns out that April was worse, right, and May and June haven't necessarily
12    reversed that trend.  And so I do think that we have to anticipate for our business
that the economic conditions are likely going to continue like this for the
13    remainder of the calendar year*** . . . .

14 *Id.* at 9 (emphasis added).  He also advised that "over 80% of our [gaming operations] revenue

15 is variable as it relates to our exposure directly to game play levels." *Id.* at 13.  IGT also

16 lowered its projected EPS range for the fourth quarter to $0.30-$0.35. *Id.* at 10.

17    These disclosures clearly warned of the decline in economic conditions that caused IGT

18 to miss its fourth quarter EPS projection. *See* Ex. 19 (10/30/08 earnings release) at 1 (reporting

19 $0.18 EPS ($0.28 excluding one-time charges) due to "'challenging economic operating

20 conditions affecting our customers and in turn our business'"); ¶ 72.  The fourth quarter EPS

21 projection therefore is protected by the Safe Harbor and cannot be the basis of liability.

22

23 ─────────────────────────────────────────────

statement was not a prediction, but a non-actionable statement of a goal. *Siegel v. Lyons*, No. C-
24 95-3588 DLJ, 1996 WL 634206 (N.D. Cal. Sept. 16, 1996), explained that "a material
difference exists between a concrete financial prediction or forecast and 'targets' or 'goals' for
25 future performance" and that "'[t]argets' or 'goals' would only imply a false statement of fact if
defendants knew that management was actually aiming for a different result." *Id.* at *5 & n.7.
26 Plaintiffs make no such allegations here.

27

28

1
2

        2.      **Projections of operating expenses as a percentage of revenues are protected by the Safe Harbor**

3

       The Safe Harbor also protects defendants' conference call statements regarding IGT's

4

expected operating expenses as a percentage of total revenue for fiscal 2008.  *See* ¶¶ 28 (26%-

5

28%), 42 (26%-29%), 54 (26%-28%), 63 (25%-28%).  These statements were forward-looking.

6

*See* 15 U.S.C. § 78u-5(i)(1)(A) (defining "forward looking statement" as including "a statement

7

containing a projection of . . . other financial items").[12]  As set forth above, IGT provided

8

numerous warnings concerning factors that could affect revenue, and as a result, the operating

9

expense as a percentage of revenue.  *See supra* at 9-14.  As fiscal 2008 progressed, IGT

10

cautioned that the operating expense percentages were just above the projected range for each

11

of the second and third quarters.  *See* Ex. 14 at 4; Ex. 17 at 4.  On the July 17, 2008 conference

12

call, IGT made cautionary statements concerning operating expenses themselves:

13
14
15

> Our target range for operating expense has been 25% to 28% of revenues, depending on quarterly fluctuation in demand with the goal to maintain if not exceed 30% operating income margins.  Accordingly we have undertaken an organization wide review of our cost structure to ensure that we can achieve this goal.

16

Ex. 17 at 4.

17
18
19
20

> *[W]e acknowledge that operating expense are not at optimal levels.  So, we are already giving expenses company wide as Pat had reflected*.  The goal here is to have 30% operating income margins and so *if we aren't going to have the revenue growth breakout that we were hoping for this year and next and still kind of waiting until 2010 for the material sb impact, then we need to manage expenses in a much more prudent and careful way* . . .

21

*Id.* at 5.  These cautionary statements are sufficient to foreclose liability.[13]

22
23
24

[12] *See also In re Ligand Pharms., Inc. Sec. Litig.*, No. 04-cv-1620, 2005 WL 2461151, at *2, *5, *18 (S.D. Cal. Sept. 27, 2005) (applying Safe Harbor to prediction that "[t]otal operating expenses [would be] between $180 million and $195 million").

25
26

[13] *See, e.g., Ligand*, 2005 WL 2461151, at *5, *18 (Safe Harbor applied to projection of operating expenses where cautionary statements warned that results might differ from estimates and identified factors that could cause actual results to fall short).

27
28

### 3. Defendants warned of the risks to expected demand

IGT's risk disclosures also foreclose claims based on statements of expected demand. Plaintiffs have complained of the following statements:

- IGT "'anticipate[d] benefiting from growth in new or expanding domestic markets beginning in the second half of fiscal 2008'" (¶ 31);

- "Cavanaugh conveyed that there would be growth in future sales based on estimates that there was a lot of new capacity being created by anticipated casino openings throughout the world" (¶ 33);

- IGT expected "'an increase in replacement units in both Q3 and Q4, as well as the tremendous demand of new and expansion units'" (¶ 38);

- "'Market expansion continues really in a very robust way even though there has [sic] been a couple of setbacks'" and "'we continue to expect an uptick in our business levels during the second half'"(¶ 53); and

- "'We still believe that the industry is going to grow, and that growth is healthy despite this gaming revenue slowdown,'" "'we expect a moderate pick-up in replacement demand in the fourth quarter of 2008,'" "'we will have a good replacement quarter here in Q4'" (¶ 62).[14]

These are forward-looking statements concerning assumptions underlying IGT's financial forecasts. *See* 15 U.S.C. § 78u-5(i)(1)(D) (defining "forward-looking statement" to include "any statement of the assumptions underlying or relating to" financial or business forecasts). The statements were accompanied by the warnings set forth above, including that:

> **Slow growth in the number of new casinos or the rate of replacement of existing gaming machines could limit or reduce our future profits.**
>
> Demand for our products is driven substantially by the replacement of existing gaming machines, the establishment of new gaming jurisdictions, and the addition of new casinos or expansion of existing casinos within existing gaming jurisdictions. . . . ***[T]he rate of growth in the North American marketplace has diminished. A continued reduction in growth or in the number of gaming jurisdictions or delays***

---

[14] Courts have found similar statements to be non-actionable immaterial statements of optimism. *See infra* at 21. *See also, e.g., Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (market for company's services had "'an expected annual growth rate of 10% to 30% over the next several years'"); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) ("'[w]e expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first'"), *aff'd*, 95 F.3d 922 (9th Cir. 1996).

1    *in the opening of new or expanded casinos could reduce the demand for our*
2    *products*.

3    Ex. 3 at 33 (emphasis added).  These statements therefore cannot form the basis of liability.[15]

4    In addition, the Complaint does not allege that increased replacement demand and sales

5    growth in the second half of fiscal 2008 failed to materialize.  IGT reported unit shipments of

6    12,100 in the second quarter (Ex. 14 at 3), 20,200 in the third quarter (Ex. 17 at 2), and 20,100

7    in the fourth quarter (Ex. 20 (10/30/08 Transcript) at 2).  *Compare* ¶¶ 31, 53, 62.  IGT also

8    disclosed increased domestic replacement demand in the fourth quarter of 4,900 units (Ex. 20 at

9    3), up from 3,600 units in the third quarter (*id.*) and 3,100 in the first quarter (Ex. 10 at 3).

10   *Compare* ¶¶ 38, 62.  Similarly, the complaint does not dispute that analysts had estimated

11   market growth based in part on legalization of gaming in new jurisdictions.  *See* Ex. 8 (12/5/07

12   Transcript) at 3; ¶ 33.  Because plaintiffs do not plead that IGT's demand statements were false,

13   these claims should be dismissed.

14                    **4.    The game play level statements are protected by the Safe Harbor**

15   The Safe Harbor also protects defendants' statements about expected trends in game

16   play levels during the Class Period.  *See* ¶¶ 39, 52, 62.  As with the demand statements, the

17   game play level statements were forward-looking statements concerning assumptions

18   underlying IGT's financial forecasts.  *See* 15 U.S.C. § 78u-5(i)(1)(D).  These statements were

19   accompanied by warnings in IGT's SEC filings, including that:

20       a decline in the relative health of the gaming industry would likely result in a decline
         in the amount of resources our customers have to purchase our products and services.
21       This may also result in reduced play levels[.]

22   *E.g.*, Ex. 9 at 18.  As set forth above, defendants discussed play level trends in each of the

23   January, April, and July conference calls.  *See supra* at 11, 13-14.  The Complaint cannot avoid

24

25   [15] *See In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 400-01 (S.D.N.Y. 2006) (risk
26   disclosures protected statements under Safe Harbor and bespeaks caution doctrines).

27

28

1    dismissal by selective quotation – omitting the cautionary language immediately surrounding

2    the challenged excerpts.[16]   The Safe Harbor expressly requires courts to consider such

3    cautionary language.[17]   In light of these disclosures, the play level statements cannot be the

4    basis of liability.

5                    **5.      IGT's statements concerning server-based gaming technology were**
                             **accompanied by meaningful warnings**

6

7            The Complaint includes allegations concerning IGT's development of server-

8    based gaming technology.  *See, e.g.*, ¶¶ 27, 55.  While plaintiffs contend that issues with sb™

9    products undermined IGT's second and fourth quarter 2008 financial forecasts (¶¶ 34, 49, 57,

10   65), the Complaint does not actually allege that IGT made any projection of revenues based on

11   sb™ technology for that year.  To the contrary, the Complaint concedes that IGT expected "'to

12   begin commercializing this product *in 2009*.'"  ¶ 27 (emphasis added); *see also* Ex. 9 at 24

13   ("we believe our sb™ applications will be commercially available beginning in 2009").

14           IGT's conference call statements concerning expectations surrounding server-based

15   gaming technology are also protected by the Safe Harbor.  The statute defines forward-looking

16   statements to include "a statement of the plans or objectives . . . relating to the [company's]

17   products or services."  15 U.S.C. § 78u-5(i)(1)(B).  IGT's SEC filings warned that "[t]here is

18   no guarantee that our new products will attain . . . market acceptance" and that "delays by us in

19   introducing new products on schedule could negatively impact our operating results[.]"  *E.g.*,

20   Ex. 9 at 18-19.  Defendants provided additional specific cautionary language on the calls.

21           On the November 1, 2007 call, Mr. Matthews said that IGT was "on target to begin

22   commercializing this product in 2009" and "'especially excited about the returns we anticipate

23

24   [16] *Compare* ¶ 39 *with* Ex. 10 at 7; *compare* ¶ 52 *with* Ex. 14 at 2, 8, 11; *compare* ¶ 62 *with* Ex. 17 at
25   3, 5, 9.

26   [17] *Copper Mountain*, 311 F. Supp. 2d at 864, 876; *see* 15 U.S.C. § 78u-5(e).

27

28   MOTION TO DISMISS, MEMO OF Ps&As                    -18-
     CASE NO. 3:09-cv-00419-ECR-RAM

1  in the next few years as server-based technology is rolled out."' ¶ 27.  On that same call,

2  however, he explained that IGT was still discussing with customers the pricing for sb™:

> My guess is that pricing will remain a private conversation that we're having with a
> number of prospective customers. . . . We feel fairly comfortable that the pricing is
> going to sort itself out in the way in which the operators feel as if they're paying for
> something that truly gains them efficiencies and increases the activity on their casino
> floor and at the same time is fair to us for bringing what is really such an expensive
> innovation to the industry.

7  Ex. 4 at 11.  This was not a surprise, given that IGT was not expecting to start commercializing

8  sb™ products until 2009 – more than a year later.  *See* ¶ 27.[18]

9          On the April 17, 2008 call, Mr. Matthews was asked whether IGT expected additional

10  announcements of sb™ technology deals following the press releases concerning the

11  Company's selection by Harrah's and memorandum of understanding with CityCenter.  Mr.

12  Matthews responded:

> I sure hope so.  I mean, that's our job here is to go and try to figure out ways that we
> can expand our customer opportunities.  We're not much for making press releases,
> as you know, as it relates to securing new business, because we think that is
> something that we do in the ordinary course.  So every systems deal we get we don't
> announce, and every time we get a machine order we don't make any particular
> celebratory noise about it; that's what we do.  And in the case of sb, I think that these
> early adopters of Harrah's and [CityCenter] are very important to make known. . . .
> But over time we expect to be selling an awful lot of sb systems and probably not
> announcing every one.

18  Ex. 14 at 10.  Thus, the sound bite in the Complaint (¶ 55: '"we expect to be selling an awful

19  lot of SB systems"') was not a near-term prediction, but a general statement that IGT

20  eventually expected many other deals involving sb™ technology.[19]

21  _____

22  [18] These disclosures also undercut plaintiffs' claims of misrepresentations concerning expected
higher margins associated with sb™ technology.  *See* ¶¶ 30, 35, 41, 46.  Examination of the

23  language surrounding the excerpts in the Complaint shows that the "higher margin" statements
addressed IGT's expected shift to game operations and non-machine sales revenues generally,

24  not just sb™ technology in particular.  *Compare, e.g.,* Ex. 6 at 7 *with* ¶ 30 ("IGT 'become[s]
less focused on hardware deliveries, and more focused on providing software solutions [like SB

25  technology] that that naturally migrates you to a ***higher margin***'" (emphasis in Complaint)); *see
also* Ex. 9 at 1; Ex. 10 at 5;  Ex. 13 (3/12/08 Transcript) at 2.  The Complaint does not dispute

26  that IGT's game operations and non-machine sales provided higher margins than machine sales.

27

28

1    Plaintiffs also claim that Mr. Matthews made a false and misleading statement on the

2    April 17, 2008 call when he said that IGT was "'comfortable that we will accomplish' delivery

3    of version '4.0' of the SB technology to CityCenter upon CityCenter's opening."  ¶ 55.  Again,

4    this statement was qualified by cautionary language.  Mr. Matthews explained that

5       [T]he challenge, of course, is that we are developing a very broad system from
        scratch, and *so just maintaining proper product definition and meeting those*
6       *internal timelines is really the challenge.  And of course along the way we've*
        *changed specifications somewhat of the underlying technologies.   We have*
7       *redefined some of the applications that we have as priorities, and still are working*
        *with customers to make sure that we kind of meet their initial requirements for the*
8       *product.  So there's some movement of parts as far as that is concerned.*  But I
        think we feel comfortable that we have the resources necessary for timely delivery,
9       4.0 is due right around that CityCenter opening.  And so where we are hoping that
        it's deployed, it is 3.2, as we previously said that we for sure will have deployed in
10      that property.  *And so if everything goes well, we have perhaps 4.0 in advance of*
        *that opening, or maybe shortly thereafter.*

11

12   Ex. 14 at 11-12.  IGT separately disclosed that CityCenter was "scheduled to open in late

13   2009," that the installation would be "the first . . . of its kind," and that IGT would "continue to

14   work with MGM Mirage and our other test locations that have been working with us on the

15   development and testing of these new products to refine the various aspects of the system and

16   prepare for CityCenter's floorwide deployment."  Ex. 15 (4/17/08 press release) at 1.  Mr.

17   Matthews' timeline statement is not actionable in light of all this cautionary language.  *See*

18   *Clorox*, 353 F.3d at 1133 (Safe Harbor foreclosed liability based on timetable estimate).[20]

19

20

---

21   [19]  This statement also is not actionable because it is a "vague statement of corporate optimism
     that is not subject to objective verification."  *See infra* at 21-22; *Impac*, 554 F. Supp. 2d at 1096
22   (statement that "'[w]e continue to expect solid loan acquisitions and originations'" was non-
     actionable "generalized assertions of corporate optimism") (citing *Glen Holly Entm't, Inc. v.*
23   *Tektronix, Inc.*, 352 F. 3d 367, 379 (9th Cir. 2003)).

24   [20]  *See also In re ATI Techs. Inc. Sec. Litig.* No. 05-4414, 2007 WL 2301151, at *10 -*11 (E.D.
     Pa. Aug. 8, 2007) (similar; granting motion to dismiss); *In re Ascend Commc'ns Sec. Litig.*, No.
25   97-cv-8861, slip op. at 22 (C.D. Cal. Feb. 5, 1999) ("The statement that the 56 Kbps modems
     would begin shipping that month is a forward-looking statement of future management plans.").
26

27

28

1

## C. The Alleged Omissions From Announcements Concerning Harrah's and CityCenter Are Not Actionable

2

3       Plaintiffs challenge IGT's press releases announcing anticipated sb™ installations at

4   Harrah's and CityCenter.  ¶¶ 44, 50.  The Complaint does not dispute that the statements in the

5   press releases were accurate.  Instead, plaintiffs contend that the announcements were

6   misleading because defendants omitted to disclose that "IGT was required to provide the

7   technology" "for free for as long as two years" and therefore the agreements "had no prospects

8   of creating revenues for IGT for several years" ¶¶ 44, 49(f), 50, 65(d).[21]  Plaintiffs are wrong.

9       The press releases made no reference to expected revenues from the transactions.

10  Rather, the announcements made clear that IGT had yet to work out the terms of the deals.  The

11  Harrah's installation was "subject to Harrah's corporate approvals, execution of definitive

12  agreement, and receipt of required regulatory approvals."  Ex. 12 (2/13/08 press release) at 1.

13  Similarly, the CityCenter press release announced a "formal memorandum of understanding"

14  rather than a definitive agreement. Ex. 15 at 1.  Because defendants had no duty to disclose any

15  revenue projections associated with the transactions, the Complaint fails to state an actionable

16  omission.  *See Verifone*, 11 F.3d at 870.[22]  Indeed, IGT already had disclosed separately that

17  there was no set pricing model for sb™ installations and that commercialization would not

18  begin until 2009.  *See supra* at 18-19.

19

20  [21] While the Complaint cites CW#8 for its allegation that IGT would "provide the technology . . .
21  for free for at least two years" to CityCenter (¶ 65(d)), it provides no basis whatsoever for plaintiffs'
    assertion that IGT was doing this for Harrah's (¶ 49(f)).

22  [22] *See also In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 64-65 (D. Mass. 1998)
23  (dismissing claim based on alleged misleading press release announcing company's deal to
    begin testing products on customer's network; company had no duty to specify that the
24  customer had no commitment to purchase products); *In re DSP Group, Inc. Sec. Litig.*, No. C-
    95-4025 CAL, 1997 WL 678151, at *4 -*5 (N.D. Cal. Mar. 5, 1997) (announcements of license
25  agreements were not rendered misleading by omission to state that no revenues would be
    produced immediately; these were accurate statements of historical fact and there was no duty to
26  disclose any revenue projections based on those licenses).

27

28  MOTION TO DISMISS, MEMO OF Ps&As                    -21-
    CASE NO. 3:09-cv-00419-ECR-RAM

1    **D.    Vague Statements Of Corporate Optimism Are Not Actionable**

2            Statements that are "generalized, vague and unspecific assertions, constituting mere

3    'puffery'" cannot constitute actionable misrepresentations. *Glen Holly*, 352 F.3d at 379

4    (affirming dismissal of fraud and negligent misrepresentation claims). Courts "routinely

5    dismiss" securities claims based on vague, subjective statements of corporate optimism,

6    because such statements are immaterial as a matter of law.[23] The Complaint here challenges a

7    number of statements nearly identical to those that other courts have found to be non-actionable

8    "puffery":

9        • IGT is the "'clear technology leader,'" "'best in class,'" and has an "'industry
           leading portfolio'" of intellectual property (¶¶ 27, 46);[24]

10       • Innovative products would "'drive market growth in coming years'" and "'assure
           that future prospects are solid'" (¶ 27);[25]

11
12       • "'innovation is a key component of our business strategy'" (¶ 28);[26]

13       • IGT is "'focused'" (¶ 46) and has made a "'commitment'" to development of
           server-based gaming technology (¶ 44);[27]

14   _____

15   [23] *Grossman v. Novell*, 120 F.3d 1112, 1121-22 (10th Cir. 1997) (courts "routinely dismiss"
     "soft, puffing statements incapable of objective verification"); *see also Raab*, 4 F.3d at 289
16   (affirming dismissal of claims based on immaterial puffery). The Reform Act bars liability
     based on immaterial forward-looking statements. *Syntex*, 855 F. Supp. at 1095; 15 U.S.C. § 78u-
17   5(c)(1)(A)(ii).

18   [24] *See, e.g., In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) ("'Ford is a
     worldwide leader in automotive safety'"); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200
19   (N.D. Cal. 2008) ("'on the technology front we hit the ball out of the park'"); *Copper
     Mountain*, 311 F. Supp. 2d at 868-69 ("'products will continue to position [CM] solutions as
20   best-of-breed'"); *Wenger*, 2 F. Supp. 2d at 1245 ("'We're the leader in a rapidly growing
     market'").

21   [25] *See, e.g., Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 301 (D. Mass. 2004) ("I am
22   confident that our strategy and products position us for leadership in the product development
     space"); *Yahoo!*, 592 F. Supp. 2d at 1200 (company was "'well positioned to succeed'");
23   *Splash*, 160 F. Supp. 2d at 1076-77 (company's position was "'solid'"); *In re Calpine Corp.
     Sec Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) (finding term "solid" to be "far too
24   vague to be actionable under the PSLRA").

25   [26] *See, e.g., ATI*, 2007 WL 2301151 at *2, *9 ("'innovation and technology leadership are at the
     core of our strategy and the key to our vision and future success'"); *DSP*, 1997 WL 678151, at
26   *6 ("'The Company believes it is making progress in implementing its [ ] business strategy'").

27

28

- IGT would be "'prudent'" in its capital deployment and management of expenses (¶¶ 42, 48, 54, 63);[28] and

- We "made progress in achieving our long-term objectives" (¶ 55).[29]

These immaterial "puffing" statements cannot form the basis of a securities fraud claim.

## III.   THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Whether or not plaintiffs have set forth any actionable statements, the Complaint should be dismissed for failure to plead "a strong inference" that defendants acted with scienter. Allegations meet this "strong inference" standard only if, taken collectively, they create an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfradulent intent." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). Courts should consider all available inferences in deciding whether scienter has been alleged sufficiently, and courts can draw those inferences in favor of either party. *Id.*; *see also Gompper v. VISX, Inc.*, 298 F.3d 893, 896-98 (9th Cir. 2002).

The required state of mind for securities fraud generally is "deliberate recklessness," which is "a form of intentional or knowing misconduct." *Silicon Graphics*, 183 F.3d at 976; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). With respect to

---

[27] *See, e.g.*, *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (company's "'commitment to create earnings opportunities'"); *In re American Bus. Fin. Servs. Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 400 (E.D. Pa. 2005) ("'this organization has focused its energies on answering the needs of our target markets'"); *Boston Tech.*, 8 F. Supp. 2d at 65 ("'[the company] is highly focused on providing enhanced services specifically for the needs of wireless service operators'"); *In re The Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2003 WL 22436233, at *16 (E.D. Pa. July 16, 2003) ("'the Company continues its acquisition program on a focused and disciplined basis'"). Interestingly, the original complaint in this case alleged that IGT devoted too many resources to development of server-based gaming. *See* Dkt. No. 1, ¶ 30.

[28] *See, e.g.*, *In re Metris Cos. Sec. Litig.*, 428 F. Supp. 2d 1004, 1011 (D. Minn. 2006) ("'we are taking a conservative approach to our losses, given this uncertain economy'").

[29] *See, e.g.*, *American Bus. Fin. Servs. Inc.*, 413 F. Supp. 2d at 400 ("These accomplishments demonstrate our continued focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth.").

forward-looking statements, which form the basis of nearly all of the claims here, the required state of mind is "'***actual knowledge*** . . . that the statement[s were] false and misleading' at the time made."  *Clorox*, 353 F.3d at 1134 (emphasis added); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1021-22 (9th Cir. 2005) (affirming dismissal in relevant part); *see* 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II).  "This standard of actual knowledge of falsity at the time the statements are made is even more difficult to satisfy than the *Silicon Graphics* deliberate recklessness standard."[30]  "To demonstrate actual knowledge for . . . statements about future economic performance, plaintiffs would have to demonstrate that [an individual defendant] knew the growth he was predicting ***was not possible*** ."[31]

### A.     The "CW" Allegations Do Not Support a Strong Inference of Scienter

The Complaint cites information from eight confidential witnesses ("CW"s) to try to establish scienter.  *See, e.g.*, ¶¶ 34(b)-(e), 49(b)-(e), 57(b)-(e), 65(b)-(d).  The Ninth Circuit recently confirmed that "a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA's pleading requirements."  *Zucco Partners*, 552 F.3d at 995.  First, the information provided by the CWs must be "indicative of scienter," *i.e.*, it must show that defendants knew their statements were false when made.  *Id.* at 994.  Absent specifics as to what each defendant knew and when he knew it, the Court "cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of [the company's] problems that would cause their optimistic representations to the contrary to be consciously misleading."  *Silicon Graphics*, 183 F.3d at 985.  Second, "'allegations attributed to

---

[30] *In re Network Assocs., Inc. Sec. Litig.*, No. C-99-01729-WHA, 2000 WL 33376577, at *12 (N.D. Cal. Sept. 5, 2000).

[31] *Ascend Commc'ns*, slip op. at 26 (emphasis added); *see In re Connetics Corp. Sec. Litig.*, No. C-07-02940 SI, 2008 WL 3842938, at *5 (N.D. Cal. Aug. 14, 2008) (allegations "not sufficient to demonstrate that statements predicting an optimistic FDA approval date were made with actual knowledge that it would be impossible for the FDA to approve [the drug] prior to June 25, 2005").

1    unnamed sources must be accompanied by enough particularized detail to support a reasonable

2    conviction in the informant's base of knowledge.'" *Zucco Partners*, *LLC v. Digimarc Corp.*,

3    445 F. Supp. 2d 1201, 1204 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009) (quoting *In re*

4    *NorthPoint Commc'ns Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002)).

5    The CW allegations here fail both tests.

6          None of the CW allegations provides a strong inference that defendants knew, at the

7    time the statements were made, that IGT's financial forecasts or expectations for demand, play

8    levels[32] and SB technology would not be met.  The CW allegations have no bearing on

9    defendants' knowledge:  none of the CWs is alleged to have been a member of senior

10   management or to have had any contact with Mr. Matthews or Mr. Cavanaugh.  *See* ¶ 34.[33]

11   "General allegations of defendants' 'hands-on' management style, their interaction with other

12   officers and employees, their attendance at meetings, and their receipt of unspecified weekly or

13   monthly reports," like those offered here (¶ 79), "are insufficient."  *Daou*, 411 F.3d at 1022

14   (citing *Vantive*, 283 F.3d at 1087).  The CW allegations would not create a strong inference of

15   scienter even if true and known to defendants at the time.  The allegations simply point to

16   normal obstacles in the course of business.  As the Ninth Circuit has stated:

17          Problems and difficulties are the daily work of business people.  That they exist does
            not make a lie out of any of the alleged false statements.
18

19

20

21   [32] None of the CW allegations even mention play levels.  Contrary to the Complaint (*see* ¶ 73),
     there was no admission on the October 30, 2008 call of prior misrepresentations concerning play
22   levels.  The October statements were consistent with the information provided by defendants on
     prior calls.  *See supra* at 11, 13-14.  *See also In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843,
23   848 (9th Cir. 2003) (affirming dismissal and finding that post-Class Period "admissions" were
     not inconsistent with defendants' prior statements).
24

25   [33] *See In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1211-12 (D. Ariz. 2009)
     (rejecting CW allegations because "Plaintiffs do not provide any information linking CW 2 with
26   the Defendants or giving him personal knowledge of the Defendants' state of mind").

27

28   MOTION TO DISMISS, MEMO OF Ps&As          -25-
     CASE NO. 3:09-cv-00419-ECR-RAM

1    *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (affirming dismissal).[34]

2           Here, CW#7's allegations concerning competition and lack of customer interest in AVP

3    machines are irrelevant given that the stated expectations concerning demand were met.  *See*

4    *supra* at 17.  The allegations from various CWs concerning alleged missed internal deadlines,

5    in-fighting between groups of employees, software integration issues, and a lack of leadership

6    (¶¶ 34(b), 49(b), 57(b)) are consistent with IGT's own cautionary statements (*see supra* at 20)

7    and do not demonstrate any actual knowledge by defendants that SB could not be developed for

8    commercialization over the coming years.[35]  Similarly, CW#6 alleges that IGT Labs purchased

9    obsolete memory sticks, but provides no other information such as the amount spent or the

10   timing of that purchase.  *See* ¶¶ 34(d), 49(d), 57(c), 65(b).  Without such information, there can

11   be no strong inference that it was not possible for IGT to meet its target operating expenses as a

12   percentage of revenue, or that defendants actually knew this to be the case.[36]

13          In addition, the Complaint fails to provide the requisite details indicating that the CW

14   allegations should be given any weight.  Plaintiffs provide the CWs' job titles but little else.  *See*

15   ¶ 34.  The Complaint does not explain what the CWs' job responsibilities were, what individuals

16

17   [34] *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159 (S.D. Cal. 2008) (CW
     allegations provided "litany of employee complaints about how [company] was managed" but
18   did not show that defendants actually knew that company could not sustainably operate with
     low headcount); *Impac*, 554 F. Supp. 2d at 1094 ("[p]resuming these [CW] allegations are true,
19   they establish that Impac's management team exhibited poor judgment, stubbornness,
     arrogance, and perhaps even incompetence" but "do not show any deceit"); *Wenger*, 2 F. Supp.
20   2d at 1247 ("All businesses from time to time suffer . . . problems . . ., but many manage to 'do
     very well' despite these commonplace business wobbles.").
21
22   [35] *See Ligand*, 2005 WL 2461151, at *12 (CW allegations along the lines of company's cautionary
     language failed to provide strong inference of scienter).
23
     [36] *See, e.g.*, *American Bus. Fin. Servs.*, 413 F. Supp. 2d at 390-91 (CWs did not provide
24   sufficiently particular allegations as to extent of alleged practices so as to create strong inference
     of scienter); *Yahoo!*, 592 F. Supp. 2d at 1201 (information from 15 CWs did not show "how
25   Yahoo!'s circumstances at the time of each of Defendants' statements were 'inconsistent with
     the statements so as to show that the statements must have been false or misleading when
26   made'") (citation omitted).

27

28

1    they worked with, or how they obtained their information.[37]  Without such corroborating details,

2    the allegations attributed to these CWs must be rejected because there is no way to ascertain

3    whether they are "'speaking from personal knowledge'" or "'merely regurgitating gossip and

4    innuendo.'"[38]  Allegations that may have originated from "'hallway conversations'" and "vague

5    claims of common knowledge" do not demonstrate scienter.[39]

6         **B.    The Alleged Stock Sales Do Not Support A Strong Inference of Scienter**

7            The Complaint also points to Class Period stock sales by certain IGT officers and

8    directors as indicating defendants' motive to commit securities fraud.  ¶¶ 79-84.  These stock

9    sales allegations do not create a strong inference of scienter.  As an initial matter, five of the six

10   alleged sellers – Messrs. Bittman, Burt, Ciorciari, Johnson, Morro and Pennington – are not

11   defendants in this action and are not alleged to have made any misstatements.  These

12   individuals' sales therefore are not probative of scienter.[40]

13

14   [37] *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 953 (D. Ariz. 2007) (rejecting
     allegations attributed to CWs with "vague and generalized job responsibilities"); *Dot Hill*, 594

15   F. Supp. 2d at 1163 (rejecting allegations attributed to CWs where "[i]nformation about [their]
     job responsibilities is virtually nonexistent"); *In re Hypercom Corp. Sec. Litig.*, No. 05-cv-455,

16   2006 WL 726791, at *6 (D. Ariz. Jan. 25, 2006) (rejecting CW allegations as "Plaintiffs do not
     allege any facts describing CW-3's accounting position or his job responsibilities").

17   [38] *Zucco Partners*, 445 F. Supp. 2d at 1207 (citing *In re Metawave Commc'ns Corp.*, 298 F. Supp.

18   2d 1056, 1068 (W.D. Wash. 2003)).

19   [39] *Dot Hill*, 594 F. Supp. 2d at 1163.

20   [40] *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 834 n.12 (C.D. Cal. 1998) (plaintiffs' inclusion of
     sales by "unnamed insiders" was "misleading" because "[t]heir transactions are irrelevant to

21   alleging scienter against the five named Defendants"); *In re Versant Object Tech. Corp.*, No.
     98-cv-299, 2001 WL 34065027, at *5 (N.D. Cal. Dec. 4, 2001) (sales by non-defendant were

22   "irrelevant to alleging scienter against the named Defendants"); *Nat'l Junior Baseball League v.
     Pharmanet Dev. Group Inc.*, No. 08-cv-5723, 2010 WL 1379735, at *25 (D.N.J. Mar. 30, 2010)

23   ("the allegations that these three [non-defendants] sold their stock during the Class Period do
     not establish scienter on the part of [defendants]"); *In re Century Bus. Servs. Sec. Litig.*, No. 99-

24   cv-2200, 2002 WL 32254513, at *7 n.18 (N.D. Ohio June 27, 2002) ("Since these individuals
     are all non-defendants . . . the Court does not consider these sales probative of the defendants'

25   scienter."); *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 685 (E.D. Ky. 2002) (noting
     that "sales of non-defendants" were likely irrelevant); *In re First Union Corp. Sec. Litig.*, 128 F.

26   Supp. 2d 871, 898 (W.D.N.C. 2001) ("Plaintiffs' inclusion of allegations regarding stock sales
     by [non-defendant is] curious and unavailing").

27

28

1    The only alleged sales by defendants in the Complaint are Mr. Matthews's sales of

2    November 19-20, 2007.  ¶ 80.  Realizing that equity is a significant part of executive

3    compensation, the Ninth Circuit has held that plaintiffs who rely on stock sales to plead scienter

4    have the burden to provide specific allegations showing that the sales were suspicious in

5    magnitude and "'dramatically out of line with prior trading practices at times calculated to

6    maximize the personal benefit from undisclosed inside information.'"  *Zucco Partners*, 552 F.3d

7    at 1005; *see also Silicon Graphics*, 183 F.3d at 986 (trades must be suspicious in timing or

8    amount).  Plaintiffs have not done so here.

9    Mr. Matthews' sales were not suspicious in amount.  While plaintiffs allege that the

10   sales comprised 27% of Mr. Matthews' IGT stock, the Ninth Circuit explained that the correct

11   inquiry is not the percentage of stock sold, but the percentage of stock ***and vested options*** sold:

12   > [W]e can see no reason to distinguish vested stock options from shares because
13   > vested stock options can be converted easily to shares and sold immediately.  Actual
        > shares plus exercisable stock options represent the owner's trading potential more
14      > accurately than the stock shares alone.

15   *Silicon Graphics*, 183 F.3d at 986-87.  Mr. Matthews sold only 13% of his total holdings, *i.e.*

16   stock and vested options.[41]  The Ninth Circuit has held that where the CEO of a company sold

17   only 13% of his stock and vested options, "his trading percentage belies any intent to rid himself

18   of a substantial portion of his holdings."  *Vantive*, 283 F.3d at 1094.  Even assuming 27% was

19   the correct figure (it is not), the Ninth Circuit has found that stock sales in similar or even

20   greater percentages do not support an inference of scienter.[42]  Moreover, in contrast to the

21   _____

22   [41] The percentage of total holdings sold is determined by dividing the number of shares sold
     during the class period by the sum of the number of shares sold during the class period and the
23   number of shares and vested options beneficially owned at the end of the class period.  Here, the
     calculation is as follows:  379,658/(379,658 + 1,048,600 + 1,500,000) = 12.96%.  *See* Ex. 25
24   (11/21/07 Forms 4); Ex. 26 (5/13/08 Forms 4); Ex. 27 (11/18/08 Forms 4); Ex. 21 (1/16/09
     Schedule DEF 14A) at 31-32.

25   [42] *See, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir.
     2008) (no inference of scienter where insider "sold only 37% of his total stock"); *Vantive*, 283
26   F.3d at 1094 (sales of 26% were not "terribly 'unusual' or suspicious").  *See also In re Taleo*

27

28   MOTION TO DISMISS, MEMO OF PS&AS          -28-
     CASE NO. 3:09-cv-00419-ECR-RAM

1    alleged $15.5 million in gross proceeds from the sales (¶ 80), Mr. Matthews's net proceeds were

2    only approximately $631,000.[43]

3            Mr. Matthews' sales also are not suspicious in timing.  In both *Zucco Partners* and

4    *Silicon Graphics*, the Ninth Circuit indicated that stock sales are not suspicious unless

5    "calculated to maximize the personal benefit from undisclosed inside information."  *Zucco*

6    *Partners,* 552 F.3d at 1005; *Silicon Graphics*, 183 F.3d at 986.  Here, Mr. Matthews' sales

7    occurred in November 2007 – two months prior to IGT's announcement that it had *achieved* its

8    financial forecast for the first quarter of fiscal 2008.  The trades took place at a distinctly

9    disadvantageous time for Mr. Matthews:  IGT's stock price closed lower on November 19, 2007

10   than on any other day between September 13, 2007 and January 11, 2008.  *See* Ex. 1.  The Ninth

11   Circuit in *Ronconi* held that similar stock sales did not support an inference of scienter.  253

12   F.3d at 436.  There, the stock was trading at higher price two months after the sales and "the

13   below-expectation earnings report" was not released until three months later.  *Id.* at 435.  The

14

15

16

_____

17   *Corp. Sec. Litig.*, No. 09-cv-151, 2010 WL 597987, at *12 (N.D. Cal. Feb. 17, 2010) (stock
18   sales of 38% and 61% of defendants' holdings did not support inference of scienter); *Kairalla v.*
     *Advanced Med. Optics, Inc.*, No. 07-cv-5569, 2008 WL 2879087, at *9 (C.D. Cal. June 6, 2008)
19   (stock sales of 26% of defendant's holdings did not support inference of scienter); *In re Pixar*
     *Sec. Litig.*, 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006) (stock sales of 25% did not support
20   inference of scienter); *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1038-40 (N.D. Cal.
     2000) (sales of 29% and 31% were "insufficient to support an inference of scienter"), *aff'd*, 32
21   Fed. Appx. 338 (9th Cir. 2002); *Wenger*, 2 F. Supp. 2d at 1238 n.6 (sales of 26%, 38%, 25%,
     and 32% were not suspicious).

22   [43] In 2008 the top federal income tax rate, inclusive of Medicare taxes, was 36.45%.  IGT's
23   closing stock price on November 19, 2007 was $40.95.  Therefore, the after-tax proceeds that
     Mr. Matthews received for selling 379,658 shares after exercising the underlying options at
24   $17.50 were approximately $5,658,000.  This was almost totally offset by the cost of exercising
     an additional 192,977 options and holding the shares.  Mr. Matthews paid $17.50 per option
25   exercised and also incurred an immediate tax liability of approximately $8.55 per option.  Thus,
     the total cost of exercising those options was approximately $26.05 per option, or about
26   $5,027,000.  Mr. Matthews' net proceeds were only about $631,000 ($5,658,000 - $5,027,000).

27

28

1    court explained: "When insiders miss the boat this dramatically, their sales do not support an

2    inference [of scienter]. . . ." *Id.*[44]

3          Finally, the Complaint does not plead that Mr. Matthews' sales were "dramatically out

4    of line with prior trading practices." *Zucco Partners*, 552 F.3d at 1005. "For individual

5    defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful

6    trading history' for purposes of comparison to the stock sales within the class period." *Id.*

7    "[P]laintiffs can get the insider trading reports from the Securities and Exchange Commission"

8    *Ronconi*, 253 F.3d at 436-37. Here, plaintiffs merely allege that Mr. Matthews sold no stock in

9    the twelve-month period preceding November 2007. ¶ 83. This twelve-month slice of trading

10   history is not "meaningful." Mr. Matthews joined IGT's board of directors in 2001 and has

11   made numerous stock sales during his tenure with the Company. For example, in February

12   2006 Mr. Matthews sold approximately 580,000 shares of IGT stock. Ex. 24 (2/15/06 Forms 4).

13   Plaintiffs' limited comparison with the months leading up to the Class Period does not support a

14   strong inference of scienter. *Ronconi*, 253 F.3d at 437 (trading history limited to seven months

15   preceding class period was insufficient to support strong inference of scienter).[45]

16

17

18

---

19   [44] *See also Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1164 (S.D. Cal. 2003) (stock sales were
     not suspicious where defendants sold stock at prices well below peak); *In re Guess?, Inc. Sec.
20   Litig.*, 174 F. Supp. 2d 1067, 1078 (C.D. Cal. 2001) (same); *In re ICN Pharms., Inc. Sec. Litig.*,
     299 F. Supp. 2d 1055, 1068 (C.D. Cal. 2004) (stock sale that "occurred about seven months
21   before the Company's July 11, 2002 disclosure" was not suspicious); *In re Read-Rite Corp. Sec.
     Litig.*, 115 F. Supp. 2d 1181, 1183 (N.D. Cal. 2000) (sales "occurring many months prior to the
22   announcement which triggered the stock price correction upon which this action pivots, do not
     amount to a strong implication of the requisite scienter"); *Wenger*, 2 F. Supp. 2d at 1251 (stock
23   sales were not suspicious because they did not occur "immediately before a negative earnings
     announcement"); *Plevy*, 38 F. Supp. 2d at 835 (no inference of scienter where "Defendants did
24   not sell any of their stock as the price climbed higher toward its peak").

25   [45] *See also In re Verifone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140, 2009 WL 1458211, at *7
     (N.D. Cal. May 26, 2009) (rejecting allegations that failed to "show[ing] trades over some
26   period of years where such data is available, with specific dates associated with the trades.").

27

28   MOTION TO DISMISS, MEMO OF PS&AS                    -30-
     CASE NO. 3:09-cv-00419-ECR-RAM

1

**CONCLUSION**

2          For the foregoing reasons, the Complaint should be dismissed in its entirety.

3

4     Dated:  June 17, 2010                              Respectfully submitted,

5                                                        WILSON SONSINI GOODRICH & ROSATI
                                                         Professional Corporation
6

7
                                                         By:   /s/ Boris Feldman
8                                                               Boris Feldman

9                                                        Attorneys for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Motion to Dismiss, Memo of Ps&As              -31-
      Case No. 3:09-cv-00419-ECR-RAM

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on June 17, 2010, a true and correct copy of **NOTICE OF**

4  **MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT;**

5  **SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** was electronically

6  filed with the Clerk of the Court using the CM/ECF System which will transmit a Notice of

7  Electronic Filing to all registered CM/ECF registrants for this case.

8        Executed at Palo Alto, California, on June 17, 2010.

9

10                                        By:    _____/s/*Rosemarie Dean*_____

11                                                 Rosemarie Dean

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28