THE O'MARA LAW FIRM, P.C.
WILLIAM O. O'MARA (Nevada Bar No. 837)
DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV  89501
Telephone:  775/323-1321
775/323-4082 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
    & DOWD LLP
ARTHUR C. LEAHY
BRIAN O. O'MARA (Nevada Bar No. 8214)
MATTHEW I. ALPERT
PHONG L. TRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>    vs.<br><br>INTERNATIONAL GAME TECHNOLOGY, et al.,<br><br>                       Defendants. | No. 3:09-cv-00419-ECR-RAM<br><br>CLASS ACTION<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................1

II.    FACTS ........................................................................................................1

    A.    Overview of Defendants' Fraud................................................................2

    B.    Defendants Misrepresented the Game Play Levels ...................................4

    C.    Defendants Made False Sales/Revenue Forecasts ....................................6

    D.    Defendants Misrepresented IGT's Operating Expenses............................7

    E.    Defendants Misrepresented IGT's SB Technology ..................................8

    F.    Defendants Made False EPS Forecasts...................................................11

III.   ARGUMENT ............................................................................................11

    A.    The "Play Level" Allegations Are Not Protected by the Safe Harbor.................12

    B.    Defendants' Sales/Revenue Forecasts Are Actionable...........................16

    C.    The Statements About Operating Expenses Are Actionable ................................20

    D.    The Misrepresentations About the SB Technology Are Actionable ...................22

    E.    Defendants' EPS Forecasts Are Not Protected by the Safe Harbor......................27

    F.    Plaintiffs Plead a Strong Inference of Scienter .....................................31

IV.    CONCLUSION..........................................................................................40

# TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008)........................................................................31

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ..........................................................16, 18, 19

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ............................................................. *passim*

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) .......................................................26

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ...............................................................26, 27

*Dolphin & Bradbury, Inc. v. SEC*,
   512 F.3d 634 (D.C. Cir. 2008)...................................................................15

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ...................................................................40

*Freeland v. Iridium World Commc'ns, Ltd.*,
   545 F. Supp. 2d 59 (D.D.C. 2008) .............................................................14

*Freudenberg v. E*Trade Fin. Corp.*,
   No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053
   (S.D.N.Y. May 11, 2010)............................................................................32

*Gilligan v. Jamco Dev. Corp.*,
   108 F.3d 246 (9th Cir. 1997) .....................................................................11

*In re Ambac Fin. Group, Inc.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................12

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ...................................................................39

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................................33

**Page**

*In re Cutera Sec. Litig.*,
No. 08-17627, 2010 U.S. App. LEXIS 13334
(9th Cir. June 30, 2010) ...................................................................14

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ...........................................32, 33, 34, 39

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007) .............................................31

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008), *cert. denied*,
129 S. Ct. 1993 (2009) ....................................................................11

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ...............................................34

*In re Musicmaker.com Sec. Litig.*,
No. CV 00-2018 CAS (MANx), 2001 U.S. Dist. LEXIS 25118
(C.D. Cal. June 4, 2001) ..................................................................12

*In re Omnivision Techs.*,
No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
(N.D. Cal. July 29, 2005) ............................................................39, 40

*In re Par Pharm. Sec. Litig.*,
No. 06-cv-3226(PGS), 2009 U.S. Dist. LEXIS 90602
(D.N.J. Sept. 30, 2009) ....................................................................20

*In re RAIT Fin. Trust Sec. Litig.*,
No. 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS 103549
(E.D. Pa. Dec. 22, 2008) ..................................................................33

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D Ill. 2003) ...................................................33

*In re Secure Computing Corp.*,
184 F. Supp. 2d 980 (N.D. Cal. 2001) .................................................39

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...............................................38

- iii -

**Page**

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ...................................................................20

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..................................................................... *passim*

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998)......................................................................14

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ...............................................................................31

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..................................................................................34

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................32

*Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ...................................................................... *passim*

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .........................................................................15, 28

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...........................................................12, 31, 33, 35

*Marucci v. Overland Data, Inc.*,
    No. 97-CV-0833 TW (JFS), 1999 U.S. Dist. LEXIS 12194
    (S.D. Cal. Aug. 2, 1999) ......................................................................................12

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .........................................................................25, 26

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
    *v. Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .........................................................................34, 39

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..............................................................................32

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .................................................................... *passim*

570287_1

**Page**

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ..................................................................................20, 26

*Rosenbaum Capital, LLC v. McNulty*,
    549 F. Supp. 2d 1185 (N.D. Cal. 2008) ................................................................14

*Roth v. Aon Corp.*,
    No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471
    (N.D. Ill. Mar. 7, 2008) ........................................................................................32

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) .......................................................................... *passim*

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .............................................................33, 35, 36, 37

*South Ferry LP# 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................33

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)...............................................................................32, 34

*Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) ...................................................................31

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................31

*United States v. Berger*,
    473 F.3d 1080 (9th Cir. 2007) ..............................................................................20

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)...................................................................................................................1, 40
    §78t(a)...................................................................................................................1, 40
    §78u-4(b)(2)...............................................................................................................31
    §78u-5(c)(1)(A)(i)........................................................................................12, 18, 24

**Page**

**RULES**

Federal Rules of Civil Procedure

Rule 9(b) ..................................................................................................................1

Rule 12(b)(6)..............................................................................................................1

**SECONDARY AUTHORITIES**

*Merriam Webster's Collegiate Dictionary* (10th ed. 2000).........................................38

I.     INTRODUCTION

Plaintiffs respectfully submit this opposition to defendants' motion to dismiss. Plaintiffs properly plead causes of action pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Fed. R. Civ. P. 9(b) and 12(b)(6). Contrary to defendants' arguments, their alleged misrepresentations and omissions are actionable. Furthermore, defendants' misrepresentations are not protected by the PSLRA's safe harbor for forward-looking statements. Plaintiffs also properly plead scienter.

II.    FACTS

This class action alleges that defendants[1] made false and misleading statements and omissions in violation of §§10(b) and 20(a) of the 1934 Act during the period from November 1, 2007 through October 30, 2008 (the "Class Period"). ¶¶2, 4. Defendants' fraud caused IGT's securities to trade at artificially inflated prices during the Class Period. ¶4. As parts of defendants' fraud were slowly revealed during and after the end of the Class Period, the artificial inflation caused by defendants' misrepresentations and omissions came out of IGT's securities prices and IGT's securities declined in value, causing plaintiffs and the class – who bought IGT securities during the Class Period – to suffer damages. ¶¶4, 9-10, 85-88. During the Class Period, defendants made misrepresentations and omitted material information on the following topics: (1) game "play levels," *i.e.*, how much gamblers were gambling; (2) IGT's sales/revenue growth; (3) IGT's operating

---

[1]     Defendants are International Game Technology ("IGT"), and its former President/CEO Thomas J. Matthews ("Matthews") and CFO Patrick W. Cavanaugh ("Cavanaugh"). *See* Consolidated Complaint, ¶¶2, 12-14 (all "¶__" references herein are to the paragraph numbers of the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint"), filed April 26, 2010). Emphasis is added and citations are omitted throughout unless otherwise indicated.

expenses; (4) IGT's server-based ("SB") technology; and (5) IGT's forecasts of quarterly earnings per share ("EPS") for the second and fourth fiscal quarters of 2008.

A.      **Overview of Defendants' Fraud**

Defendants attempted to differentiate IGT from its competitors during most of the Class Period by implying that IGT was impervious to the lagging economy.  Defendants conveyed that, despite difficult economic times, IGT was presently succeeding and would succeed in the future. Starting on the first day of the Class Period (11/1/07) and continuing throughout most of the rest of that period, defendants emphasized that they saw a very bright future for IGT in fiscal 2008 notwithstanding the economy because IGT was expecting growth in its sales/revenues in second ("2Q"), third ("3Q") and fourth ("4Q") quarters of fiscal 2008.[2]  ¶¶24-26; *see also* ¶¶31, 33, 38, 53, 62.  Defendants also made bullish forecasts of EPS for 2Q and 4Q.  ¶¶26, 40, 47, 53, 61.  Defendants further represented throughout the Class Period that IGT's unique SB technology was "on target" for commercialization in 2009, and how excited they were about the "higher margin[s]" they expected from SB technology and how it "assur[ed] that IGT's future prospects remain[ed] solid."  ¶¶27, 35; *see also* ¶¶30-31, 41, 44, 46, 50, 55.  Defendants also downplayed declines in play levels, at first saying nothing, and then stating that they saw nothing unusual or claiming lower player levels would have little affect on IGT while simultaneously representing that play levels in the future months would be the "best."  *See* ¶¶34(a), 49(a), 57(a), 65(a) (defendants were aware of large growing decline in play levels in 11/07); *compare* ¶¶24-33 (no mention of huge decline in play levels); ¶39 ("play levels are very much in line with what we normally see"); ¶52 (lower play levels due to

---

[2]      IGT operated on a fiscal year beginning on October 1 and ending on September 30.  2Q covered the period of 1/1/08-3/31/08.  3Q covered 4/1/08-6/30/08.  4Q covered 7/1/08-9/30/08.

normal "seasonality" and IGT products "less impacted"; next six months are "best . . . for . . . play levels").  Defendants also repeatedly stated that operating expenses would remain at 25%-29% of total annual revenues, and that defendants would be "prudent" in spending capital, while cutting costs "quickly."  ¶¶28, 42, 54, 63.  None of these representations, however, were true.  In fact, IGT's future was dismal, as defendants were later forced to admit.  Massive declines in play levels and sales/revenues and ballooning expenses were materially and negatively impacting IGT throughout the Class Period – as a result, defendants knew it was impossible for IGT to attain their optimistic EPS forecasts.  In addition, contrary to their sunny representations that the SB technology was on schedule for commercialization in 2009 and that it would lead to "higher margins," the technology was never on schedule and was being given away for free for long periods of time, thereby ensuring that "higher margins" would not occur anytime soon, if at all.

Defendants' fraud was very successful in causing IGT's stock to trade at artificially high levels during the Class Period.  Buoyed by defendants' fraud, IGT's stock hit its all-time and Class Period high of $49.41 in February 2008.  ¶87.  However, as partial (but not full) disclosures of the truth occurred throughout the remainder of the Class Period, ultimately revealing the full extent of defendants' fraud and IGT's true dismal condition, IGT's stock price began to fall, ultimately plummeting to less than $8 per share by November 2008.  ¶78.  While plaintiffs and the class, who purchased IGT securities during the Class Period when IGT's stock was inflated by defendants' fraud, suffered over $1 billion in losses, at least one defendant and other IGT insiders did much better – they unloaded hundreds of thousands of shares of their IGT stock at prices near IGT's all-time high price, for nearly $29 million in proceeds.  ¶¶4, 80-84.

- 3 -

### B.        Defendants Misrepresented the Game Play Levels

While defendants painted a rosy picture of IGT's future during the Class Period (*e.g.*, ¶¶26, 31, 33, 38, 40, 47, 53, 61-62), defendants became aware that a key business metric was indicating that IGT's business was going to be very negatively impacted.  ¶34(a).  This metric – play levels – began rapidly declining at the beginning of the Class Period (11/07) and indicated to defendants that IGT would suffer financially in the upcoming quarters.  *Id*.  Defendants were aware of this in November 2007[3] yet they said nothing to the investing public in the first few months of the Class Period.  *See* ¶¶24-33, 35; *see also* Defs.' Exs. 4-9.  Later, on January 17, 2008, in response to a question about whether defendants saw softening play levels, Cavanaugh denied that defendants did, representing that "all we're seeing at this point is ***normal seasonality***."  ¶39.  This statement was false because defendants saw a significant decline in play levels as early as November 2007 that was not normal and the decline was accelerating by January 2008.  ¶49(a).  By April 2008, defendants were unable to deny that play levels were affecting IGT.  Cavanaugh admitted for the first time that "lower play levels" contributed to IGT's awful 2Q results.  ¶52.  But instead of disclosing that play levels were uncharacteristically declining and were accelerating, and that this portended badly for IGT for the rest of the fiscal year (¶57(a)), defendants misrepresented that lower play levels were again due to normal "seasonality."  ¶52.  Defendants further misled investors by claiming that IGT's products were "probably . . . slightly less impacted by the overall economic impact on play levels" in

---

[3]        ¶34(a); ¶73 (defendant Matthews admitted at end of Class Period that defendants were aware of declining play levels "since last November [2007]").  *See also* Defs.' Ex. 10 at 7 (Cavanaugh acknowledged that play levels are something defendants "***continue to keep a close eye on***"); *id*. at 10 (Matthews acknowledged in discussion regarding play levels that "we do have our eye on kind of the overall trends throughout all markets").

2Q (¶52), when they knew otherwise.  ¶57(a).  Defendants also misled investors into believing IGT would face little negative impact from lower play levels going forward by representing that the last six months of fiscal 2008 were "the best six months of the year for game play levels."  ¶52.  This was highly misleading because play levels had been plummeting at an unprecedented rate for months, the decline was accelerating, and defendants knew that IGT was headed towards disastrous future quarters.  ¶57(a).

Late in the Class Period, on July 17, 2008, defendants finally admitted that the declines in play levels were "unprecedented."  ¶60.  However, even this disclosure did not reveal the entire truth because defendants knew but did not disclose that the declines were going to have a severe economic impact on IGT's 4Q.  ¶65(a).  Nonetheless, defendants misrepresented that IGT would perform relatively well in 4Q.  ¶¶61-62.  Finally, on October 30, 2008, IGT announced horrible 4Q financial results and defendants admitted for the first time the entire truth regarding play levels.  ¶72.  Contrary to defendants' prior representations that that lower levels were due to "normal seasonality," (¶39) or that IGT games were less affected by lower play levels, or that the next six months were the "best" for play levels, defendants now admitted that IGT's terrible financial results were in large part caused by "lower play levels resulting from the current economic environment."  ¶73.  And Matthews admitted that defendants saw the significant declines in play levels "since last November [2007] that accelerated a bit in April [2008] and appears to have accelerated even a bit further in October [2008]."  *Id.*

C.       Defendants Made False Sales/Revenue Forecasts

One of the main ways defendants attempted to communicate that IGT was going to succeed in fiscal 2008 was by attaining sales/revenues growth.  Matthews forecasted that IGT was going to experience growth in sales and revenues in "Q2 through 4" of fiscal 2008.  ¶26.[4]  This theme of "good" or "tremendous" quarterly sales/revenue growth was repeated throughout the Class Period by defendants.  *See* ¶¶31, 33, 38, 53, 62.  These representations, however, were false.  In fact, defendants knew their forecasts of growth were unattainable.  This is so because defendants knew at the time they made the forecasts that: (1) the significantly declining play levels were continuing to accelerate, indicating that IGT faced extremely difficult financial conditions in the upcoming quarters; (2) IGT was losing sales to its competitors at ever-increasing rates; and (3) customers were not buying IGT's new "AVP" machines.  ¶¶34(e), 49(e), 57(d), 65(c).  Indeed, at the time the forecasts were made, defendants were aware IGT was rapidly losing market share because IGT's machines were not selling, as competitors' machines generated more profit for casino and gaming operators.  Thus, operators were buying competitors' machines, not IGT's products.  *Id.*  In addition, sales were slumping as IGT was emphasizing the sale of its new AVP machines, which customers did not want.  Customers were not buying AVP machines because they were more expensive,

---

[4]       *See also* Defs.' Ex. 4 at 3 (Cavanaugh stated that "we expect the installed base to grow at a rate of 500 to 1500 machines per quarter during the last three quarters of fiscal '08" and "we expect new unit shipments to accelerate in the second half of fiscal 2008"); *id.* at 11-12 (Matthews bullishly forecasted growth for fiscal "Q2 through 4 of this year," stating that "game operations are going to continue to grow," "you're going to continue to see growth and strength in our non-machine sales," [y]ou're going to see growth internationally," and "you're going to see . . . an uptick in new unit demand in the back half of the year."  Matthews also confidently conveyed that his forecasts of increased sales/revenues were accurate by stating "we're in a pretty good position these days to have decent visibility to an improved outlook.").

required new hardware and wiring, and were designed to work with IGT's SB technology, which was not then in the marketplace and which did not have any pricing models so that customers could estimate their potential costs for the new technology. *Id.* Moreover, plummeting play levels indicated that sales and revenues would not be growing. *Id.*[5]

### D.    Defendants Misrepresented IGT's Operating Expenses

Throughout the Class Period, defendants represented that they were "prudent" in managing IGT's capital, and would limit expenses to 25%-29% of IGT's fiscal year total revenues. *See, e.g.*, ¶¶28, 42, 54. Late in the Class Period, on July 17, 2008, when defendants announced that 3Q expenses were "not at optimal levels," defendants misleadingly reassured investors that IGT's operating expenses would still be only "25 to 28%" of revenues and further that defendants were "manag[ing] expenses in a much more *prudent and careful* way" and "act[ing] on [cost containment/cuts] reasonably quickly." ¶63.[6]

---

[5]    That defendants' forecasts were knowingly false is corroborated by IGT's actual performance in the last three quarters of fiscal 2008. For 2Q, Matthews admitted that it "was a disappointing quarter," while an analyst called it "weak[]." Defs.' Ex. 14 at 5, 13. Indeed, IGT's 2Q sales/revenues were approximately $36.5 million *less* than the second quarter of the previous fiscal year. *See* Defs.' Ex. 16 at 11 (2Q sales/revenues were $573.2 million versus 2Q07's $609.7 million). In addition, IGT announced EPS of only $0.22, far below defendants' forecasts of $0.35-$0.40 or just "slightly below." ¶51; *see also* ¶40. 3Q was also below expectations. Sales/revenues for 3Q were $677.4 million versus $706.5 million in the same quarter the year before, a decline of $29.1 million. *See* Defs.' Ex. 18 at 11. EPS was not much better. Contrary to defendants' forecasts that IGT would likely "have [a] *$0.40 plus* quarter[] in . . . Q3" (¶40), IGT actually attained only $0.35 in EPS for the quarter (¶58). And 4Q was a massacre – sales/revenues fell $30.7 million, from $662.9 in the fourth fiscal quarter of 2007 to $632.2 million in 4Q. Defs.' Ex. 19 at 13. In addition, instead of meeting defendants' revised EPS forecasts of $0.30-$0.35, IGT generated only $0.18 in EPS for 4Q. ¶72.

[6]    *See also* Defs.' Ex. 17 at 5 ("[W]e acknowledge that operating expense[s] are not at optimal levels. So, we are already giving expenses company wide . . . . [W]e need to manage expenses in a much more prudent and careful way . . . and we'll make sure that we continue to undertake the

- 7 -

Defendants' statements were false when made.  Rather than being "prudent and careful" in managing IGT's expenses, as defendants represented, IGT was actually spending like it had a "bottomless purse."  ¶¶34(d), 49(d), 57(c), 65(b).  In every quarter of the Class Period, IGT repeatedly made huge, imprudent purchases of "end-of-life" components – such as memory sticks – by the tens of thousands that subsequently became useless.  *Id.*  Moreover, throughout the Class Period, there were absolutely no controls in place to check spending or even monitor SB spending, IGT's largest initiative.  *Id.*  This was a "continuous issue" at IGT during the Class Period.  *Id.*  In addition, contrary to defendants' July 2008 representations that they would "act . . . quickly" (¶63) on cost containment, in reality, there was no concerted effort at all at IGT to control or monitor costs until months later, at the end of the Class Period.  ¶¶34(d), 49(d), 57(c), 65(b).  In fact, Matthews later admitted that defendants had not acted quickly on cutting IGT's expenses.  *See* ¶76 ("it just took us a little while to say we were committed to" cutting expenses).[7]

### E.      Defendants Misrepresented IGT's SB Technology

A large part of defendants' fraud was their constant promotion of IGT's SB technology.  Even prior to the Class Period, defendants promoted SB technology as the wave of the future.  *See, e.g.,* ¶¶20-23.[8]  During the Class Period, defendants' representations about SB technology intensified.  Matthews represented at the beginning of the Class Period that SB technology was

---

measures necessary to do that."); *id*. at 11 (in connection with discussion concerning cutting expenses, Matthews stated "we can probably act on it reasonably quickly").

[7]      As a result, rather than attaining defendants' forecast of operating expenses of 25% to 28% of total revenues for fiscal 2008 (¶63), IGT failed to meet the forecast, reporting operating expenses of 30% of total revenues for the fiscal year and 32% in 4Q.  ¶76.

[8]      *See also* Defs.' Ex. 14 at 5 (Matthews: "'07 was really the introduction of the concept to the marketplace.").

expected to produce exciting returns for IGT when it was commercialized, "drive market growth" and "assure that IGT's future prospects remain[ed] solid." ¶27. Matthews represented that IGT was "**on target** to begin commercializing this product **in 2009**." *Id.* Defendants repeatedly emphasized during the Class Period how IGT was "***focused***" on SB technology, and how the sale of the technology would allow IGT to attain "***higher margin[s]***," that is, make IGT a more profitable company, and "further differentiate IGT" from its competitors. ¶¶30-31; *see also* ¶¶35, 41, 46, 55. Defendants created the illusion that they remained on schedule for higher margins by announcing agreements to provide SB technology to Harrah's Entertainment, Inc. ("Harrah's") and CityCenter (¶¶44, 50), creating the expectation that the purportedly highly profitable SB technology would begin contributing to IGT's financial results in the not-too-distant future. Defendants furthered the illusion of being on schedule by representing that CityCenter would receive the advanced version "4.0" of SB technology upon its opening. ¶55.

Defendants' representations were false. They had no basis for making such representations and knew it. IGT was not "on target" to commercialize the SB technology by 2009. According to numerous former IGT employees who worked directly on the SB technology, IGT had fallen far behind schedule as it repeatedly missed internal deadlines, and defendants were aware of this. ¶34(b) (first and third bullet points). Missed deadlines were caused in part by internal in-fighting between the Networking Systems and Engineering groups. *Id.* (second bullet point); ¶49(b). IGT was also not on target because of numerous delays caused by software integration issues. ¶34(b) (third bullet point). Importantly, delays were caused in part by the inability of the technology to

- 9 -

function with more than 12 to 14 machines at one time, of which defendants were also aware.[9] ¶34(b) (third bullet point). Indeed, IGT was so far behind schedule that Matthews' representation on April 17, 2008 that IGT was on schedule to deliver the purportedly advanced version "4.0" of the SB technology to CityCenter upon its opening, was patently false. Version 4.0 was never scheduled to be developed by CityCenter's opening and in fact was not delivered. ¶56.[10]

Defendants also had no basis to represent that the SB technology would create "higher margin[s]." ¶34(c). During the Class Period, defendants had not developed a pricing model for the SB technology, nor had they determined what customers would be willing to pay for it. Therefore, defendants were in no position to claim SB technology would generate "higher margin[s]." ¶¶34(c), (e), 49(c), (e), 57(d), 65(c). In addition, while defendants touted the Harrah's and CityCenter agreements, implying they would generate higher margins soon, defendants did not disclose that the agreements required IGT to provide SB technology for free for at least two years, and therefore, there would be no revenues, let alone higher margins, any time soon. ¶¶49(f), 57(e).

---

[9]     This function was critical to the success of the SB technology because it was supposed to provide efficiencies of scale by linking all games on the casino floor to a central network server. *See, e.g.*, ¶¶20-23; *see also* Defs.' Ex. 4 at 6 (SB to allow "a casino . . . to manage" its floor "from a central server"); Defs.' Ex. 6 at 4 ("[W]hat if we can do that on every machine and every casino? That's what the SB window is all about"); Defs.' Ex. 7 at 24 (SB "ensure[s] the future is powered by an open network that enables products from multiple suppliers to work together"); Defs.' Ex. 9 at 8 (SB designed to "allow[] distribution of features and applications across multiple gaming manufacturers' platforms and devices").

[10]     IGT was also not "focused" on the SB technology. Internally, IGT employees were fighting about whether or not SB technology should even be pursued. In addition, IGT did not make SB technology a priority. Within IGT, there was no focus on or leadership in executing the initiative. Constant changes in managers on the project led to a lack of leadership, unclear vision for the technology, no clear product definition and decreased productivity throughout the Class Period. ¶34(b) (second and fourth bullet points); ¶¶49(b), 57(b).

F.       **Defendants Made False EPS Forecasts**

Despite the massive problems IGT was facing (as discussed above), defendants made bullish forecasts of IGT's EPS for 2Q and 4Q.  First, on November 1, 2007, Matthews represented that IGT's 2Q EPS would be $0.35 to $0.40.  ¶26.  Similarly, on January 17, 2008, Matthews represented that the 2Q EPS forecast would remain in "the range . . . of $0.35 to $0.40, . . . or maybe even slightly below."  ¶40.  Defendants knew IGT could not attain this forecast because of the major issues IGT was facing.  ¶¶34(a)-(f), 49(a)-(g).  Predictably, IGT failed to deliver in 2Q, reporting EPS of only $0.22, far below forecasts.  ¶51.

The forecasts for 4Q were no better.  Despite near certainty that IGT was facing a financial catastrophe (¶¶34, 49, 57, 65), Matthews again made wildly optimistic forecasts for 4Q.  ¶26 (forecasted that 4Q, *i.e.*, "second half of '08," would "break out" of $0.35-$0.40 range); ¶40 ("***$0.40-plus in . . . Q4***"); ¶53 ("slightly exceeding" $0.35-$0.40 range); ¶61 (slightly downgrading forecast to "range of $0.30 to $0.35" but "confident . . . we will be able to be at the high end of this range or even outside of the range on the upside.").  These forecasts were also knowingly unattainable.  ¶¶34, 49, 57, 65.  This is corroborated by the fact that IGT's actual results for 4Q were dismal, with IGT reporting EPS of only $0.18.  ¶72.

III.     **ARGUMENT**

On a motion to dismiss, the Court must accept plaintiffs' allegations as true, consider those allegations in their entirety and not scrutinize them in isolation.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1993 (2009).  The issue at the pleading stage "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997); *see also Gilead*, 536 F.3d at 1057 (stating that a "'well-pleaded complaint may proceed even if it

- 11 -

strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely'").

### A.    The "Play Level" Allegations Are Not Protected by the Safe Harbor

Defendants argue that their representations about play levels were forward-looking statements protected by the PSLRA's "safe harbor."[11] Defs.' Mem. at 17-18.  Defendants are wrong. Most of their misrepresentations about play levels were not forward-looking but rather were *statements of present and historical fact* which are not protected by the safe harbor.  *Livid Holdings*, 416 F.3d at 948 ("extension of the [safe harbor] to statements of historical fact is inappropriate").[12] For example, the Complaint alleges that, on January 17, 2008, in response to a question from a securities analyst about whether defendants saw a softening in play levels in the *just-completed* first fiscal quarter of 2008, Cavanaugh stated "all *we're seeing at this point* is normal seasonality." ¶39; *see also* Defs.' Ex. 10 at 7.  Similarly, Matthews stated "play levels *are* very much in line with what we normally see due to seasonal factors."  ¶39.  These statements are clearly historical statements about play levels in the just-completed first fiscal quarter.[13]  The same is true for defendants' other

---

[11]    The PSLRA safe harbor is a codification of the former bespeaks caution doctrine.  *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 948 (9th Cir. 2005); Defs.' Mem. at 7. "Forward-looking" statements (*i.e.*, projections/forecasts of future events) are immunized from liability by the PSLRA safe harbor if, among other things, they are identified as forward-looking and they are "accompanied by meaningful cautionary statements identifying important factors that could cause" them to be false.  15 U.S.C. §78u-5(c)(1)(A)(i).

[12]    *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *In re Musicmaker.com Sec. Litig.*, No. CV 00-2018 CAS (MANx), 2001 U.S. Dist. LEXIS 25118, at *68 (C.D. Cal. June 4, 2001); *Marucci v. Overland Data, Inc.*, No. 97-CV-0833 TW (JFS), 1999 U.S. Dist. LEXIS 12194, at *26-*27 (S.D. Cal. Aug. 2, 1999); *In re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d 241, 272 n.36 (S.D.N.Y. 2010).

[13]    These historical statements were untrue because defendants knew months earlier, in November 2007, that play levels were not experiencing "normal" seasonal declines but rather were

play level statements.  On April 17, 2008, defendants discussed IGT's just-completed 2Q.  ¶52.  In discussing 2Q, which had ended 17 days earlier, defendants again misrepresented that lower play levels during 2Q were due to "seasonality."  *Id.*; *see also* Defs.' Ex. 14 at 8 ("I think that the primary impact on play levels this quarter is seasonality.").  Matthews further misrepresented that IGT's products were "less impacted by . . . play levels" in 2Q.  ¶52.  These statements discuss ***historical*** play levels in 2Q and are not protected by the safe harbor.

The only statement about play levels which could possibly be considered forward-looking is Matthews' representation in April 2008 that the last six months of fiscal 2008 were "the best six months of the year for game play levels."  ¶52.  While Matthews was speaking of the six months ahead, plaintiffs submit this statement was not properly identified as forward-looking.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010) ("[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified" as forward-looking.  "'[T]he use of linguistic clues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking'" are usually sufficient.).  Here, Matthews spoke in the present tense and delivered the statement in confident, certain, absolute terms, with no caution or indication that it was an expectation or belief: "These six months ***are*** the best six months of the year for game play levels."

experiencing significant declines indicating very difficult times ahead for IGT.  ¶¶34(a), 73.  In addition, in the January 17, 2008 conference call, defendants admitted they were very aware of play levels, as they were "continu[ing] to keep a close eye on" them.  Defs.' Ex. 10 at 7; *id.* at 10 ("we do have our eye on" things like play levels).  Thus, defendants cannot contend that they were unaware of the huge uncharacteristic declines during the Class Period.

Defs.' Ex. 14 at 11.[14]  This statement was not properly identified as forward-looking.  *See Slayton*, 604 F.3d at 769.

Even assuming *arguendo* that the statement was forward-looking, the PSLRA safe harbor is inapplicable because the statement was both knowingly false and lacking in meaningful cautionary language.  *See In re Cutera Sec. Litig.*, No. 08-17627, 2010 U.S. App. LEXIS 13334, at *17-*24 (9th Cir. June 30, 2010).  The statement was knowingly false because defendants were aware of an uncharacteristic and accelerating decline in play levels before and at the time of the statement which contradicted this optimistic statement's message that play levels would be the "best" (*i.e.*, improve) in coming months.  ¶57(a).  The optimistic statement was also not accompanied by meaningful cautionary language.  Defendants only warned that play levels "*may*" decline[15] when in fact they knew play levels *were already* significantly, uncharacteristically and rapidly falling, had been falling for months and would negatively impact IGT in the coming six months.  ¶57(a).  The Ninth Circuit holds that this is not meaningful cautionary language because "'"*to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit*.'"'"  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406 (9th Cir. 1996).[16]  Indeed, it is obvious that warning that an event "might" occur "is quite different from knowing" it "in fact" had already occurred.  "It goes without saying that investors would treat the two differently."  *Berson v. Applied Signal Tech., Inc.*,

---

[14]     Further bolstering the conclusion that this statement was not forward-looking is Matthews' follow-up comment: "the fact *is* still an upward trend *is* alive and well" in play levels.  *Id.* at 13.

[15]     *See* Defs.' Mem at 17 ("'a decline in . . . the gaming industry . . . *may . . . result in reduced play levels*'").

[16]     *See also Slayton*, 604 F.3d at 770; *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D. Cal. 2008); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1117-18 (D. Nev. 1998); *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 74 (D.D.C. 2008).

527 F.3d 982, 987 (9th Cir. 2008).[17]  Defendants also cite their misrepresentations of historical fact

discussed above to argue there was cautionary language in those statements.  *See, e.g.*, Defs.' Mem.

at 12-14 (quoting and citing Defs.' Ex. 10 at 7, 10; Defs.' Ex. 14 at 8-9; Defs.' Ex. 17 at 5, 9, 10,

13).  Again, the "extension of the [safe harbor] to statements of historical fact is inappropriate."

*Livid Holdings*, 416 F.3d at 948.  In any event, the language cited by defendants is far from

meaningful.[18]

---

[17]     Most of the rest of the purported meaningful cautionary language mentioning play levels
suffers from the same defect.  For example, defendants cite various exhibits that indicate play levels
"may" or "could" possibly decline.  Defs.' Mem. at 10-13 (quoting and citing Defs.' Ex. 3 at 34;
Defs.' Ex. 9 at 18; Defs.' Ex. 16 at 4; Defs.' Ex. 14 at 1).  Again, this language does not warn that
defendants knew play levels **had already** significantly declined and were accelerating.  ¶¶34(a),
49(a), 57(a), 65(a), 73.  Thus, such language is not meaningful.  *Stac Elecs.*, 89 F.3d at 1406;
*Slayton,* 604 F.3d at 770 n.5; *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008);
*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009).

[18]     In Defs.' Ex. 10, while defendants noted a decline in gaming revenues, they then
misleadingly represented that play levels were where they were because of "normal seasonality"
which was "in line with what we'd normally see."  *Id.* at 7, 10.  Once defendants chose to speak
about play levels, "they were bound to do so in a manner that wouldn't mislead investors," *Berson*,
527 F.3d at 987, yet this statement was very misleading because, at the time it was made, defendants
were aware that this was not a normal seasonal decline.  ¶49(a).  Defs.' Ex. 10 also illustrates that
defendants undoubtedly knew what was happening with play levels since they conceded they were
"keep[ing] a close eye on it." *Id.* at 7.  Similarly, Defs.' Ex. 14 at 8-9 shows that while defendants
stated that play levels "weren't as robust" and did not have as "big[]" an "uptick" as they would have
liked, defendants again misleadingly attributed any declines to normal "seasonality" instead of
informing investors that they were seeing unprecedented, huge, accelerating declines that they knew
would negatively affect IGT.  *Id.*; ¶57(a).  Defendants also misleadingly deemphasized the impact of
lower play levels on IGT by misrepresenting that IGT's games were "less impacted." *Id.* Defs.' Ex.
17 is actually a confirmation that defendants' previous play level statements (that any declines were
due to "normal seasonality") were false.  Late in the Class Period, in July 2008, defendants finally
admitted that the earlier "normal" declines were in fact not normal at all but rather "unprecedented."
*Id.* at 5, 9.  And defendants even tried to misleadingly downplay this statement by only slightly
adjusting their EPS forecast, to $0.30-$0.35, from $0.35-$0.40, thus creating the impression that IGT
would only be marginally affected by lower play levels when defendants knew otherwise.  *Id.* at 10;
*see also* ¶¶34(a), 49(a), 57(a), 65(a), 73.

B.      **Defendants' Sales/Revenue Forecasts Are Actionable**

Defendants argue that their forecasts of sales/revenue growth are also protected by the safe harbor. Defs.' Mem. at 16-17. Defendants further argue that plaintiffs do not properly plead the forecasts were false. *Id.* at 17. First, plaintiffs properly plead the forecasts were false. The Complaint adequately pleads that defendants' forecasts of growth were knowingly unattainable because: (1) the significant and rapid decline in play levels would negatively impact IGT in future quarters; (2) IGT was already rapidly losing market share, as competitors manufactured more profitable machines for casino operators, which caused operators to buy competitors' machines instead of IGT's; and (3) IGT's emphasis on selling its new AVP machines was causing further erosion in IGT's sales, as customers were not buying them due to their high price, the fact that they required too much new hardware and wiring, and were designed to work the SB technology, which was not available and had no pricing so that purchasers could estimate their costs. *See* ¶¶34(e), 49(e), 57(d), 65(c). Nonetheless, defendants claim that the forecasts were not false because IGT attained its forecasts of growth. Defendants point to several exhibits, showing first an increase and then a decrease in "product sales" machines shipped during 2Q through 4Q. Defs.' Mem. at 17 (citing Defs.' Exs. 10, 14, 17, 20) (shipments went from 12,100 in 2Q to 20,200 in 3Q and to 20,100 in 4Q). First, defendants' argument that this Court should determine whether IGT actually met its forecasts in the face of contrary allegations is an inappropriate attempt to adjudicate facts on a motion to dismiss.[19] Second, defendants' exhibits prove nothing. The fact that defendants concede

---

[19]      *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 735 (7th Cir. 2004) ("Nor has the time arrived to evaluate [defendant's] contention that its projections panned out . . . . [I]t is inappropriate to entertain such an argument at the pleading stage.").

that the exhibits show that shipments actually *declined* modestly in 4Q is an indicator that IGT did

not meet its forecasts, especially since the forecasts projected "tremendous demand" or "growth" in

the second half of fiscal 2008. *E.g.*, ¶¶31, 38, 53. In any event, the sales/revenue forecasts were not

limited only to "product sales" machine shipments as defendants assume. Indeed, defendants

forecasted IGT would experience "good" *replacement demand* in 4Q (¶62), yet IGT admitted it had

"lower level[s] of replacement demand" in Q3 (Defs.' Ex. 17 at 2) which only "modestly" "picked

up" in Q4 (Defs.' Ex. 20 at 3). Furthermore, defendants forecasted "tremendous demand [for] *new*

*and expansion units*" in the second half of fiscal 2008 (¶38), yet while such demand increased to

8600 units in Q3 (Defs.' Ex. 17 at 3), it then fell precipitously to only 4000 units in Q4 (Defs.' Ex.

20 at 3). Such performance was hardly "tremendous" and illustrates shrinkage, not growth, in these

units.[20] Plaintiffs adequately plead the sales/revenue forecasts were false. *See* ¶¶34(e), 49(e), 57(d),

65(c).[21]

---

[20]     Further corroborating the fact that IGT did not attain its sales/revenue forecasts are the facts
that IGT badly missed on its EPS forecasts for 2Q (¶51) and 4Q (¶72) and barely met the low end of
the forecast range in 3Q (¶58) despite defendants' statements that IGT would probably exceed that
3Q range (¶53). It does not require much to conclude that IGT missed its EPS forecasts because it
was not meeting its sales/revenue growth forecasts. Moreover, IGT's sales/revenues were down for
2Q, 3Q and 4Q compared to the prior year's quarters, another indicator that IGT's sales and
revenues were not growing. *See supra* at 7 n.5; Defs.' Ex. 16 at 11; Defs.' Ex. 18 at 11; Defs.'
Ex. 19 at 13. Defendants cite to a paragraph of the Complaint and a statement by Cavanaugh wherein he
claims an analyst "had estimated market growth," to argue that IGT's sales/revenue forecasts were
met. Defs.' Mem. at 17 (citing Defs.' Ex. 8 and ¶33). But the fact that an analyst forecasted growth
in the industry does not mean IGT would automatically attain its forecasted growth. An analyst
could forecast incredible market growth yet IGT would get none of it, especially if its machines were
not selling as alleged here. ¶¶34(e), 49(e), 57(d), 65(c).

[21]     Plaintiffs further properly plead the forecasts were *knowingly* false. *See infra* at 31-39
(discussion regarding defendants' scienter).

Defendants also did not provide meaningful cautionary language as required by the PSLRA. Such language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i).  "Dismissal on the pleadings . . . requires *a stringent showing*: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements are not misleading.'"  *Livid Holdings*, 416 F.3d at 947.  The "cautionary statements must be 'precise' and 'directly address[] . . . the [defendants'] future projections.'"  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996).  Such language must be "'extensive and specific,'" "'substantive and tailored to the specific future projections,'" and "'based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.'"  *Slayton*, 604 F.3d at 772.  To be meaningful, the language most also identify the "major risks [defendant] objectively faced *when* it made its forecast."  *Asher*, 377 F.3d at 734.  Vague or "'[b]lanket warnings'" which generally warn investors that investments have risks "'[are] insufficient to ward against a securities fraud claim.'"  *Provenz*, 102 F.3d at 1493; *Slayton*, 604 F.3d at 772.

Defendants point to one statement that they claim meets this stringent standard.  In summary, it states that slow growth in new casinos or replacement machines "*could*" limit or reduce future profits, that the rate of growth in North America "has diminished," and that continued reduction in growth or delays in new or expanded casinos and jurisdictions "*could*" reduce demand.  *See* Defs.' Mem. at 16-17 (quoting Defs.' Ex. 3 at 33).  First, this "warning" was not "tailored to" nor did it "directly address" either of the EPS forecasts at issue (2Q and 4Q) or the issues that might cause IGT to miss its forecasts – currently plummeting play levels and currently slumping sales.  ¶¶34(e), 49(e), 57(d), 65(c).  Second, as with the "warnings" related to play levels, warning that a risk could occur

- 18 -

when it had ***already*** happened is insufficient.  *Stac Elecs.*, 89 F.3d at 1406.  Third, defendants quote language that was issued in ***August 2007***, long before the Class Period started and the forecasts were made, and relating to a period of time not at issue.  *See* Defs.' Ex. 3 at 37 (dated 8/6/07).  Such language could not have been "tailored to the specific future projections," *Slayton*, 604 F.3d at 772, since those projections had not yet been made.  The language also was not "a realistic description of the risks applicable to the particular circumstances," *id.*, nor did it identify "the major risks [defendants] objectively faced ***when***" they made their forecasts.  *Asher*, 377 F.3d at 734.  Fourth, the "warning" in Defs.' Ex. 3 made in August 2007 was essentially repeated over and over again, remaining the same even as the risks changed.[22]  This is insufficient because repeating the same language while the problems changed to those enumerated in ¶¶34(e), 49(e), 57(d) and 65(c) does not trigger the safe harbor.  *See Slayton*, 604 F.3d at 772-73.  Fifth, the language was very general and vague, to the effect that slowing growth could affect profits or demand.  This is the very type of vague, "generally applicable risk factors" that are "too general to trigger the" safe harbor.  *Provenz*, 102 F.3d at 1494 ("expected to 'decline'" language is insufficient); *Slayton*, 604 F.3d at 772 ("'potential deterioration in the high-yield sector . . . could result in further losses'" is insufficient).[23]

---

[22]     *See* Defs.' Mem. at 10-11 (citing Defs.' Ex. 3 at 33 (8/07 – "slow growth" in new or replacement machines "could" affect IGT); Defs.' Ex. 4 at 1 (11/07 – "slow growth" in new or replacement machines "may" affect IGT); Defs.' Ex. 10 at 1, 5 (1/08 – "slow growth" in new casinos and replacement machines "may" affect IGT)).

[23]     Finally, a court should be loath to dismiss an action at the pleading stage based on purported cautionary language because there is "no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the items mentioned in [defendants'] cautionary language were those that at that time were the (or any of the) 'important' sources of [the] variance" in the forecasts.  *Asher*, 377 F.3d at 734.

**C.      The Statements About Operating Expenses Are Actionable**

Defendants falsely represented that IGT's operating expenses for fiscal year 2008 would not exceed 25% to 29% of total fiscal year revenues.  ¶¶28, 42, 54, 63.  Defendants also represented during the Class Period that they "will continue to be ***prudent***" or "careful" in spending IGT's money.  ¶¶42, 54, 63.  Defendants incorrectly contend that all their statements are forward-looking and thus protected by the safe harbor.  Defs.' Mem. at 15.  They also incorrectly argue that their statements that they were prudent are nonactionable puffery.  *Id.* at 23.

First, defendants' statement that they "will ***continue to be prudent***" with IGT's expenditures is not forward-looking.  "Will ***continue*** to be" implies not only that defendants "will" be "prudent" in the future but also that defendants ***had already been*** prudent – a historical fact.  The safe harbor does not apply to statements of historical fact.  *Livid Holdings*, 416 F.3d at 948.  Defendants' puffery argument also fails for the same reason.[24]  Defendants' puffery argument fails for another reason.  "Puffery" is based on the concept that some statements are so vague that they are not considered ***material***.  *See Raab v. Gen. Physics Corp*., 4 F.3d 286, 289 n.1 (4th Cir. 1993) ("puffery lacks, as a matter of law, the materiality to be actionable").  However, in this case defendants affirmatively stated to investors that they were and would continue to be prudent in their expenditures, while even providing forecasts of exactly how much they planned to spend.  "It is self-evident that . . . 'information relating to financial condition,'" such as expenditures, is material to investors.  *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007).  Indeed, if as the Complaint alleges, IGT was

---

[24]      "Statements of present or historical fact are not mere 'puffery.'"  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009); *In re Par Pharm. Sec. Litig*., No. 06-cv-3226(PGS), 2009 U.S. Dist. LEXIS 90602, at *32 (D.N.J. Sept. 30, 2009) (same).

spending like it had a "bottomless purse" while defendants contradictorily claimed they were being "prudent," "'a reasonable shareholder would consider the misrepresentation . . . important,'" and thus material. *Provenz*, 102 F.3d at 1489.

With respect to the forecasts, they were knowingly false when made (*see* ¶¶34(d), 49(d), 57(c), 65(b) and *infra* at 31-39) and were not accompanied by meaningful cautionary language. Defendants first point to their purported warnings on pages 9-14 of Defs.' Mem. to claim they issued meaningful cautionary language.[25] *See* Defs.' Mem. at 15. But none of these purported "warnings" mentions operating expenses or forecasts of the same. *See generally* Defs.' Mem. at 9-14. Therefore, they are not meaningful. *Provenz*, 102 F.3d at 1493 (cautionary language "must . . . 'directly address[] . . . future projections'"); *Slayton*, 604 F.3d at 772 (language must be "'tailored to the specific future projections'"). Defendants then point to two statements they made late in the Class Period (7/17/08), claiming that these statements were cautionary. Defs.' Mem. at 15 (quoting Defs.' Ex. 17 at 4-5). However, all that defendants said then was they would review costs to ensure they could attain their forecasts; and that while expenses were "not at optimal levels" they were "already" reducing (*i.e.*, "giving") expenses; and they reaffirmed their earlier prudence by essentially restating they would "manage expenses in a much more ***prudent*** and ***careful*** way." *Id.* Nowhere was there any warning that IGT might miss its forecast or that they had previously ***not*** been prudent, let alone any disclosure that expenses were out of control, that IGT was spending like it had a bottomless purse, or that there were absolutely no attempts to control or even monitor costs on IGT's SB technology project. ¶¶34(d), 49(d), 57(c), 65(b). Moreover, despite these meaningless warnings,

---

[25]    Plaintiffs incorporate herein by reference their arguments at 12-19, *supra*, and 27-30, *infra* which discuss many of these same "warnings" and why they are insufficient.

on the same day defendants then **reaffirmed** their earlier forecasts that operating expenses would be "25 to 28% of revenues." Defs.' Ex. 17 at 4. Defendants' language was hardly meaningful. Indeed, it reassured investors that defendants would continue to be "prudent and careful" and reaffirmed the previous forecasts.

### D.     The Misrepresentations About the SB Technology Are Actionable

Defendants argue that their representations about IGT's SB technology are protected by the safe harbor, that their statements about CityCenter and Harrah's are not actionable, and that many of their representations are puffery. Defs.' Mem. at 18-23. These contentions are meritless. Defendants represented at the beginning of the Class Period that IGT "**remain[ed] on target** to begin commercializing [SB technology] in 2009." ¶27; *see also* Defs.' Ex. 4 at 6 (Matthews: "During 2007, IGT made meaningful progress with our SB efforts, and **remain on target** to begin commercializing this product in 2009."). This was not a forward-looking statement. Rather, it was a historical statement concerning IGT's **then-current** status in developing the SB technology – defendants communicated that IGT was presently "on target" with its development efforts such that SB technology would be commercialized in 2009. ¶27. Thus, it is not protected by the safe harbor. *Livid Holdings*, 416 F.3d at 948 (statements of present fact not protected). Moreover, defendants never corrected this statement during the Class Period.[26] This statement was knowingly false, as

---

[26]     In fact, defendants continued to subsequently communicate that they were on schedule with development. *See, e.g.*, Defs.' Ex. 10 at 10 ("And so really **all the timing that we've remarked on in the past remains intact**."); ¶41 (in 1/08 Matthews stated: "[o]n sb, we continue to make progress"); Defs.' Ex. 14 at 5 (in 4/08 Matthews stated: "we continue to make progress on the timelines that we previously announced"); ¶55 (same).

IGT was never "on target" with its development of the technology.[27]  Yet all defendants warned was that there could be "delays by us in introducing new products on schedule," (Defs.' Mem. at 18) or "meeting those internal timelines is really the challenge" (*id.* at 20).  Regardless whether the "on target" statement was forward-looking, defendants' warnings were deficient as they warned of a potential delay and missed deadlines that had ***already*** occurred.  *Stac Elecs.*, 89 F.3d at 1406; *Slayton*, 604 F.3d at 770.

To keep the illusion going that IGT was on schedule, Matthews later misrepresented that defendants were "comfortable that [they] will accomplish" delivery of advanced version "4.0" of the SB technology to CityCenter upon its opening.  ¶55; *see also* Defs.' Ex. 14 at 7 (same).  This was a lie because version 4.0 was never scheduled to be developed by the time CityCenter opened and CityCenter did not receive it.  ¶57(b).  Defendants claim this misrepresentation is immunized because defendants stated that developing the SB technology involved changing product definitions, specifications, customer requirements, and challenging timelines; the installation would be the first of its kind; and they were testing/refining the technology.  Defs.' Mem. at 20.  But these statements never disclosed that version 4.0 was ***never*** scheduled to be developed by the time CityCenter opened and that it would not be delivered.  ¶57(b).[28]

---

[27]  Throughout the Class Period, defendants were aware that IGT was always behind schedule in developing the technology because of repeated missed internal deadlines, in-fighting between developers at IGT, software integration and stability issues, lack of leadership and management turnover.  ¶¶34(b), 49(b), 57(b).

[28]  In fact, defendants' "warnings" actually supported Matthews' lie, by suggesting CityCenter would receive the nonexistent version 4.0 "perhaps . . . in advance of that opening, or maybe shortly thereafter."  Defs.' Mem. at 20 (quoting Defs.' Ex. 14 at 11-12).

Defendants also take issue with their misrepresentations that SB technology would lead to "**higher-margin[s]**."  ¶35; *see also* ¶¶41, 46, 55; Defs.' Mem. at 18-19.[29]  Defendants argue that these statements are immunized by the safe harbor because they disclosed in November 2007 that they were still discussing pricing with customers.  Defs.' Mem. at 19 (quoting Defs.' Ex. 4 at 11).  However, this ignores that Cavanaugh stated a month later (in December 2007) that he was "comfortable" that "sometime over the next couple of quarters . . . *you can probably rest assured that we have at least reached some kind of an agreement with our customers on . . . pricing*."  Defs.' Ex. 8 at 3.  Moreover, defendants *subsequently* stated that SB technology would lead to "higher margin[s]" (*e.g.*, ¶35).  Thus, investors reasonably believed defendants knew that the SB technology would lead to higher margins – otherwise, why would they say it?  It cannot be said that defendants' "warning" was such '"that reasonable minds could not disagree that the challenged statements were not misleading."'  *Livid Holdings*, 416 F.3d at 947.[30]

To further keep the illusion going that IGT remained on target and "higher margins" were in the not-too-distant future, defendants announced agreements to provide SB technology to Harrah's and CityCenter.  ¶¶44, 50.  These announcements were misleading because they did not disclose that IGT was providing the technology for free for at least two years and therefore no revenues or higher

_____

[29]   Defendants argue that their statements about "higher margins" did not pertain to SB technology but rather game operations and non-machine sales.  *See* Defs.' Mem. at 19 n.18.  A look at the statements, however, shows otherwise.  *See, e.g.*, ¶35 (IGT to generate "**higher-margin** revenues as gaming floors begin the migration to *system-based* game delivery and applications").

[30]   In any event, defendants' vague "we are talking price with customers" statement does not warn precisely, specifically, or substantively of the "important factors" that defendants had no pricing model at all and no clue what customers would pay (¶¶34(c), 49(c), 57(d), 65(c)), as required by the PSLRA.  *Provenz*, 102 F.3d at 1493; *Slayton*, 604 F.3d at 772; 15 U.S.C. §78u-5(c)(1)(A)(i).

margins were going to occur anytime soon.  ¶¶49(f), 57(e).  Defendants argue that these statements are not actionable because: (1) the agreements were not final; (2) the announcements were literally true; and (3) defendants had no duty to disclose the lack of revenue.  Defs.' Mem. at 21.  Defendants are incorrect.  First, whether or not the agreements were final is irrelevant – it is undisputed that IGT announced that it agreed to provide SB technology to Harrah's and CityCenter.[31]  Second, defendants' announcements, while """literally accurate, . . . bec[a]me, through their context and manner of presentation, devices which misle[]d"""" investors.  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  The announcements were misleading because defendants had previously represented that the SB technology would be commercialized in 2009 (¶27), implying that revenues would be generated sometime sooner than two years after the contracts were announced.  Indeed, the CityCenter announcement stated that CityCenter would open in late 2009, implying revenue would occur then.  *See* Defs.' Ex. 15 at 1.[32]  Matthews also discussed the agreements extensively with securities analysts and investors.  Defs.' Ex. 14 at 5, 7, 9-12, 14.  In response to a specific question about the "economics" of the CityCenter deal, Matthews implied revenues were imminent as he discussed "six categories" of revenues "that we might be deriving . . . as we deploy sb," and stated that all those categories were "present opportunities as it relates to the CityCenter deal."  *Id.* at 10.

---

[31]     Any quibbling on this issue is simply an inappropriate attempt to adjudicate the facts on a motion to dismiss.  In any event, Matthews was definitive about the agreements: "***We made several deals during the quarter***" regarding "server-based gaming."  Defs.' Ex. 14 at 5.  Matthews also stated that the CityCenter "MoU is largely binding upon the parties," and that "the MoU for most respects ***represents a final agreement between the parties***."  *Id.* at 9.

[32]     Defendants had also previously implied that the deals would immediately start contributing revenue.  For example, in November 2007, Matthews represented that version 4.0 of the SB technology (which was purportedly going to be installed at CityCenter), was "really going to have the applications that make a difference on ***revenue***."  Defs.' Ex. 6 at 4.

And while Matthews cryptically referenced some non-specified "incentives" given to CityCenter, he never mentioned that the deal would provide ***absolutely no revenues for more than two years***. *Id.* Instead, Matthews further misled investors into thinking revenues would be generated by CityCenter and Harrah's in less than two years by discussing IGT's economic future and stating "that sb will be delivered and ***impacting our [fiscal] 2010***." *Id.* at 13. Given defendants' foregoing statements suggesting revenue would be generated soon, the announcements were false and misleading. *See Miller*, 519 F.3d at 886 (whether defendants' statements are false is measured "through their context and manner of presentation" and """"not by literal truth, but by the ability of the material to accurately inform rather than mislead"""). In addition, since defendants chose to "tout" the deals, "they were bound to do so in a manner that wouldn't mislead investors as to [the deals]." *Berson*, 527 F.3d at 987; *see also Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006) (by "volunteering" information regarding agreement "[d]efendants assumed an obligation . . . to convey 'the whole truth'"). Failing to disclose the lack of revenue misled investors.

Defendants also incorrectly claim their misrepresentations were puffery. Defs.' Mem. at 22-23. As noted above, puffery is based on the concept that statements are too vague to be material. *Raab*, 4 F.3d at 289. However, the statements must be viewed in context to determine their materiality because "[w]hat might be innocuous 'puffery' . . . standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). The misrepresentations at issue emphasized that SB technology was on target to begin sale in 2009, that it would generate higher margins soon and that it was the key to IGT's future. *E.g.*, ¶¶27, 30-31, 35, 41, 44, 46, 50, 55-56. All of the statements challenged by defendants as puffery (Defs.' Mem. at 22-23)

- 26 -

emphasized and were an integral part of the foregoing misrepresentations.  ¶¶27, 30-31, 35, 41, 44, 46, 50, 55-56.  Thus, they were not puffery.  *Casella*, 883 F.2d at 808.

### E.      Defendants' EPS Forecasts Are Not Protected by the Safe Harbor

Defendants argue their EPS forecasts for 2Q and 4Q are protected by the safe harbor because they provided meaningful cautionary language.  Defs.' Mem. at 9-14.  Defendants are incorrect.[33]

Defendants made optimistic forecasts of IGT's EPS (¶¶26, 40, 53, 61) despite the fact that IGT was besieged with issues, which defendants were aware of, that prevented IGT from attaining the forecasts.  From the first day of the Class Period, defendants were aware that play levels were plummeting and accelerating every month, indicating that IGT would suffer in future quarters.  ¶¶34(a), 49(a), 57(a), 65(a).  Defendants were also aware that IGT's operating expenses were out of control during the Class Period – IGT was making wasteful, useless expenditures, did not monitor or attempt to control SB expenditures, and spent like it had a "bottomless purse."  ¶¶34(d), 49(d), 57(c), 65(b).  Defendants were further aware that IGT's sales were slumping, as IGT was losing sales to competitors who produced machines that were more profitable, and IGT's new AVP machines were not wanted.  ¶¶34(e), 49(e), 57(d), 65(c).  These facts made it clear to defendants at the time they spoke that IGT could not attain the forecasts.  ¶¶34(f), 49(g), 57(f), 65(e).

Defendants rely on cautionary language, which they repeated over and over before IGT's conference calls, warning that "actual results *may* differ."  Defs.' Mem. at 9 (citing Defs.' Ex. 4 at 1; Defs.' Ex. 10 at 1; Defs.' Ex. 14 at 1; Defs.' Ex. 17 at 1); *see also* Defs.' Mem. at 11, 13 (citing Defs.' Ex. 4 at 1; Defs.' Ex. 10 at 1; Defs.' Ex. 14 at 1).  These repetitious "warnings," however, are

---

[33]     Plaintiffs incorporate herein by reference their arguments at 12-26, *supra* demonstrating how much of the same purported cautionary language defendants rely on here is insufficient.

meaningless "boilerplate" that do not protect defendants. *See Lormand*, 565 F.3d at 244 (rejecting as insufficient "'could cause actual results to be materially different'"); *Slayton*, 604 F.3d at 772-73 (repetitious language remaining unchanged is insufficient). In addition, as previously discussed (*supra* at 12-15), defendants' statements that play levels "*may*" or "*could*" decline (Defs.' Mem. at 10-11, 13 (citing Defs.' Ex. 3 at 34; Defs.' Ex. 16 at 4; Defs.' Ex. 14 at 1)) were insufficient because defendants knew play levels had *already* declined and were accelerating. Thus, these are not warnings; rather, they are misleading. *See Stac Elecs.*, 89 F.3d at 1406.[34]

Moreover, as previously discussed *supra* at 18-19, defendants' statements that growth had slowed in North America and a continued reduction in new jurisdictions, casinos, or the rate or replacement demand "could," or "may" reduce demand for IGT's products (Defs.' Mem. at 10 (citing Defs.' Ex. 3 at 33); Defs.' Mem. at 11 (citing Defs.' Exs. 4, 10) was not meaningful. This language was not tailored to nor directly addressed either the 2Q or 4Q forecasts or the real reasons IGT's sales were falling – unprecedented declining play levels; competitors' machines being more profitable to operators than IGT's; and customers rejecting IGT's AVP machines. ¶¶34(e), 49(e), 57(d), 65(c). Statements like these, as well as defendants' statements that "[o]ur business is vulnerable to changing economic conditions" (Defs.' Mem. at 10), "we've been operating in a difficult environment" (*id.* at 11) and there was "uncertainty surrounding the future market conditions" (*id.* at 12) are insufficient because they "were too general to trigger the [safe harbor]."

---

[34]    The remainder of defendants' statements about play levels (Defs.' Mem. at 12-14 (citing Defs.' Ex. 10 at 7, 10; Defs.' Ex. 14 at 8-9; Defs.' Ex. 17 at 5, 9)) were either: (1) not forward-looking statements and therefore not subject to the safe harbor; (2) the alleged misrepresentations about play levels at issue herein; (3) admissions that defendants were well aware of declining play levels; or (4) admissions that their prior statements about play levels were false. *See supra* 12-15 & n.18.

*Provenz*, 102 F.3d at 1494 (statements that defendants were "'living in an uncertain economic environment'" or that "revenue was expected to 'decline'" or that "gross margin would be 'flat to slightly down'" are insufficient).[35]   Moreover, defendants' purported warnings that they "anticipate[d] [that] replacement demand w[ould] remain at historically low levels," that it was the "weakest replacement demand that [they'd ever] seen since 1998 [and that it was] going to continue into Q2" (Defs.' Mem. at 11 (quoting Defs.' Ex. 10 at 3-4)) were not cautionary because Matthews boldly stated in his next breath that "[w]e continue at these ***peak earnings*** . . . ***despite the minimal demand levels***, which really reflects on what ***we anticipate in terms of being able to expand that even further***."  Defs.' Ex. 10 at 4.  In other words, Matthews communicated that IGT would continue generating "peak" EPS or even "expand" EPS regardless of any dip in demand.  *Id*. Matthews furthered this understanding regarding the 2Q forecast by "keep[ing] . . . in place" IGT's previous EPS forecast of "[$]0.35-$0.40," while stating that "the fact of the matter is the range stays in place at 0.35 to 0.40 as . . . ***the official guidance*** given by the company."  *Id*. at 5, 9. Accordingly, while Matthews hinted that the Q2 forecast might be "a little bit to the weak side of" $0.35-$0.40, he still unequivocally represented that IGT's "***official***" forecast was $0.35-$0.40 and that there was "[n]o reason for [him] to change that."  *Id*.  Thus, the "warning" about the 2Q forecast was, at best, equivocal since Matthews stated that the "official" forecast which he had "no reason . . . to change" was the optimistic "peak" EPS of $0.35-$0.40.  The Ninth Circuit has concluded, when facing similar arguments, that these types of "'cautionary' statements led the analysts to believe that the second quarter earnings would be similar to the first quarter earnings," and thus were insufficient

---

[35]    Further, warning that continued slow growth ***could*** happen when it was ***already*** occurring is not meaningful.  *Stac Elecs*., 89 F.3d at 1406.

to invoke safe harbor protection. *Provenz*, 102 F.3d at 1493-94 (court rejects as "too general" even stronger language than at bar that "revenue was expected to 'decline'" and "margin would be 'flat to slightly down'").[36]

Defendants' statements that IGT's games *might* not "attain this market acceptance" or that competitors *might* outmaneuver IGT (Defs.' Mem. at 10 (quoting Defs.' Ex. 3 at 34)), were meaningless "warnings" because IGT's machines were *already* not being accepted by customers and competitors had *already* outmaneuvered IGT (¶¶34(e), 49(e), 57(d), 65(c)).[37] *Stac Elecs.*, 89 F.3d at 1406.[38]

---

[36]    In any event, defendants' purported "warnings" did not convey the important information that IGT's business had deteriorated so badly because of declining play levels, reduced sales and exploding expenses, that IGT was not going to miss by just "a little" or "slightly" but rather by a gargantuan amount – IGT missed its forecast by a mile, reporting only $0.22 (¶51), stunning the market with the size of the miss, and triggering a major decline in IGT's stock price. ¶56.

[37]    Defendants' statements that "[c]ompetitors are doing a better job . . . and doing a better job with their games" (Defs.' Mem. at 13 (quoting Defs.' Ex. 14 at 8)) and that "we do see . . . very slight increases of performance from certain of our competitors" (Defs.' Mem. at 12 (quoting Defs.' Ex. 10 at 10)) are not meaningful cautionary language either. In no way were these statements "'substantive and tailored to the specific [2Q or 4Q] projections'" as required by the PSLRA. *Slayton*, 604 F.3d at 772. Indeed, there is absolutely no reference at all to the forecasts in the statements. *See* Defs.' Ex. 14 at 8; Defs.' Ex. 10 at 10. Nor do the statements warn investors that IGT might not attain those forecasts because competitors had already overtaken IGT. Indeed, defendants' statement that they saw "*very slight*" increases of performances from competitors minimizes the impact that IGT was then experiencing.

[38]    Finally, defendants argue that the safe harbor protects them for their 2Q EPS forecasts because they warned that there were "interest rate fluctuations." Defs.' Mem. at 11 (citing Defs.' Ex. 4 at 2). First, contrary to defendants' contention, defendants' language warned of nothing – Cavanaugh, in discussing IGT's just-completed first fiscal quarter, simply made the general observation that "margins and gross profit came in slightly lower when interest rates go down, and they increase when rates go up." Defs.' Ex. 4 at 2. He did not warn that 2Q or any other quarter could be subject to declining interest rates. Indeed, he did not mention EPS forecasts at all. *Id.* Second, the Complaint does not allege that IGT missed its 2Q EPS forecasts because defendants misrepresented or omitted to disclose the risk of fluctuating interest rates. Rather, as discussed

- 30 -

### F.      Plaintiffs Plead a Strong Inference of Scienter

Defendants argue that plaintiffs fail to properly plead scienter because the "CW" and insider sales allegations are deficient.  Defs.' Mem. at 23-30.  Defendants are incorrect.  In determining whether plaintiffs properly plead "facts giving rise to a strong inference that the defendant[s] acted with" scienter (15 U.S.C. §78u-4(b)(2)), the Court must consider "all the allegations holistically" and "collectively," instead of "in isolation" as defendants do with the CWs and insider sales.  *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 326 (2007).  When *all* the scienter allegations are considered *together*, the Complaint raises a strong inference that defendants knowingly made misrepresentations.  The inference of scienter, however, "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  Rather, it need only be "cogent and at least as compelling as any opposing inference." *Id.*[39]

When the allegations (and defendants' exhibits[40]) are viewed collectively, they plead a strong inference that defendants knowingly made misrepresentations:

---

above, the Complaint alleges the forecasts were knowingly unattainable because of huge declines in play levels, out-of-control spending, and slumping sales.  Defendants' disclosures about interest rates have nothing to do with plaintiffs' allegations, and are therefore irrelevant.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415 (9th Cir. 1994) ("'the language bespeaking caution [must] *relate directly* to that to which plaintiffs claim to have been misled'").

[39]      Accordingly, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff."  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *accord Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 792 (D. Ariz. 2009).  To engage in this comparative analysis, a defendant, however, must come forward with a plausible opposing inference. *Tellabs*, 551 U.S. at 324.  Defendants have not done that.  Thus, "the absence of any suggested counter inference strengthens the contention that there can be but one conclusion drawn from the facts, as pled." *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1259, 1264 (M.D. Fla. 2007).

[40]      Defendants concede their exhibits are relevant in their request for judicial notice.

- Defendants stated, early in the Class Period, that they kept "a close eye" on play levels (Defs.' Ex. 10 at 7, 10); thus they were aware of the steep, uncharacteristic decline in those levels at the beginning of the Class Period which accelerated throughout the period (¶¶34(a), 49(a), 57(a), 65(a));[41] as a result, defendants knew that their representations that the decline was due to "normal seasonality" (¶¶39, 52) were false; in fact, defendants admitted that their "normal seasonality" representations were false by later conceding that the decline was actually "unprecedented" and admitting that they had "never really seen gaming play levels fall . . . as [they had] in the first half of this year" (Defs.' Ex. 17 at 5, 9); in addition, at the end of the Class Period, defendants also admitted that they were aware of the declines in November 2007 (¶73); – defendants' admissions create a strong inference of scienter;[42]

- In connection with defendants' bullish (but false) forecasts of sales/revenue growth, defendants repeatedly emphasized that they were monitoring and aware of IGT's actual growth prospects, stating "we're in a pretty good position these days to have decent visibility," and "[w]e are glad about the visibility that we have." Defs.' Ex. 4 at 12; *see also* Defs.' Ex. 14 at 11 ("we do have such good visibility to . . . demand"); Defs.' Ex. 17 at 9 ("we have a pretty good sense [of] new and expansion unit demand"); these repeated statements by defendants that they had good visibility, *i.e.*, they monitored and were knowledgeable about IGT's growth prospects, creates a strong inference that they knew of the adverse facts (¶¶34(e), 49(e), 57(d), 65 (c)) which rendered their forecasts unattainable;[43]

- CEO Matthews and VP of Finance Cavanaugh repeatedly spoke confidently and knowledgeably about issues important to IGT – play levels, IGT's sales/revenue

---

[41]     Statements by "top executives that they . . . monitored" the information which contradicted their misrepresentations creates a strong inference of scienter. *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (scienter alleged where "top executives said that they monitored" information at issue).

[42]     *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999) (subsequent admission revealing that an earlier statement was a misrepresentation creates a strong inference of scienter); *Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053, at *26 (S.D.N.Y. May 11, 2010) ("'plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period'"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (same); *Roth v. Aon Corp.*, No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471, at *24 (N.D. Ill. Mar. 7, 2008) (finding that "post-Class Period statements [can] provide strong[] support" that earlier false statements were made with scienter).

[43]     *Daou*, 411 F.3d at 1022; *Oracle*, 380 F.3d at 1234.

- 32 -

growth and demand, its operating expenses, the SB technology and IGT's EPS forecasts (¶¶24-76; *see also passim* Defs.' Exs.); they spoke so often and with such knowledge and confidence on these issues that there is a strong inference that they knew all the details about these issues, including the facts that contradicted their misrepresentations (¶¶34, 49, 57, 65);[44]

- Eight former employees of IGT ( the "CWs"), seven of which worked at IGT during the entire Class Period, and two of which worked for IGT for 12 or more years, and all of which worked either directly on the SB technology, its expenditures or in sales (or who were otherwise very familiar with these issues), each provided reliable information from their personal knowledge demonstrating not only that defendants' representations were false,[45] but also in many cases, that defendants were aware of the information contradicting their  statements when they spoke (¶¶34, 49, 57, 65);[46]

---

[44]     *See South Ferry LP v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter . . . ."); *Makor*, 513 F.3d at 711 ("[A]t the top of the corporate pyramid sat . . . the CEO. . . . Almost all the false statements . . . emanated directly from him.  Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is exceedingly unlikely."); *South Ferry LP# 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-59 (W.D. Wash. 2009) (where CEO defendant "repeatedly" made "'confident'" false statements on certain topics which conveyed "'I know what I'm talking about'" or "superior knowledge," an inference arises that he knows of facts contradicting those statements); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D Ill. 2003) (Plaintiffs' "allegations are backed up by the statements in the complaint about the numerous statements made by various defendants about the credit portfolio and about its effect on Sears' profits.  Logically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements . . . .  Plaintiffs have sufficiently alleged facts leading to a 'strong inference' of scienter."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[I]f a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.").

[45]     *See Daou*, 411 F.3d at 1015 ("'the number of sources[ and] the reliability of the sources'" are relevant to whether scienter is properly pled).

[46]     *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS 103549, at *48-*49 (E.D. Pa. Dec. 22, 2008) (allegations by CWs that defendant "knew" facts contradicting its statements are sufficient to allege scienter).

- Many of the CWs corroborated information provided by other CWs, and the information they provided coherently and plausibly supported the fraud allegations (¶¶34(b), (d), 49(b), (d), 57(b), (c), (e), 65(b), (d));[47]

- Defendants are alleged to be high-ranking executives at IGT, where they were aware of all information concerning the company, and were directly involved in day-to-day operations, thus making it unlikely they did not know of the information contradicting their representations (¶¶13-18, 79);[48]

- Matthews, after promising late in the Class Period to "act . . . quickly" in containing IGT's costs (¶63) subsequently admitted that he had not (¶76);[49]

- The magnitude of IGT's misses on its 2Q and 4Q EPS forecasts (approximately 50% misses) raises an inference of scienter;[50]

- There were unusual and suspicious stock sales by at least one defendant and other high-level insiders (¶¶80-84);[51] and

- IGT had five core parts of its business that were critical to its success: (1) play levels were an extremely important business indicator to defendants (which, as discussed above, they kept a close eye on) (*e.g.*, ¶34(a)); (2) IGT's SB technology (including the major deals with Harrah's and CityCenter) was its core focus and main initiative

---

[47]    The "corroborative nature of the other facts alleged (including from other sources)" and "the coherence and plausibility of the allegations" is indicative of scienter. *Daou*, 411 F.3d at 1015; *see also In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008) (scienter properly alleged after considering, among other things, "whether the statements attributed to confidential witnesses have been corroborated").

[48]    "[I]t is hard to believe that" high-ranking officers who were "directly responsible for [the company's] day-to-day operations . . . would not have known about" major company issues which had a "devastating effect on the corporation's revenue." *Berson*, 527 F.3d at 988.  Indeed, "it would be 'absurd to suggest' that top management was unaware" of major company issues.  *Id.* at 989.

[49]    *Stevelman*, 174 F.3d at 84-85 (admission indicating that prior representation was false establishes scienter).

[50]    *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009) ("the amount by which the second quarter results missed expectations" raise an inference of scienter).

[51]    "'"Unusual" or "suspicious" stock sales by corporate insiders may constitute circumstantial evidence of scienter.'"  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).

for the future (*e.g.*, ¶¶27, 31, 35, 41); (3) IGT's successful fiscal 2008 performance depended on sales/revenues growth which defendants repeatedly said they were monitoring (*e.g.*, ¶¶31, 33, 38, 53, 62); (4) similarly IGT's fiscal 2008 success was equally dependent on keeping costs under control which defendants repeatedly said they were by saying they were "prudent" and "careful" about IGT's expenditures (¶¶28, 42, 54, 63); and (5) successfully executing all of the foregoing factors (except SB technology) was critical if IGT was to meet its all-important EPS forecasts. Given that these were the core operations of IGT (illustrated by the fact that defendants repeatedly spoke about these topics), defendants are presumed to know all pertinent information about these topics, including the facts which contradicted their representations.[52]

When all of the foregoing allegations are considered collectively, as required under *Tellabs* (*South Ferry*, 542 F.3d at 784), they raise a strong inference defendants made knowingly false statements.[53]  Defendants said they closely watched play levels and therefore they had to see the plummeting levels which clearly contradicted their statements that levels were "normal" and that the levels would not greatly affect IGT.  Indeed, defendants later admitted that those same play levels were not normal but "unprecedented" and that they did negatively affected IGT.  Similarly, defendants repeatedly stated that they had good "visibility" over IGT's sales/revenues growth prospects and therefore it can be inferred that they saw that growth was not occurring as represented due to falling play levels, competitors' machines being more profitable and the AVP machines being rejected by customers.  Moreover, defendants' constant assurances that they were being "prudent" in

---

[52]     *South Ferry*, 542 F.3d at 781 ("it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers"); *id.* at 781-86 (such allegations are properly considered in the scienter analysis and may alone establish scienter); *Berson*, 527 F.3d 987, 989 (it is permissible to "***infer*** that these high-level managers must have known about" the adverse facts; "it would be 'absurd to suggest' that top management was unaware") (emphasis in original).

[53]     Defendants incorrectly rely on Ninth Circuit cases such as *Silicon Graphics*, *Vantive* and *Read-Rite* (Defs.' Mem. at 23, 25, 28), which the Ninth Circuit has recently held "are too demanding " in light of *Tellabs*.  *South Ferry*, 542 F.3d at 784.

- 35 -

spending IGT's money were incredulous in light of the facts that IGT spent like it had a "bottomless purse," made numerous wasteful SB technology purchases, and had no spending controls or monitors over IGT's SB technology initiative.  In addition, in light of IGT's deliberate ignoring of cost controls, it can be inferred defendants knew their conservative forecasts of operating expenses were without basis.  Late in the Class Period, defendants further lied about controlling costs by promising to act quickly on cost containments but subsequently admitting that they had not. Furthermore, defendants knew that massively declining play levels, IGT's fizzling sales/revenues and uncontrolled spending would have a disastrous effect on IGT's future quarters.  As a result, defendants knew their optimistic EPS forecasts were unattainable, without basis and false.  *See Provenz*, 102 F.3d at 1487 (forecast is false if "'there is no reasonable basis for the'" forecast or that defendants were "'aware of undisclosed facts tending seriously to undermine'" the forecast). Moreover, the magnitude of the EPS misses for 2Q and 4Q (approximately 50% misses each quarter) further infer scienter.  Finally, SB technology was clearly a core issue at IGT during the Class Period as defendants constantly spoke of it, announced deals for it, and promised that it would lead to future success.  Given defendants' high-ranking positions at IGT, along with their repetitious, confident, and knowledgeable communications about the technology and the importance of it to IGT's ongoing success, SB technology was a "core operation" of IGT and it along with the "important [CityCenter and Harrah's] transactions" create a strong inference that such important company matters "are known to key company officers" such as Matthews and Cavanaugh.  *South Ferry*, 542 F.3d at 781. In fact, to infer otherwise, according to the Ninth Circuit, is "'absurd.'"  *Berson*, 527 F.3d at 989. Moreover, given the dramatic impact play levels, growth, and expenses could (and did) have on IGT and its EPS, they too are properly considered "facts critical to a business's 'core operations' or important transactions" which defendants are presumed to know.  *South Ferry*, 542 F.3d at 781;

- 36 -

*Berson*, 527 F.3d at 989.  The alleged insider sales only add to the above allegations.  All these allegations considered together plead a strong inference of scienter.

With respect to defendants' arguments against scienter, defendants' "CW allegations" argument is based mainly on the contention that the Complaint is too vague because it does not allege enough detail about the CWs and the information they provided.[54]  This argument should be rejected because even assuming the allegations are vague, "[v]ague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."  *South Ferry*, 542 F.3d at 784.  Again, when the CW allegations are coupled with all the other scienter allegations, a strong inference of scienter is pled, vagueness notwithstanding.  In any event, the allegations are not vague.  The Ninth Circuit rejected defendants' precise argument here that the CW information was insufficient because the CWs were not "senior management" and they did not have personal contact with defendants: "any number of [non-management] company employees would be in a position to . . . know, or could reasonably deduce, that the company had suffered such setbacks."  *Berson*, 527 F.3d at 985.  The Ninth Circuit found that "'engineers'" (like CW#4, CW#5 and CW#6 here (¶34)) were among those people that would know about major issues within a company.  *Berson*, 527 F.3d at 985.  Defendants also ignore that fact that the rest of the CWs were "managers" or "executives" (CW#1, CW#2, CW#3, CW#5, CW#6, CW#7 and CW#8) (¶¶34, 57(e)) who, while not what defendants would call "senior management," were all still clearly high enough in the company to know what was happening or at

---

[54]    *See* Defs.' Mem. at 24-27 (arguing that allegations did not plead that CWs were senior management, had personal contact with defendants, provide the amount or timing of memory stick purchases, include the CWs' job responsibilities, who they worked with, or how they learned the information).

least able to "reasonably deduce" what was happening. *Berson*, 527 F.3d at 985.[55]  Contrary to

defendants' contentions, the CW allegations are not gossip but rather reliable detailed information

based on the CWs' personal knowledge while employed at IGT during the Class Period.[56]

Similarly, defendants' insider sales arguments should be rejected.  In the 12-month long

Class Period Matthews sold 379,658 shares, nearly 27% of the shares he owned, at $41 per share and

higher, close to IGT's all-time and Class Period high of $49.41 per share. ¶¶80, 81, 83.  Matthews

sold zero shares in the twelve months immediately before the Class Period but then, in just two Class

Period days, he dumped the 379,658 shares at prices mostly over $41 per share, far higher than

---

[55]     *See also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003) (allegations that each CW "held a significant position at the company" indicate reliability).

[56]     The Complaint alleges much more detail establishing the reliability of the CWs than defendants let on.  It alleges that most of the CWs worked directly on the SB technology and therefore were intimately aware of the problems with such technology. *E.g.*, ¶¶34(b), (d).  The Complaint also alleges that CW#7 was an "Account Executive," who obviously worked in sales, and therefore would clearly be in a position to known what was happening with IGT's customers and sales/revenue growth.  ¶34(e); *see Merriam Webster's Collegiate Dictionary* 8 (10th ed. 2000) ("account executive" defined as "a business executive . . . responsible for dealing with a client's account").  The Complaint also alleges that two of the CWs had been with IGT for many years (CW#1 – 15 years; CW#6 – over 12 years) and were very familiar with the company and its business. ¶34(b), (d). These allegations establish that the CWs were reliable sources in a position to know and see what they said they knew and saw.  Defendants' demands for more detail are meritless. *SeeBeyond*, 266 F. Supp. 2d at 1159 (allegations about CWs' involvement in company, and information attributed to them being the type they would be expected to have are sufficient under the PSLRA).  Defendants also argue that the issues the CWs identified were nothing more than normal business problems not indicative of fraud.  This ignores the fact that defendants were misrepresenting the status of those problems – they said SB technology was on schedule and high margin when it was not; they said they expected good demand when everything indicated otherwise; they said they were prudent spenders when they were not; they said play levels were nothing to be alarmed about when they were; and they said IGT would attain rosy forecasts when they had no basis to say so.  Defendants' other arguments (that IGT met sales/revenue forecasts and that defendants provided cautionary language about missed SB deadlines) are meritless for the reasons previously discussed *supra* at 16-17 and 22-23.

November 2008's $7.58 price, and far closer to IGT's all-time high of over $49.  ¶¶78, 80-81, 83.

Matthews sold those hundreds of thousands of shares in November 2007 (¶80), *the same month he*

*learned of the steep declines in play levels, knowing those steep declines were going to negatively*

*affect IGT*.  ¶34(a).  Other IGT executives similarly sold large portions of their holdings near the all-

time high price in one or two day periods when they had sold no shares in the comparable pre-class

period.  *See* ¶¶80-84.  These are unusual and suspicious insider sales.  *See, e.g.*, *In re Omnivision*

*Techs.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *14-*15 (N.D. Cal. July 29, 2005) (sale

of 18% of holdings support finding of scienter).[57]

---

[57]     Defendants argue that a sale of 27% of one's stockholdings is not unusual or suspicious. Defendants are wrong.  *See Provenz*, 102 F.3d at 1491 (20% sale is unusual and suspicious). Defendants also improperly try to adjudicate facts on a motion to dismiss by arguing Matthews' net proceeds were less than his gross proceeds.  This stage is not the time to adjudicate facts. Defendants then argue that vested, unexercised options must be counted when determining the percentage of stock sold.  Defendants are wrong again.  *See Am. West*, 320 F.3d at 939 n.16 ("This percentage is derived from the common stock and *exercised* options."); *In re Secure Computing Corp.*, 184 F. Supp. 2d 980, 989 (N.D. Cal. 2001) (vested options not counted).  Defendants also argue that using the 12-month period immediately before the 12-month Class Period to compare stock sales is wrong.  Defendants are incorrect.  *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (examining 10 months preceding 10-month Class Period).  Finally, defendants argue that the stock sales by non-defendant IGT insiders are not probative of scienter. This too is incorrect – the Ninth Circuit considers "other [non-defendant] executives as well as defendants' family members" stock sales probative of scienter.  *Daou*, 411 F.3d at 1024.

- 39 -

**IV.      CONCLUSION**

For the foregoing reasons plaintiffs request that defendants' motion be denied.[58]  If the Court

is inclined to grant any part of defendants' motion, plaintiffs request leave to amend.  *See Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (given PSLRA's "technical and

demanding" pleading standards, leave to amend should be freely given).

DATED:  August 9, 2010                        Respectfully submitted,

                                              ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              ARTHUR C. LEAHY
                                              BRIAN O. O'MARA
                                              MATTHEW I. ALPERT
                                              PHONG L. TRAN


                                                    s/ Arthur C. Leahy
                                              _____
                                                   ARTHUR C. LEAHY

                                              655 West Broadway, Suite 1900
                                              San Diego, CA  92101
                                              Telephone:  619/231-1058
                                              619/231-7423 (fax)

                                              Lead Counsel for Plaintiffs

                                              THE O'MARA LAW FIRM, P.C.
                                              WILLIAM M. O'MARA
                                              DAVID C. O'MARA
                                              311 East Liberty Street
                                              Reno, NV  89501
                                              Telephone:  775/323-1321
                                              775/323-4082 (fax)

                                              Liaison Counsel

_____

[58]      Because the Complaint properly pleads a viable §10(b) claim, it also pleads a §20(a) claim.
*Omnivision*, 2005 U.S. Dist. LEXIS 16009, at *11-*12.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 9, 2010.

s/ Arthur C. Leahy
ARTHUR C. LEAHY

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:artl@rgrdlaw.com

## Mailing Information for a Case 3:09-cv-00419-ECR-RAM

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard G. Campbell , Jr**
  rcampbell@armstrongteasdale.com,bmeich@armstrongteasdale.com,zbuzzone@armstrongteasdale.com

- **Boris Feldman**
  boris.feldman@wsgr.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com,risac@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William M. O'Mara**
  bill@omaralaw.net

- **David C OMara**
  david@omaralaw.net,val@omaralaw.net

- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Nikki Stitt Sokol**
  nsokol@wsgr.com,ijames@wsgr.com,bbahns@wsgr.com,rdean@wsgr.com,38922.501ecfClassAction.palib1@matters.wsgr.com

- **David S. Steuer**
  dsteuer@wsgr.com

- **Jacob Thayer Veltman**
  jveltman@wsgr.com

- **Jonathan J Whitehead**
  jonathan@jjwhitehead.com,joanna@jjwhitehead.com,pkindall@sbcglobal.net,collette@jjwhitehead.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`