**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA**

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | 3:09-CV-419-ECR-RAM |
| Plaintiff, | ) ) | **Order** |
| vs. | ) ) | |
| INTERNATIONAL GAME TECHNOLOGY, et al., | ) ) ) | |
| Defendants. | ) ) | |

This case arises out of alleged violations of the federal securities laws. Now pending is a motion to dismiss (#50) the consolidated complaint. The motion is ripe, and we now rule on it.

**I. Background**

On July 30, 2009, Plaintiffs filed a class action complaint for violations of the federal securities laws against International Game Technology ("IGT" or the "Company"), and individual officers of IGT. On March 11, 2010, the Court granted (#41, amended by #44) Plaintiffs' unopposed motion (#14) to appoint The Iron Workers District Counsel of Western New York and Vicinity Pension Fund ("Iron Workers") as lead plaintiff.

1    On April 26, 2010, Plaintiffs filed a consolidated class
2 complaint (#45), alleging securities fraud in violation of Section
3 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and
4 Rule 10b-5 promulgated thereunder, as well as control person claims
5 under Section 20(a) of the Exchange Act against IGT, Thomas J.
6 Matthews ("Matthews"), and Patrick W. Cavanaugh ("Cavanaugh")
7 (collectively, "Defendants").  The action is filed on behalf of a
8 class of all persons and entities who purchased or otherwise
9 acquired IGT securities between November 1, 2007 and October 30,
10 2008, inclusive (the "Class Period").

11    The facts as alleged in the complaint are as follows. Defendant
12 IGT is a Nevada corporation specializing in the design, manufacture,
13 and marketing of electronic gaming equipment and network systems, as
14 well as licensing and services.  (Consol. Class Compl. ¶ 12 (#45).)
15 Defendant Matthews served as IGT's President, CEO, and Chairman of
16 the Board of Directors during the Class Period.  (Id. ¶ 13.)
17 Defendant Cavanaugh served as IGT's Vice President of Corporate
18 Finance and Investor Relations during the Class Period.  (Id. ¶ 14.)
19 Both Matthews and Cavanaugh are alleged to have made false and
20 misleading statements about IGT, and failed to disclose material
21 facts about IGT during the Class Period.  (Id. ¶¶ 13-14.)

22    The Class Period commenced on November 1, 2007.  (Id. ¶ 24.)
23 On that date, IGT issued a press release announcing record financial
24 results for its fourth fiscal quarter and year ended September 30,
25 2007.  (Id.)  Plaintiffs allege that Defendants "painted a picture
26 of a bright future for IGT."  (Id. ¶ 26.)  Specifically, Defendant
27 Matthews forecasted that IGT's earnings per share ("EPS") for the
28

                                    2

next two quarters would be $0.35 to $0.40.  (Id.)  Defendant Cavanaugh represented that IGT's fiscal 2008 total operating expenses would be between 26 and 28% of total revenues.  (Id.)  IGT's stock price rose over the next several days.  (Id.)  Defendants continued to portray a bright future for IGT in the following days.

On November 28, 2007, IGT filed its Securities and Exchange Commission ("SEC") Form 10-K for the fiscal year that ended September 30, 2007.  (Id. ¶ 31.)  Therein, IGT represented that it expected continued growth during 2008, notwithstanding that domestic replacement sales are expected to remain at historically low levels. (Id.)  Defendants also represented that its new server-based ("SB") technology would aid in IGT's growth in the future.  (Id.)  IGT's stock price rose after the Form 10-K was filed.  (Id.)

Plaintiffs allege, however, that Defendants were aware that things were not as rosy as Defendants were portraying.  (Id. ¶ 34.) Relying on several confidential witness statements, Plaintiffs allege that play levels, a metric indicative of IGT's business success, began to rapidly decrease in November 2007, which Plaintiffs claim Defendants were aware of but misrepresenting to its investors.  (Id.)  IGT's new SB technology was also, according to Plaintiffs, facing numerous problems that Defendants did not disclose to investors. Operating expenses also exceeded 30% of revenues, and confidential witnesses claim that Defendants were "repeatedly wast[ing] money" as if IGT had a "bottomless purse." (Id.)

3

1    IGT achieved its EPS forecasts in the first and third fiscal
2 quarters of 2008.  (Id. ¶¶ 36, 58)  In the first quarter, IGT
3 reported that it generated EPS of $0.36, in line with prior
4 forecasts of $0.35-$0.40.  (Id. ¶ 36.)  After announcing the first
5 quarter results, Defendant Cavanaugh stated that "on the surface,
6 all we're seeing at this point is normal seasonality" in reference
7 to the low play levels.  (Id. ¶ 39.)  Defendant Matthews represented
8 that "play levels are very much in line with what we normally see
9 due to seasonal factors."  (Id.)  Defendants predicted that the
10 Company's EPS forecasts in the range of $0.35 to $0.40 would likely
11 be exceeded in Q3 and Q4, and perhaps "a little bit to the weak
12 side" in Q2.  (Id. ¶ 40.)  In February 2008, IGT announced that
13 Harrah's Entertainment, Inc. had selected IGT's SB technology for
14 installation.  (Id. ¶ 44.)  In April of 2008, IGT announced that it
15 had signed a memorandum of understanding with the CityCenter in Las
16 Vegas for installation of SB technology products for CityCenter's
17 casino scheduled to open in late 2009.  (Id. ¶ 50.)
18    On April 17, 2008, IGT announced that its second fiscal quarter
19 EPS was $0.22, below the forecasts of $0.35-$0.40 or "slightly
20 below."  (Id. ¶ 51.)  Defendants continued to represent that IGT's
21 products were "probably . . . slightly less impacted by the overall
22 economic impact on play levels." (Id. ¶ 52.)  Defendants continued
23 to maintain their EPS guidance at $0.35 to $0.40 for upcoming
24 quarters, and forecasted that operating expenses would be between 26
25 and 28 percent of total revenues.  (Id. ¶ 53.)  Defendant Matthews
26 also stated that IGT was comfortable that it would accomplish
27
28                                 4

delivery of version 4.0 of the SB technology to CityCenter. (Id. ¶ 55.)

On July 17, 2008, IGT announced an EPS of $0.35 for its third fiscal quarter of 2008, in line with prior guidance. (Id. ¶ 58.) Defendant Matthews represented that play level declines were unprecedented and could affect IGT. (Id. ¶ 60.) Matthews adjusted IGT's EPS forecast to a range of $0.30 to $0.35. (Id. ¶ 61.) IGT's common stock declined by nearly 8 percent on July 17, 2008 to $22.77 per share, and then declined more than 2 percent on July 18 and 21, 2008. (Id. ¶ 64.) In September 2008, following rumors of layoffs, IGT's stock price declined nearly six percent to $17.70 per share. (Id. ¶ 71.)

On October 30, 2008, IGT reported an EPS of $0.18 per share, lower than its previous forecast of $0.30 to $0.35 per share. (Id. ¶ 72.) IGT's stock price fell nearly five percent, to $12.01 per share. (Id.)

On July 30, 2009, Plaintiffs filed suit in federal court. On June 17, 2010, Defendants filed a motion to dismiss (#50) the consolidated complaint. On August 9, 2010, Plaintiffs opposed (#58). On September 9, 2010, Defendants replied (#59).

## II. Motion to Dismiss Standard

Plaintiffs' claims are brought under Sections 10(b) and 20(a) of the Exchange Act, as well as under Rule 10b-5 of the Rules and Regulations of the Exchange Act, 17 C.F.R. § 240.10b-5. To state a valid claim under Section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission of fact, (2)

1  scienter, (3) a connection with the purchase or sale of a security,
2  (4) transaction and loss causation, and (5) economic loss.'" <u>Zucco</u>
3  <u>Partners, LLC v. Digimarc Corp.</u>, 552 F.3d 981, 990 (9th Cir. 2009)
4  (quoting <u>In re Dao Systems, Inc.</u>, 411 F.3d 1006, 1014 (9th Cir.
5  2005)). These claims are subject to the heightened pleading
6  standards of Federal Rule of Civil Procedure 9(b) and the Private
7  Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-
8  4(b). Federal Rule of Civil Procedure 9(b) provides that "[i]n
9  alleging fraud or mistake, a party must state with particularity the
10 circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).
11 The PSLRA also provides that "a complaint shall specify each
12 statement alleged to have been misleading, the reason or reasons why
13 the statement is misleading" and should also state "with
14 particularity all facts" on which any allegation rests, including
15 any allegations regarding scienter. 15 U.S.C. § 78u-4(b). The
16 court must dismiss complaints that do not meet these requirements.
17 15 U.S.C. § 78u-4(b)(3).
18     The United States Supreme Court recently clarified the standard
19 by which a court must consider a Rule 12(b)(6) motion to dismiss a
20 Section 10(b) action. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>,
21 551 U.S. 308, 322 (2007). First, a court must accept all factual
22 allegations in the complaint as true. <u>Id.</u> Second, a court must
23 also consider the complaint in its entirety, as well as other
24 sources such as "documents incorporated into the complaint by
25 reference, and matters of which a court may take judicial notice."
26 <u>Id.</u> Third, in determining whether a plaintiff has sufficiently pled
27
28                                    6

scienter, a court "must take into account plausible opposing inferences." Id.

### III. Discussion

Defendants seek to dismiss Plaintiffs' claims pursuant to the PSLRA and Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to demonstrate material misrepresentation and scienter. Plaintiffs argue that they properly pled causes of action sufficient to withstand dismissal under the PSLRA. Specifically, Plaintiffs allege that (1) Defendants knowingly misrepresented the conditions IGT faced, such as the economic impact on play levels; (2) Defendants knowingly announced unrealistic EPS forecasts that were not met in the second and fourth quarters of 2008; (3) Defendants knowingly misrepresented that their operating expenses would be between twenty-six and twenty-nine percent of total revenues; and (4) Defendants knowingly misrepresented that the SB technology was on track and would generate revenue through deals struck with Harrah's and CityCenter. Plaintiffs rely on confidential witness statements, statements by the Defendants, and stock sales by insiders and Defendant Matthews to support their claim of scienter.

A. Economic Impact on IGT

Defendants claim that the complaint fails to demonstrate fraud regarding Defendants' statements about play levels and the overall impact of the economy on IGT. The complaint alleges that Defendants misrepresented that IGT was impervious to the economic downturn and uniquely positioned for continued growth. The complaint also alleges that Defendants repeatedly claimed that any decline in play

7

1 levels was due to normal seasonality, rather than the economic
2 downturn.
3     As evidence that Defendants knowingly misrepresented the
4 economic impact on IGT, Plaintiffs cite statements by Defendants
5 made on October 30, 2008.  During a conference call, Defendant
6 Cavanaugh disclosed that IGT's financial results in the fourth
7 quarter were caused by "lower play levels resulting from the current
8 economic condition."  During the same call, Defendant Matthews
9 stated that "we have seen play levels decline really since last
10 November [2007] that accelerated a bit in April [2008] and appears
11 to have accelerated even a bit further in October [2008]."  (Consol.
12 Compl. ¶ 73.)  Defendants' statements appear to contradict
13 Defendants' numerous reassurances, made during the Class Period
14 through April 2008, that lower play levels were due to seasonality
15 as opposed to the overall economic downturn.  In light of these
16 statements, we find that Plaintiffs have provided evidence of
17 scienter.
18     Defendants argue that the game play level statements are
19 protected by the PSLRA's safe harbor.  We disagree.  Defendants'
20 statements that all they were seeing is normal seasonality were not
21 forward-looking, and therefore fall outside of the protection of the
22 safe harbor.  Nor are the statements protected because information
23 about game play levels may have been available in the public domain.
24 While companies are under no obligation to disclose information
25 readily available to investors, Defendants' insistence that any
26 decline they were seeing is due to normal seasonality was not merely
27
28                                     8

a matter of omission, but of misrepresentation and direct contradiction to any readily available information.

Plaintiffs also claim that Defendants' statement that the latter half of the fiscal year was the best six months of the year for game play levels was misleading. Here, we disagree with Plaintiffs. Plaintiffs have not shown that this statement is false as a description of historical data or past performance.[1]

B. EPS Forecast

Plaintiffs claim that Defendants' EPS forecasts for the second and fourth fiscal quarters of 2008 were knowingly false because Defendants knew that the forecasts were not achievable when they announced them. Defendants' EPS forecasts, however, are protected by the safe harbor, and cannot form the basis for a securities fraud suit.

Under the PSLRA, "forward-looking statements" are protected by a safe harbor when certain conditions are met. The PSLRA provides that a person shall not be liable with respect to any forward-looking statement, written or oral, if the statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the

---

[1] Even if we were to find that the statement is considered a forward-looking prediction rather than a statement of past performance, it is protected by the PSLRA's safe harbor for forward-looking statements, as long as it is accompanied by meaningful cautionary language. Defendants warned that historical results are not necessarily indicative of future prospects, and also that reported results should not be considered an indication of future performance. These warnings are sufficient to protect Defendants' statements about the best six months of the year.

9

forward-looking statement." 15 U.S.C. § 78u-5(c).  The PSLRA also protects forward-looking statements if a plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading, or if made by or with the approval of an executive officer of a business entity.  Id.  The PSLRA defines forward-looking statements to mean, *inter alia*, statements of future economic performance, such as the EPS forecasts challenged here.  15 U.S.C. § 78u-5(i).

Defendants' EPS forecasts were accompanied by meaningful cautionary language.  The forecasts were identified as forward-looking through statements such as "our forward-looking statements, including any comments regarding our earnings expectations." (Mot. to Dismiss, Exhibit 4, at 1 (#52-4).)  Defendants accompanied the EPS forecasts with language warning that IGT's business is vulnerable to changing economic conditions such as recessions.  Defendats also warned that economic slowdowns may result in reduced play levels, which could result in lower revenues.  There were additional warnings that the rate of growth of the gaming market in North America has diminished, which could reduce the demand for IGT's products.  These warnings meaningfully covered the risks that IGT's business was subject to in the economic downturn.

The statute itself protects forward-looking statements as long as the requirement of cautionary language is met.  15 U.S.C. §78u-b(5).  The second prong of the safe harbor, the requirement of actual knowledge of falsity is independent.  See id. (safe harbor protects forward looking statements accompanied by meaningful cautionary language, or when plaintiff fails to prove actual

knowledge of falsity). Because we rule that the forward-looking statements were accompanied by meaningful cautionary language, we do not examine the argument that the statements are protected under the second prong of actual knowledge.[2]

### C. Operating Expenses

In the complaint, Plaintiffs challenged "IGT's forecasts of total operating expenses." (Consol. Compl. ¶ 54.) Such forecasts are forward-looking statements, falling under the category of "a statement containing a projection of . . . financial items." 15 U.S.C. § 78u-5(i). Plaintiffs also challenged Defendants' representations that IGT will be prudent in its capital deployment.

Defendants claim that statements regarding operating expenses as a percentage of total revenues are protected by the safe harbor because the warnings concerning factors that could affect revenue were clearly applicable to statements that operating expenses were expected to be a certain percentage of total revenues. On July 17, 2008, Defendants also warned that "[o]ur target range for operating expense has been 25% to 28% of revenues, depending on quarterly fluctuation in demand with the goal to maintain if not exceed 30% operating income margins." (Mot. to Dismiss, Exhibit 17, at 4 (#52-

---

[2] Some courts disagree. See, e.g., In re SeeBeyond Tech. Corp. Sec. Litig., 266 F.Supp. 2d 1150, 1164 (C.D. Cal. 2003) (holding that knowledge of actual falsity will negate any safe harbor protection). The majority of courts, however, hold that the two prongs of the safe harbor are independent. See, e.g., Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999) (noting that "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."). The majority reading of the statute is consistent with the legislative history. See H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 743 ("[t]he first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement.")

11

17).)  Defendants acknowledged that "operating expense are not at optimal levels. . . . if we aren't going to have the revenue growth breakout that we were hoping for this year . . . we need to manage expenses in a much more prudent and careful way."  (Id. at 5.)

However, as Defendants concede, there were no tailored warnings to Defendants' earlier statements regarding operating expenses.  For instance, in January, Defendants announced that "[f]or the remainder of fiscal 2008, we anticipate our total operating expenses to remain between 26 and 29% of total revenues."  (Mot. to Dismiss, Exhibit 10, at 3 (#52-10).)  Before that announcement, Defendants did warn that for the second quarter of 2008, IGT "anticipate[d] replacement demand will remain at historically low levels."  (Id.)  However, this warning does not accompany IGT's statements about operating expenses.

Because Defendants' statements regarding operating expense forecasts were not accompanied by meaningful cautionary language, they are not protected by the first prong of the safe harbor.  The second prong protects forward-looking statements if the plaintiff fails to prove that the statement is made with actual knowledge that the statement was false or misleading.  Plaintiffs rely on a confidential witness statement to prove that the statements were made with actual knowledge of falsity.  A complaint relying on statements from a confidential witness must pass two hurdles to satisfy the heightened pleading requirements of PSLRA.  Digimarc, 552 F.3d at 995.  First, the confidential witness "must be described with sufficient particularity to establish [his] reliability and personal knowledge," and the statements by a confidential witness

12

1  "must [itself] be indicative of scienter."  Id.  The first prong is
2  only required if there is no additional evidence providing an
3  adequate basis for believing that the defendants' statements were
4  false. Id.  In this case, Plaintiffs have provided no additional
5  evidence that Defendants knew the statements were false when made.
6  Therefore, Plaintiffs must satisfy both requirements relating to
7  confidential witness statements.

8      CW#6, allegedly a former Engineering Manager for IGT Labs until
9  December 2008, stated that IGT spent like it had a "bottomless
10 purse" and repeatedly wasted money on items that became useless.
11 (Consol. Compl. ¶ 34.)  CW#6's statement, however, is insufficient
12 to prove actual knowledge of falsity.  While the complaint describes
13 CW#6's job title and employment information briefly, it fails to
14 allege with particularity facts supporting the necessary assumption
15 that Defendants knew that their statements about projected operating
16 expenses were false when made.  Digimarc, 552 F.3d at 996.  We
17 conclude that the complaint fails to allege facts in sufficient
18 detail to create a strong inference that Defendants' forward-looking
19 statements concerning operating expenses were knowingly false when
20 made.

21      D. SB Technology

22      Finally, Defendants claim that Plaintiffs have failed to plead
23 a claim of securities fraud based on Defendants' statements
24 regarding the SB technology.  Plaintiffs pled that Defendants
25 repeatedly made statements that SB technology was on track when it
26 was not, and announced deals with Harrah's and CityCenter without
27 disclosing that the deals were not expected to create revenue for at

1 least two years.  Plaintiffs also challenge Defendants' statement
2 that IGT expected to deliver version 4.0 of the SB technology to
3 CityCenter upon its opening.
4      Plaintiffs concede that Defendants announced that IGT did not
5 expect to begin commercializing SB technology until 2009.
6 Defendants' statements that SB technology was on track are forward-
7 looking statements, and furthermore, cannot serve as the basis of a
8 securities fraud claim because Plaintiffs do not allege that the SB
9 technology was not installed on time.  Defendants' statement that
10 IGT expected to deliver version 4.0 at CityCenter's opening is also
11 a forward-looking statement, and Plaintiffs properly pled that the
12 forward-looking statement was untrue, because version 4.0 was not
13 installed when CityCenter opened.  The statement, however, is
14 protected by the first prong of the safe harbor, because it was
15 accompanied by meaningful cautionary language.  For instance, when
16 Defendant Matthews made the statement, he accompanied it by warning
17 that IGT was "developing a very broad system from scratch, and so
18 just maintaining proper product definition and meeting those
19 internal timelines is really the challenge."  He made additional
20 warnings, and concluded that "if everything goes well, we have
21 perhaps version 4.0 in advance of that opening, or maybe shortly
22 thereafter."  This cautionary language is sufficient to put
23 investors on notice that the statement that 4.0 may be ready in time
24 was subject to various risks of delay, and therefore, this statement
25 does not pass muster as grounds for a securities fraud claim under
26 the PSLRA.

1    Plaintiffs also claim that Defendants' announcements about
2 deals struck with Harrah's and CityCenter were misleading because
3 Defendants did not disclose that IGT was required to provide the SB
4 technology for free for as long as two years.  Defendants'
5 announcements about the deals did not reference any expected
6 revenues.  The announcement regarding the deal with Harrah's stated
7 that the deal was "subject to Harrah's corporate approvals,
8 execution of definitive agreements and receipt of required
9 regulatory approvals."  (Mot. to Dismiss, Exhibit 12, at 1 (#52-
10 12).)  The press release regarding the CityCenter agreement
11 disclosed that IGT signed "a formal memorandum of understanding
12 pertaining to installing a server-based network and related IGT
13 sb(TM) and gaming management system products" at CityCenter's casino
14 "scheduled to open in late 2009."  (Mot. to Dismiss, Exhibit 15, at
15 1 (#52-15).)  Plaintiffs claim that these announcements, combined
16 with Defendants' representations that SB technology would result in
17 higher or expanded margins, created the false expectation that SB
18 technology "would begin contributing to IGT's financial results in
19 the not-too-distant future."  (Pls' Opp. at 9 (#58).)
20     Plaintiffs argue that Defendants had no basis to represent that
21 the SB technology would create higher margins, because Defendants
22 had not developed a pricing model for the SB technology during the
23 Class Period, nor determined what customers would be willing to pay
24 for it.  Plaintiffs' allegations concerning higher margins are
25 insufficient to plead either falsity or scienter as required under
26 the PSLRA.  Plaintiffs have not pled that the SB technology has
27 proven to be unprofitable; indeed, it would be premature if they
28

were to so plead on the basis of the facts presented in the complaint.  Nor do we find that Defendants' statements regarding their expectations of the new technology were made with the requisite state of mind.  Furthermore, such statements are protected as forward-looking statements under the PSLRA, and therefore cannot provide the basis for a securities fraud action.[3]

    Defendants' allegedly deficient announcements regarding agreements made with Harrah's and CityCenter, however, are not protected by the PSLRA.  In separate announcements regarding the SB technology, Defendants stated that IGT was "on target to begin commercializing this product in 2009" and that "pricing will remain a private conversation . . . We feel fairly comfortable that the pricing is going to sort itself out . . . ."  (Mot. to Dismiss, Exhibit 4, at 12 (#52-4).)  While a generous view of Defendants' statements regarding SB technology and its expected profits might excuse Defendants' failure to disclose that the deals with Harrah's and CityCenter were not made for profit, we find it equally compelling that Defendants may have intentionally misled the public and its investors when it failed to disclose that the agreements, when made, were not expected to generate any revenue for a number of years.

---

[3] IGT's warnings that the pricing model was not set on SB technology suffice to serve as meaningful cautionary language for IGT's statements that SB technology was expected to provide a higher margin of profits.

E. Insider Stock Sales

Plaintiffs allege that suspicious stock sales by Defendant Matthews and other Company insiders during the Class Period provide additional indicia of scienter to commit fraud.

The Ninth Circuit considers three factors to evaluate the suspiciousness of stock sales. Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004). These factors are: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Id. Additionally, stock sales are "only suspicious when 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Id. (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999) (superceded by statute on other grounds)).

Plaintiffs challenge several insiders' stock sales, but the only Defendant alleged to have made such sales is Defendant Matthews. Five of the six alleged sellers are not defendants in this action and are not alleged to have made any misstatements. Their sales, therefore, are not probative of scienter. See, e.g., In re First Union Corp. Sec. Litig, 128 F.Supp.2d 871, 898 (W.D.N.C. 2001); Plevy v. Haggerty, 38 F.Supp.2d 816, 832 n.12 (C.D. Cal. 1998).

Plaintiffs' calculation of the amount of Defendant Matthews' sales is also in error. Plaintiffs allege that the amount of the sales was comprised twenty-seven percent of Defendant Matthews' IGT stock. The Ninth Circuit, however, does not distinguish between vested stock options and shares, and held that actual stock shares

and exercisable stock options must be combined when evaluating the amount of allegedly suspicious stock sales. In re Silicon Graphics, 183 F.3d at 986 (superceded by statute on other grounds). Defendants aver that the correct amount of Defendant Matthews' sales is, therefore, thirteen percent rather than twenty-seven percent. The Ninth Circuit has held that where the CEO of a company sold only thirteen percent of his stock and vested options over a fifteen-month long period, "the amount is not suspicious, and does not support a strong inference of fraud." In re Vantive Corp. Sec. Litig, 283 F.3d 1079, 1094 (9th Cir. 2002) (abrogated on other grounds).

Nor do we find that the timing of Defendant Matthews' sales is suspicious. Defendant Matthews' sales occurred in November 2007, two months prior to IGT's announcement that it had achieved its financial forecast for the first quarter of fiscal 2008. Furthermore, IGT's stock price closed lower on November 19, 2007 than on any other day between September 13, 2007 and January 11, 2008. (Mot. to Dismiss, Exhibit 1, at 8 (#52-1).) The Ninth Circuit found that when share price rose two months after allegedly suspicious sales, and the below-expectation earnings report is not released until three months after the sales, the timing of the stock sales is not suspicious. Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001).

Finally, Defendant Matthews' stock sales of November 2007 are not inconsistent with his prior trading history. Plaintiffs merely allege that Defendant Matthews sold no stock in the twelve-month period preceding November 2007. This allegation is insufficient in

1  light of Defendant Matthews' sales of 580,000 shares of IGT stock in
2  February 2006. The allegedly suspicious sales in November 2007, in
3  comparison, were comprised of 379,658 shares. It does not appear
4  that these sales were "dramatically out of line with prior trading
5  practices." Digimarc, 552 F.3d at 1002.
6      We conclude, therefore, that the insider stock sales cannot
7  serve as indicia of scienter.

### IV. Conclusion

Viewed as a whole, we find that Plaintiffs have alleged inferences that Defendants intentionally misled investors to the investors' detriment at least as compelling as any plausible opposing inference. While Plaintiffs' allegations based on Defendants' EPS forecasts, SB technology schedule forecast, operating expense forecast and stock sales are insufficient to allege fraud under the PSLRA, Plaintiffs' allegations based on Defendants' statements concerning play levels and omissions relating to the CityCenter and Harrah's agreements create an inference of scienter at least sufficient to survive a motion to dismiss.

**IT IS, THEREFORE, HEREBY ORDERED** that Defendants' motion to dismiss (#50) is **DENIED**.

DATED: March _15th__, 2011.

_____
UNITED STATES DISTRICT JUDGE

19